# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### (WESTERN DIVISION)

| | | |
|---|---|---|
| RYANN RIGSBY, | ) | |
| | ) | |
| Individually and on behalf of those | ) | |
| similarly situated. | ) | Case No. 4:23-CV-00061-BCW |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| PLAZA CLUB CITY APARTMENTS, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT PLAZA CLUB CITY APARTMENTS, LLC'S
## SUGGESTIONS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Ronald D. Balfour (admitted *pro hac vice*)
*RBalfour@amundsendavislaw.com*
Michael M. Chang (admitted *pro hac vice*)
*MChang@amundsendavislaw.com*
150 North Michigan Avenue, Suite 3300
Chicago, Illinois 60601
**AMUNDSEN DAVIS, LLC**

Joseph J. Roper
*jroper@wwbhlaw.com*
Abbigale A. Gentle
*agentle@wwbhlaw.com*
4435 Main St., Suite 920
Kansas City, Missouri 64111
**WATTERS WOLF BUB HANSMANN LLC**

*Attorneys for Defendant*
*Plaza Club City Apartments, LLC*

# TABLE OF CONTENTS

UNCONTROVERTED MATERIAL FACTS ........................................................................... 1

INTRODUCTION ............................................................................................................. 10

LEGAL STANDARD ....................................................................................................... 11

ARGUMENT .................................................................................................................... 12

   I.   Plaintiff Has No Standing to Claim Injunctive Relief (Count One)
      and Will Not Suffer Any Irreparable Harm Without An Injunction ............................. 12

      a.   Plaintiff no longer lives in Plaza Club and
          lacks standing to seek injunctive relief ........................................................... 12

      b.   Plaintiff will not suffer any irreparable harm in the absence
          of an injunction, both because she no longer lives at
          Plaza Club and because both habitability issues with her
          apartment were fixed while she was there ....................................................... 13

   II.   Count Three (Breach of the Implied Warranty of Habitability) Fails Because Plaintiff's
       Lease Conspicuously Disclaimed the Implied Warranty of Habitability and Because
       Missouri Law Does Not Require Central Air Conditioning ........................................ 14

      a.   Plaintiff knowingly signed her lease with the understanding
          that PCCA expressly disclaimed any warranty of habitability .................... 14

      b.   Central air conditioning is an amenity that is not covered
          by the implied warranty of habitability under Missouri law ....................... 15

      c.   PCCA restored the premised and provided relief ........................................ 17

   III.   Count Two (Violations of the Missouri Merchandising Practices Act – Implied Warranty
        of Habitability) Fails Because Plaintiff Never Saw Any Deceptive Statements and Has No
        Underlying Claim for Breach of the Warranty of Habitability .................................. 19

   IV.   Plaintiff's Belief That Her Utility Charges Were "High" Cannot Support
        Her MMPA Claim Without Any Evidence That They Were Improper ..................... 21

      a.   It is undisputed that Paylease and Evergy,
          not PCCA, issued utility bills to Plaintiff ..................................................... 21

      b.   Plaintiff has no MMPA claim because the uncontroverted
          evidence shows she was properly charged in
          accordance with the terms of her lease ......................................................... 22

      c.   Plaintiff also has no MMPA claim because
          she has no damages caused by utility billing practices ................................ 23

V.     Plaintiff's Mo. Stat. § 441.233(2) Fails As She Cannot Identify Any Willful Conduct And The Statute Does Not Apply to Air Conditioning............................................24

VI.    Breach of Contract Is Unsupported by the Evidence Where PCCA Held Up Its End of the Bargain and Engaged in Repairs Immediately.......................................28

CONCLUSION..........................................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Beecham v. United States,*
511 U.S. 368(1994) ................................................................................................27

*Billings Mut. Ins. Co. v. Cameron Mut. Ins. Co.,*
229 S.W.3d 138(Mo. Ct. App. 2007)......................................................................29

*Boyd v. State Bd. of Registration for Healing Arts,*
916 S.W.2d 311(Mo. Ct. App. 1995).......................................................................27

*Celotex Corp. v. Catrett,*
477 U.S. 317(1986) ................................................................................................11

*Chiodini v. Fox,*
207 S.W.3d 174(Mo. Ct. App. 2006)..................................................................15, 17

*Cortinas v. Behr Process Corp.,*
No. 4:16-CV-1718 (CEJ), 2017 WL 2418012 (E.D. Mo. June 5, 2017) ...................19, 23

*Crawford v. Whittaker Const., Inc.,*
772 S.W.2d 819(Mo. Ct. App. 1989).......................................................................14

*Crowder v. Vandendeale,*
564 S.W.2d 879 (Mo. banc 1978)...........................................................................14

*Detling v. Edelbrock,*
671 S.W.2d 265 (Mo. banc 1984).......................................................................15, 17

*F.D.I.C. v. Mercer Bancorp, Inc.,*
No. 89-0849-CV-JWO-3, 1990 WL 515173 (W.D. Mo. Dec. 5, 1990) ..........................11

*Gannon Int'l, Ltd. v. Blocker,*
684 F.3d 785 (8th Cir. 2012) ..................................................................................11

*Greer v. Zurich Ins. Co.,*
441 S.W.2d 15 (Mo. 1969).......................................................................................29

*Hewitt Well Drilling & Pump Serv., Inc. v. Dir. of Revenue,*
847 S.W.2d 795 (Mo. 1993).....................................................................................25

*Hines v. Mercedes-Benz USA, LLC,*
358 F. Supp. 2d 1222 (N.D. Ga. 2005)......................................................................30

*Hodge By & through Farrow v. Walgreen Co.*,
37 F.4th 461(8th Cir. 2022) ...................................................................................11

*In re Ferro*,
228 B.R. 700 (Bankr. W.D. Mo. 1999) .................................................................25

*Jackson v. Hazelrigg Auto. Serv. Ctr., Inc.*,
417 S.W.3d 886 (Mo. Ct. App. 2014) ...................................................................20

*Jennings v. Bd. of Curators of Mo. State Univ.*,
386 S.W.3d 796 (Mo. Ct. App. 2012) ...................................................................29

*Kiechle v Drago* ,
694 S.W.2d 292 (Mo. Ct. App. 1985) ..............................................................20, 23

*Koscielski v. City of Minneapolis*,
435 F.3d 898 (8th Cir. 2006) .................................................................................11

*Kuhlmeier v. Hazelwood Sch. Dist.*,
596 F. Supp. 1422 (E.D. Mo. 1984).......................................................................13

*Lingo v. Hartford Fire Ins. Co.*,
No. 4:10CV84MLM, 2011 WL 1642223 (E.D. Mo. May 2, 2011) ...........................23, 24

*Mackey v. Belden, Inc.*,
No. 4:21-CV-00149-JAR, 2021 WL 3363174 (E.D. Mo. Aug. 3, 2021) ...................13, 14

*Mathews v. B & K Foods, Inc.*,
332 S.W.3d 273 (Mo. Ct. App. 2011) ...................................................................26

*Nixon v. Enter. Car Sales Co.*,
No. 4:09CV1896 HEA, 2011 WL 4857941 (E.D. Mo. Oct. 13, 2011)....................23, 24

*Northland Parent Ass'n v. Excelsior Springs Sch. Dist. # 40*,
571 F. Supp. 3d 1104 (W.D. Mo. 2021)..................................................................12

*Owen v. Gen. Motors Corp.*,
533 F.3d 913 (8th Cir. 2008) ................................................................. 19, 20, 21

*Pearl v. DST Sys., Inc.*,
No. 06-0918-CV-W-SWH, 2008 WL 8602367 (W.D. Mo. Apr. 25, 2008) ...........28, 29

*Ray v. Am. Airlines, Inc.*,
609 F.3d 917 (8th Cir. 2010) ..............................................................................11, 12

*Schuchmann v. Air Services Heating & Air Conditioning, Inc.*,
199 S.W.3d 228 (Mo. Ct. App. 2006). ...................................................................20

Case 4:23-cv-00061-BCW   Document 40   Filed 06/30/23   Page 5 of 40

*Seymour v. Switzer Tenant LLC,*
No. WD 85134, 2023 WL 3064714 (Mo. Ct. App. Apr. 25, 2023) ................................18

*Standard Fire Ins. Co. v. Knowles,*
568 U.S. 588(2013) ...............................................................................................12

*Summers v. Earth Island Inst.,*
129 S. Ct. 1142 (2009) .....................................................................................12, 13

*Torres v. Simpatico, Inc.,*
995 F. Supp. 2d 1057 (E.D. Mo. 2014) ...................................................................12

*TransUnion LLC v. Ramirez,*
141 S. Ct. 2190 (2021) ..........................................................................................12

*Walker v. Kemper,*
No. 4:01-CV-1223 CAS, 2005 WL 2333895 (E.D. Mo. Sept. 22, 2005).........................13

*Walsh v. Al W. Chrysler, Inc.,*
211 S.W.3d 673 (Mo. Ct. App. 2007) .......................................................................24

*Warren v. Paragon Technologies Group, Inc.,*
950 S.W.2d 844 (Mo. banc 1997) .....................................................................14, 15

*Warth v. Seldin,*
422 U.S. 490 (1975) ...............................................................................................12

## Statutes

Mo. Stat. § 407.020 ...........................................................................................19, 23

Mo. Stat. § 407.025 ...........................................................................................19, 24

Mo. Stat. § 441.233 ...............................................................................24, 25, 27, 28

Mo. Stat. § 509.050 ...............................................................................................24

## Rules

Fed. R. Civ. P. 56...............................................................................................10, 30

L.R. 56.1 .............................................................................................................10

Case 4:23-cv-00061-BCW   Document 40   Filed 06/30/23   Page 6 of 40

Other Authorities

BLACK'S LAW DICTIONARY 1599 (6th ed.1990) .......................................................................25

K.C. Ordinance Code, §§ 56-181, *et seq.* ....................................................................16, 27

*Turning off the utilities,*
18A Mo. Prac., Real Estate Law – Transact. & Disputes § 52:15 (3d ed.) ...............................24, 25

S. Helper, *Why the Pandemic Has Disrupted Supply* Chains,
THE WHITE HOUSE (June 17, 2021) ...................................................................................29, 30

## EXHIBIT LIST

| Exhibits | Description |
| --- | --- |
| A | Petition |
| B | Rigsby Deposition Transcript with Exhibits |
| C | PCCA 023447 |
| D | PCCA 040878 |
| E | PCCA 048138, PCCA 040877, PCCA 023788; PCCA 034917, PCCA 034895, PCCA 040738, PCCA 041186 |
| F | PCCA 023680 |
| G | PCCA 034921 |
| H | PCCA 035315 |
| I | PCCA 022193 |
| J | PCCA 021458, PCCA 021478, PCCA 021493 |
| K | PCCA 021478 |
| L | PCCA 042690 |
| M | PCCA 050881 |
| N | PCCA 050888 |
| O | PCCA 035310 |
| P | PCCA 021465 |
| Q | Def.'s Answers to Pl.'s First Set of Interrogs. |
| R | PCCA 021493 |
| S | PCCA 023531 |
| T | PCCA 022051 |
| U | PCCA 045151 |
| V | PCCA 037321 |
| W | PCCA 046929, PCCA 037322 |
| X | PCCA 037251, PCCA 035163, PCCA 022046 |
| Y | PCCA 000004 |
| Z | PCCA 034184 |
| AA | Def.'s Supp. Answer to Pl.'s First Set of Interrogs. |
| BB | PCCA 033893; PCCA 034184 |
| CC | Pl.'s Answer to Def.'s First Set of Interrogs., Pl.'s Supp. Answer to Def.'s First Set of Interrogs. |
| DD | PCCA 022210 |
| EE | Apartments.com and Zillow Listings |
| FF | Health Homes Rental Inspection Program Rules & Regulations |
| GG | PCCA Utility Bills |
| HH | Zego "Pre-Bill" |
| II | Rigsby Utility Bills |

# UNCONTROVERTED MATERIAL FACTS

COMES NOW Defendant Plaza Club City Apartments, LLC, by and through its undersigned counsel, and in support of its Motion for Summary Judgment states the following uncontroverted material facts pursuant to FED. R. CIV. P. 56(c)(1) and L.R. 56.1(a).

1.      Defendant Plaza Club City Apartments, LLC ("PCCA") owns apartment buildings located at 604 W. 46ᵗʰ Street and 4621 Jefferson Street, in Kansas City, Missouri. (Petition, ¶ 13, attached as **Exhibit A**.).

2.      These buildings, together with the apartment building located at 4619 Jefferson Street in Kansas City, Missouri, form an apartment complex called "Plaza Club City Apartments" ("Plaza Club") (*Id.*).

3.      Plaintiff Ryann Rigsby ("Rigsby") is a law student at University of Missouri – Kansas City. (Deposition of Ryann Rigsby ("Rigsby Dep.") at 8:17-21, attached as **Exhibit B**.).

4.      Rigsby found Plaza Club by searching the internet for places to live in Kansas City, and chose to live at Plaza Club due to its proximity to her law school campus. (Rigsby Dep. at 19:8-13; 20:21-21:7.).

5.      Rigsby toured Plaza Club in May of 2020. (Rigsby Dep. at 12:23-20:8.).

6.      Rigsby signed a lease to share an apartment at Plaza Club with MacKenzie Leonard on July 28, 2020, for a lease term beginning August 8, 2020, and moved in on August 8, 2020. (Rigsby Dep. at 21:21-22:17, *ref.* Exh. 1; *see also id.* at Exh. 1, RIGSBY 000001-0000043 ("Rigsby Lease 1").).

7.      Rigsby did not review any Plaza Club marketing material before entering into her lease agreement with PCCA, is not aware of any false promises ever being made to her by PCCA, and entered into her lease agreement with PCCA solely because of Plaza Club's proximity to the

1

University of Missouri – Kansas City Law School campus. (Rigsby Dep. at 19:3-13; 19:23-20:17; 20:21-21:7.).

8.     Rigsby lived in her first apartment at Plaza Club without problems for about a month until she had problems with her roommate, MacKenzie, and asked to be moved into a unit by herself. (Rigsby Dep. at 23:2-22; 24:5-15.).

9.     Rigsby signed a second lease for an apartment at Plaza Club on September 10, 2020, for a lease term of September 11, 2020 through September 15, 2021. (Rigsby Dep. at 28:7-12, *ref.* Exh. 3; *see also id.* at Exh. 3 at RIGSBY 000044-000088 ("Rigsby Lease 2").).

10.     Both of Rigsby's leases contained the following language in bold, capital letters:

> **TO THE EXTENT PERMITTED BY LAW, WE DISCLAIM ANY AND ALL IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO...THE IMPLIED WARRANTY THAT THE PREMISES IS SUITABLE FOR RESIDENT'S HABITABILITY OR (IF APPLICABLE) ANY IMPLIED WARRANTY OF MERCHANTABILITY.**

(Rigsby Dep. at 32:9-33:4; 34:7-12, *ref.* Exhs. 1 and 3; *see* Rigsby Lease 1 at RIGSBY_000010, Rigsby Lease 2 at RIGSBY_000054.).

11.     Rigsby specifically read this language before signing each lease, knew what it meant, and specifically agreed to it. (Rigsby Dep. at 33:14-34:5; 34:13-23.).

12.     Both of Rigsby's leases also provided that notices or requests needed to be submitted through "either the online tenant/maintenance portal, or signed in writing and delivered to [PCCA's] designated representative." (Rigsby Dep. at 36:1-21; *see* Rigsby Lease 1 at RIGSBY_000009, Rigsby Lease 2 at RIGSBY_000053.).

Air Conditioning

13.     Plaza Club has a total of six "chillers" that provide air conditioning to the property – two for each building. (PCCA 023447, attached as **Exhibit C**.).

14.     The chillers are shut down in or about every October for the fall and winter season, and turned back on in or about April. (PCCA 040878, attached as **Exhibit D.**).

15.     In 2020, there were no widespread air-conditioning problems at Plaza Club, and third-party contractor Lippert Mechanical worked at PCCA's direction to promptly fix any spot issues that certain residents experienced throughout the summer. (PCCA 048138, PCCA 040877, PCCA 023788; PCCA 034917, PCCA 034895, PCCA 040738, PCCA 041186, attached as **Exhibit E.**).

16.     About a week before chillers were scheduled to be turned back on, on April 22, 2021, third-party contractor P1 performed maintenance work on all six chillers (condenser coil cleaning), and was working on providing a list of proposed repairs for the property. (PCCA 023680, attached as **Exhibit F.**).

17.     In or about late April 2021, as per schedule, PCCA began in the process of turning the chillers on. (PCCA 034921, attached as **Exhibit G.**).

18.     In or about late-April 2021, residents reported being without air conditioning and PCCA had conversations with P1 regarding air-conditioning, and had on-site meetings on April 29, 2021. (PCCA 035315, attached as **Exhibit H.**).

19.     On April 30, 2021, PCCA assessed that two of the oldest chillers had "failed tube bundles and [were] leaking water profusely when attempting to fill." (PCCA 022193, attached as **Exhibit I.**).

20.     On May 3, 2021, P1 indicated that these two chillers would need to be replaced instead of repaired and reported that the replacements were being priced, while the others needed repair work. (PCCA 021458, PCCA 021478, PCCA 021493, attached as **Exhibit J.**).

21.     On May 4, 2021, PCCA orders that "[h]ave PO's issues asap for the repairs required below. Once I get the chiller replacement cost, I will forward." (PCCA 021478, attached as **Exhibit K**.).

22.     On May 4, 2021, P1 reports that "We will get the needed parts ordered and get started on this." (*Id*.).

23.     At that time, PCCA promptly alerted residents that "Purchase orders for all needed repairs have been made today. I am awaiting the official start time for the repairs, I expect repairs to start sometime this week before the weather spikes again. I will send and update with the specific days and times once I receive that today and/or tomorrow from our third party vendor." (PCCA 042690, attached as **Exhibit L**.).

24.     On May 12, 2021, P1 worked with Carrier to secure chillers which were in stock. PCCA 050881, attached as **Exhibit M**.).

25.     On May 14, 2021, P1 submitted to PCCA revised pricing for these in-stock Carrier units. (PCCA 050888, attached as **Exhibit N**.).

26.     On May 18, 2021, some units affected had air conditioning operational again and PCCA reported that the South and Manor buildings would be getting new chillers. (PCCA 035310, attached as **Exhibit O**.).

27.     The air conditioning in Rigsby's apartment was not working when she tried to turn it on in April or May of 2021 due to a failure of the chiller that served her unit. (Rigsby Dep. at 116:17-21.).

28.     The KCMO Health Department issued a Healthy Homes Rental Inspection Report indicating that the lack of air conditioning in Rigsby's apartment was "non-health hazardous." (Rigsby Dep. at 92:4-6, *ref*. Exh. 11 (Jun. 16, 2021, Health Homes Inspection Report)).

29. PCCA made purchase orders for repairs to the chillers on or about May 4, 2021, and repairs began on or about May 6, 2021. (PCCA 021465, attached as **Exhibit P**; *see also* Def.'s Answers to Pl.'s First Set of Interrogs. ("PCCA Interrogs."), ¶ 9, attached as **Exhibit Q**.).

30. Once it was determined that the chillers should be replaced instead of repaired, PCCA purchased replacement chillers, paid additional costs to expedite delivery of those chillers despite supply chain/logistical disruption caused by the pandemic, had them installed as soon as possible, and approved overtime for workers to accomplish all of this as quickly as possible. (PCCA 021493, attached as **Exhibit R**; *see also* PCCA Interrogs. at ¶ 9; Exh. N, PCCA 05088.).

31. Plaintiff and other residents whose apartments were affected by the chiller outage were informed by PCCA that they would receive a $150 rent credit, and an additional $200 credit to reimburse them for purchasing an in-unit air-conditioner. (PCCA 023531, attached as **Exhibit S**.).

32. An additional $150 rent credit was provided in July: in total, affected residents received $300 in rent credits, $200 reimbursement for window unit air conditioners, and PCCA worked with affected tenants to relocate them to vacant apartments not affected. (PCCA Interrogs. at ¶ 9; *see also* Rigsby Dep. at 102:6-103:12.).

33. Rigsby received both of the $150 rent credits, as well as the $200 reimbursement for purchasing an air conditioner for her apartment. (Rigsby Dep. at 100:9-20; 101:5-14; 102:6-13, *ref.* Exh. 18; *see also*, Exh. 18 to Rigsby Dep. (Email from Rigsby Regarding Rental Credits).).

34. Rigsby chose not to purchase a second air conditioner like some other tenants did, and also chose not to accept PCCA's offer to relocate her to an apartment with central air conditioning. (Rigsby Dep. at 100:11-20; 103:9-16.).

35. The air conditioner Rigsby purchased was effective at keeping the area where she had it cool. (Rigsby Dep. at 102:24-103:8.).

36. By June 11, 2021, P1 reported that certain parts had arrived and "plan[ned] on getting this repair made tomorrow morning. It is supposed to storm tonight, so that is not an option. Josh will be there at 7am tomorrow morning to get started." (PCCA 022051, attached as **Exhibit T**.).

37. On June 14, 2021, P1 reported that some of the repairs could not be completed because "[t]he seal would not hold because the pump housing is damaged. We are still looking for a replacement pump. Josh was out there most of the day Saturday trying to get it to work but just couldn't get it to stop leaking." (PCCA 045151, attached as **Exhibit U**.).

38. At that time, everyone was hoping the replacement chillers would arrive that week but "[t]his is dependent on the trucking industry and locking in a driver." (*Id.*).

39. On June 16, 2021, PCCA communicated to its residents that it was hoping to "receive chillers by Monday, the 21st. [PCCA has] already secured the crane equipment for Monday through Wednesday to place the chillers on the roof." (PCCA 037321, attached as **Exhibit V**.).

40. On June 21, 2021, replacement chillers began being installed and by June 24, all systems were back up and running. (PCCA 046929, PCCA 037322, attached as **Exhibit W**; PCCA Interrogs. at ¶ 8.).

41. On June 24, 2021, at 7:09pm, Rigsby sent her mother a text message stating that her air conditioning was working. (Rigsby Dep. at 105:15-106:5.).

42. Throughout this entire period, PCCA regularly communicated (sending weekly updates) with residents that they were working expeditiously but there had been shipping delays attributable to COVID, causing difficulty securing transportation for the chillers from New Mexico. (PCCA 037251, PCCA 035163, PCCA 022046, attached as **Exhibit X**.).

43. On July 29, 2021, Plaintiff *first* submitted an air-conditioning maintenance *after* it was restored on or about June 24, 2021, to address subsequent spot issues that came up sporadically. (PCCA 000004, attached as **Exhibit Y**.).

44.     Plaintiff's lease explained that certain utility charges would be billed by the service provider and allocated to the resident by a third-party billing company, Paylease. (Rigsby Lease 2 at RIGSBY_00061- RIGSBY_00062.).

45.     Specifically, water, sewer, and stormwater were billed based upon the number of persons residing in the unit using a ratio occupancy formula; trash was billed based upon the number of persons residing in unit; and gas and cooling are based upon unit square footage. (Rigsby Lease 2 at RIGSBY_00061- RIGSBY_00062; PCCA 034184, attached as **Exhibit Z.**)

46.     Electricity was billed by the utility company directly to Plaintiff. (*Id.*)

47.     The lease explains that the allocation "is an estimate of usage by the resident," and to the extent an allocation is used "we or our billing company will calculate your allocated share of the utilizes and services provided and all costs in accordance with state and local statutes." (Rigsby Lease 2 at RIGSBY_00062.)

48.     This billing process includes an accounting for the deduction of certain percentages attributable to common areas which are not allocated to residents, using amounts determined in accordance with industry standards. (Def.'s Supp. Answer to Pl.'s First Set of Interrogs. ("Def.'s Supp. Interrogs."), ¶ 6, attached as **Exhibit AA.**).

49.     Specifically, for electric and cooling, up to 75% of the total utility charge incurred by PCCA for the property is allocated among the residents according to the terms of their leases as described above, while the remainder is paid by PCCA; up to 95% for gas and trash; and up to 90% for water and sewer. (Def.'s Supp. Interrogs., ¶ 6.).

50.     Paylease was responsible for processing utility bills, as it "allows for better utility usage tracking and [] provides [] residents with one designated place they need to go to make rent and utility payments." (PCCA 033893, PCCA 034184, attached as **Exhibit BB.**).

51. Paylease, not PCCA, determined the amount of each individual utility fee owned based upon the process described by the Utility Addendum to each tenant's lease agreement. (PCCA Interrogs. at ¶ 14.).

52. "Paylease is a known best practice vendor throughout the Multifamily Industry that follows the National Apartment Association rules for billing back utilities. This means all [of PCCA]'s utility billing methodologies are approved practices by the National Apartment Association." (Exh. BB, PCCA 033893; PCCA 034184.).

53. Rigsby has no reason to believe any of her utility charges were inconsistent with the terms of her lease. (Rigsby Dep. at 46:18-20; 48:24-49:11; 51:5-12; 52:12-54:24.).

54. Rigsby paid each of her utility bills in full without speaking to anyone at Paylease, PCCA, or any of the utility companies regarding any concerns about the amount of her bills. (Rigsby Dep. at 49:13-50:11.).

55. Plaintiff's sole basis for alleging her utility bills were improper was that was she and her mom "thought" the charges were high. (Rigsby Dep. at 48:1-11, 49:7-11, 52:23-53:5.).

56. Plaintiff's mom based her belief that the utility bills were high on comparison to her utility bills for a "full large house" in Rolla, Missouri (Rigsby Dep. at 53:13-15.).

57. Plaintiff "did [not] know much was normal for the Kansas City area" and attributed the seemingly-high cost of her utilities to the higher cost of living in a city like Kansas City vis-à-vis living in Rolla – not to any improper charges or miscalculations. (Rigsby Dep. at 48:6-11; 49:7-11.).

58. Plaintiff has not identified any damages related to her utility bills. (Pl.'s Supp. Answer to Def.'s First Set of Interrogs. ("Rigsby Interrogs."), ¶ 4 attached as **Exhibit CC**.)

<u>Other Issues</u>

59. Before the air conditioning stopped working, Plaintiff had not encountered any problems that made her apartment at Plaza Club "unlivable." (Rigsby Dep. at 62: 11-15; 62:22-63:2.).

8

60.     Plaintiff identified several conditions other than the air conditioning outage that she noticed during her time at Plaza Club, but none of them affected her health, safety, or ability to inhabit her apartment. (Rigsby Interrogs. at ¶ 3; Rigsby Dep. at 75:9-12; 79:22-80:6; 82:24-83:6; 86:3-24; 87:5-8.).

61.     When Rigsby moved into her second apartment at Plaza Club, there was a cockroach infestation in her kitchen and dining room. (Rigsby Interrogs. at ¶ 3; Rigsby Dep. at 83:13-20.).

62.     PCCA repeatedly sprayed Rigbsy's apartment to eliminate the cockroaches, and the cockroaches were effectively removed when an exterminator was brought in, determined the cockroaches were coming from the unit below Rigsby's and sprayed that unit was well (Rigsby Dep. at 84:18-20.).

63.     Except for the cockroach issue and the air conditioning, Plaintiff never complained to PCCA, through the tenant portal or otherwise, about any of the conditions she identified, and did not consider any of the other issues a "huge problem." (Rigsby Dep. at 64:13-18; 65:3-6; 75:19-21; 79:34-8; 82:9-11; 83:13-84:10; 84:18-20; 85:21-86:2.).

64.     On June 6, 2021, Rigsby wrote a move-out letter to PCCA stating that her apartment was in good condition. (Rigsby Dep. at 59:9-24, *ref.* Exh. 8; *see also id.* at Exh. 8 (Rigsby Notice to Vacate).).

65.     Rigsby moved out of Plaza Club on either July 31 or August 1, 2021. (Rigsby Dep. at 61:10-18.).

66.     Rigsby made her last rent and utility payment for tenancy at Plaza Club on August 20, 2021 (PCCA 022210, attached as **Exhibit DD**.).

COMES NOW Defendant Plaza Club City Apartments, LLC ("PCCA"), by and through its undersigned counsel, and for its Suggestions in Support of its Motion for Summary Judgment pursuant to FED. R. CIV. P. 56 and L.R. 56.1, states as follows:

## INTRODUCTION

Party depositions and voluminous written discovery confirm that this is a straightforward case. Plaintiff Ryann Rigsby is a law student at University of Missouri—Kansas City who needed to find an apartment before classes started in August of 2020. She chose to move into Plaza Club City Apartments because it had availability and was close to campus. Rigsby originally had a roommate, MacKenzie Leonard, but some interpersonal problems led her to move into her own separate apartment a few weeks after she came to Plaza Club in August. Other than that, Rigsby's time at Plaza Club was generally uneventful until she tried to turn her air conditioning on in May of 2021.

As it turned out, the chillers for Rigsby's building had broken over the winter, and the air conditioning was not able to turn on as a result. PCCA learned of the condition and promptly took steps to resolve the issue, first by having the chiller repaired and then by having it replaced. Supply chain issues caused by the COVID pandemic delayed the availability of replacement parts, but PCCA alleviated Rigsby's problems in the interim by providing a credit for a window air conditioner and offering to relocate Rigsby to an apartment with working central air conditioning. Rigsby declined to relocate but had working air conditioning from her window unit until her central air conditioning was restored when the chiller was fixed on June 24, 2021.

That's the entire case. The other claims in Rigsby's Petition are refuted by the evidentiary record. The record confirms that Rigsby was never misled about anything, never overcharged for utilities, and never unable to inhabit her apartment. So the only relevant question here is: does the temporary central air conditioning failure, without more, suffice to support Plaintiff's claims? As discussed below, the answer is "no" for each of the counts plaintiff has tried to assert. Rigsby's need

to use a window air conditioner instead of central air conditioning appears to have been a legitimate inconvenience, but it did not prevent her from inhabiting her apartment and did not violate any terms of her lease. Accordingly, Defendant respectfully requests that the Court enter summary judgment in its favor with respect to each of Plaintiff's claims.

## LEGAL STANDARD

Summary judgment is proper when the moving party has established there is no genuine dispute based on material fact, and as such, the movant is entitled to judgment as a matter of law. *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). While the court must construe all facts in favor of the non-movant, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* In responding, "[t]he nonmoving party may not rest on mere allegations or denials, but must show a genuine issue of material fact (or that the movant is not entitled to judgment)." *Koscielski v. City of Minneapolis*, 435 F.3d 898, 901 (8th Cir. 2006) (internal citations omitted) (affirming summary judgment based on lack of evidence).

"With respect to an issue on which the nonmoving party bears the burden of proof, the moving party need only show 'that there is an absence of evidence to support the nonmoving party's case.'" *F.D.I.C. v. Mercer Bancorp, Inc.*, No. 89-0849-CV-JWO-3, 1990 WL 515173, at *1 (W.D. Mo. Dec. 5, 1990) (citation omitted); *Hodge By & through Farrow v. Walgreen Co.*, 37 F.4th 461, 465 (8th Cir. 2022) (movant's burden "may be discharged" by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case[]") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). That discovery has not closed is not, by itself, a basis for denying summary judgment. Rather, the party opposing summary judgment must "file an affidavit 'affirmatively demonstrating ... how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'" *Ray v. Am. Airlines, Inc.*, 609 F.3d 917, 923 (8th Cir.

2010) (affirming grant of summary judgment despite nonmovant's request for additional time to conduct discovery that did not articulate how such discovery was relevant) (citation omitted).

<u>ARGUMENT</u>

## I. Plaintiff Has No Standing to Claim Injunctive Relief (Count One) and Will Not Suffer Any Irreparable Harm Without An Injunction.

### a. Plaintiff no longer lives in Plaza Club and lacks standing to seek injunctive relief.

Plaintiff moved out of Plaza Club more than a year ago. She has no personal stake in the present or future condition of the property, nor does she have any personal stake in whether or not PCCA continues collecting rent. Plaintiff therefore lacks standing to seek an injunction.

"[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021)."The standing inquiry requires a plaintiff to allege 'some threatened or actual injury' traceable to the defendant, such that the plaintiff has 'such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial power on his behalf.'" *Northland Parent Ass'n v. Excelsior Springs Sch. Dist. # 40*, 571 F. Supp. 3d 1104, 1110 (W.D. Mo. 2021) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). In a putative class action, the named Plaintiff must have individual standing because "a nonnamed class member is [not] a party to the class-action litigation before the class is certified." *Torres v. Simpatico, Inc.*, 995 F. Supp. 2d 1057, 1065 (E.D. Mo. 2014) (quoting *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 593 (2013), *aff'd*, 781 F.3d 963 (8th Cir. 2015).

As to injunctive relief, "a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island*

*Inst.*, 129 S. Ct. 1142, 1149 (2009). Here, Plaintiff requests that "this Court enjoin Defendant from collecting rent until this Court finds that Defendant has adequately fixed the complaints made by the Plaintiff – tenants." (Petition at ¶ 49.) But Plaintiff no longer resides at Plaza City, and no rent is being collected from her. Specifically, Rigsby moved out of Plaza Club on either July 31 or August 1, 2021. (SUF at ¶ 65). She made her last rent payment on August 20, 2021. (SUF at ¶ 66). Even if she had not moved out early, Plaintiff's most recent lease agreement with PCCA expired on September 15, 2021. (SUF at ¶'s 6, 9).  Consequently, the future condition of the property has no impact on Plaintiff. Similarly, PCCA has not collected any rent from Plaintiff since August of 2021, and will not do so in the future since she has no ongoing lease. (*See* Rigsby Lease 2; SUF at ¶'s  9, 65, 66).  That means Plaintiff has no interest in whether PCCA collects rent going forward, either.

Therefore, an injunction would garner no personal relief to Plaintiff, and as such she has no standing to ask for one. *See, e.g.,  Kuhlmeier v. Hazelwood Sch. Dist.*, 596 F. Supp. 1422, 1424 (E.D. Mo. 1984) (finding injunctive relief was mooted where plaintiffs complained of regulations at a school which they had already graduated); *Walker v. Kemper*, No. 4:01-CV-1223 CAS, 2005 WL 2333895, at *2 (E.D. Mo. Sept. 22, 2005) (noting that the Eighth Circuit repeatedly holds injunctive relief is moot when individual is no longer subject to conditions complained of).

      **b.**      **Plaintiff will not suffer any irreparable harm in the absence of an injunction, both because she no longer lives at Plaza Club and because both habitability issues with her apartment were fixed while she was there.**

Independent of her lack of standing, Plaintiff is not entitled to an injunction because she will not suffer any irreparable harm without one. *See, e.g., Mackey v. Belden, Inc.*, No. 4:21-CV-00149-JAR, 2021 WL 3363174, at *12 (E.D. Mo. Aug. 3, 2021) ("A party seeking injunctive relief must demonstrate that there is no adequate remedy at law and irreparable harm will result if the injunction is not awarded."). Indeed, Plaintiff will not suffer *any harm at all* in the absence of an

injunction, let alone irreparable harm, and would not even if she still lived at Plaza Club. Notwithstanding the wide-ranging allegations in her Petition, Plaintiff admitted at deposition that the only two issues that affected her ability to live at Plaza Club related to her air conditioning and a problem she had involving cockroaches in her kitchen and dining room. (SUF at ¶'s 59, 63). She further testified that both have been resolved: admitting that the cockroaches were no longer an issue after the building hired an exterminator, (SUF at ¶ 62), and that the air conditioning was fixed on June 24, 2021, (SUF at ¶ 41).

Without any ongoing harm, there is no basis for an injunction and judgment should be entered against Plaintiff with respect to her claim for one. *See Mackey*, 2021 WL 3363174, at *12.

## II. Count Three (Breach of the Implied Warranty of Habitability) Fails Because Plaintiff's Lease Conspicuously Disclaimed the Implied Warranty of Habitability and Because Missouri Law Does Not Require Central Air Conditioning.

Summary judgment should be granted against Plaintiff with respect to her implied warranty of habitability claim because: 1) Plaintiff's testimony confirms she expressly agreed to disclaim the implied warranty of habitability; 2) the implied warranty of habitability does not apply to central air conditioning under Missouri law; and 3) PCCA fully restored the premises.

### a. Plaintiff knowingly signed her lease with the understanding that PCCA expressly disclaimed any warranty of habitability.

Under Missouri law, implied warranties can be disclaimed in a contract as long as the disclaimer is a "conspicuous provision which fully discloses the consequences of its inclusion [and] that such was in fact the agreement reached." *Crawford v. Whittaker Const., Inc.*, 772 S.W.2d 819, 822 (Mo. Ct. App. 1989) (quoting *Crowder v. Vandendeale,* 564 S.W.2d 879, 881, n. 4 (Mo. banc 1978)) (citations omitted). Releases of future claims must be enforced if the exculpatory language is clear and conspicuous. *Warren v. Paragon Technologies Group, Inc.*, 950 S.W.2d 844, 845 (Mo. banc 1997)(reversing finding that non-liability clause in lease was void as against public policy).

14

Here, Rigby's leases both contained the following provision:

**TO THE EXTENT PERMITTED BY LAW, WE DISCLAIM ANY AND ALL IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO...THE IMPLIED WARRANTY THAT THE PREMISES IS SUITABLE FOR RESIDENCE'S HABITABILITY OR (IF APPLICABLE) ANY IMPLIED WARRANTY OF MERCHANTABILITY.**

(SUF at ¶ 10).   The provision was stated in bold, capital letters, either of which is sufficient to make a provision "conspicuous" under Missouri law. *See Warren*, 950 S.W.2d at 849 (Robertson, J., *concurring in result*). Plaintiff admits not only that she read this provision prior to signing, but that she *understood* and *agreed* to this disclaimer. (SUF at ¶ 11). Accordingly, under *Warren*, the agreement must be enforced and summary judgment should be granted in favor of Defendant on this count.

   b.    **Central air conditioning is an amenity that is not covered by the implied warranty of habitability under Missouri law.**

Even if the warranty of habitability had not been disclaimed, it still would not apply here. During her deposition, Plaintiff identified only one issue that she said made her apartment "unlivable": the air conditioning outage (SUF at ¶ 59).   Notwithstanding Plaintiff's description, however, a lack of air conditioning does not make an apartment "uninhabitable" under Missouri law, even though it may be inconvenient. That is particularly the case where, as here, a window air conditioning unit was provided and Plaintiff turned down an offer to relocate.

"Habitability is measured by community standards, generally reflected in local housing and property maintenance codes." *Chiodini v. Fox,* 207 S.W.3d 174, 176 (Mo. Ct. App. 2006) (citing *Detling v. Edelbrock,* 671 S.W.2d 265, 270 (Mo. banc 1984)). A property is uninhabitable in the event of "dangerous or unsanitary conditions on the premises materially affecting the life, health, and safety of the tenant." *Id.* Here, the KCMO Health Department expressly found that the air conditioning issue in Rigby's apartment was *not* health hazardous (SUF at ¶ 28). This is consistent

with Kansas City health regulations, which do not contain any provision requiring air conditioning, and with Missouri law. Specifically, the Kansas City Missouri Health Department Health Homes Rental Inspection Program Rules & Regulations, enacted pursuant to Kansas City Ordinance Code Section 34-847, have no air conditioning requirement.[1] Nor does the Kansas City Code of Ordinances Subdivision regarding Basic Sanitary and Comfort Facilities. Kansas City, Missouri, Section 56-181 through 56-189. That subchapter lays out requirements for a lavatory, bathtub or shower, kitchen sink, water and sewer, heating, and water-heating, plumbing, and electrical maintenance, but none for air conditioning. *Id.*

This finding is also consistent with community standards in Kansas City, Missouri. Searches for Kansas City rentals on Apartments.com and Zillow.com include "air conditioning" as an optional amenity that can be used to filter the search. *See* Apartments.com, https://www.apartments.com/kansas-city-mo/ (last visited June 28, 2023), Zillow, https://www.zillow.com/kansas-city-mo/rentals/ (last visited June 28, 2023), collectively attached as **Exhibit EE**. About 21% of apartment listings on Apartments.com did *not* have air conditioning, and about 41% of apartment listings on Zillow did *not* have air conditioning. *See id.* By comparison, about 23% of Apartments.com listings had no dishwasher, and about 34% had no swimming pool. These numbers confirm that, like dishwashers and swimming pools, the Kansas City rental market treats air conditioning as an amenity, not a necessity for inhabiting the apartment.

The conclusion that central air conditioning is not a requirement is further confirmed by Plaintiff's own actions. Specifically, PCCA offered to relocate Plaintiff to a new apartment that had

---

[1] *See* Health Homes Rental Inspection Program Rules & Regulations, KANSAS CITY MISSOURI HEALTH DEPARTMENT, *available at* https://www.kcmo.gov/home/showpublisheddocument/1221/636956988389500000 (last visited January 6, 2022), attached as **Exhibit FF**.

central air conditioning, and she declined the offer because it "seemed extremely inconvenient" – voluntarily staying in her apartment instead. (SUF at ¶ 34). Ultimately, Rigsby chose not to move out of her apartment until July 31, 2021, or August 1, 2021. (SUF at ¶ 65).

Finally, even if air conditioning were a habitability issue, the uncontroverted facts establish that Plaintiff *had working air conditioning*. (SUF at ¶ 35). Rigsby was provided a credit by PCCA to purchase a window air conditioner, and she did in fact purchase one. (SUF at ¶ 33). The air conditioner Rigsby purchased was effective at keeping the area where she had it cool. (SUF at ¶ 35). While she might have preferred central air conditioning, that preference did not make her apartment uninhabitable within the meaning of Missouri Law.

### c. PCCA restored the premised and provided relief.

Even if the implied warranty of habitability applied, the uncontroverted facts show that Plaintiff cannot establish a claim for breaching it. In order to establish a cause of action for breach of an implied warranty of habitability, the tenant must prove four elements: "(1) entry into a lease for residential property; (2) the subsequent development of dangerous or unsanitary conditions on the premises materially affecting the life, health and safety of the tenant; (3) reasonable notice of the defects to the landlord; and (4) *subsequent failure to restore the premises to habitability.*" *Chiodini,* 207 S.W.3d at 176 (citing *Detling,* 671 S.W.2d at 272-73) (emphasis added).

Here, the uncontroverted evidence shows that PCCA took swift action to repair the air conditioning and restore the premises to its previous condition. Specifically, PCCA initially made purchase orders for repairs to the chillers on or about May 4, 2021, and repairs began on or about May 6, 2021. (SUF at ¶ 29). Once it was determined that the chillers should be replaced instead, PCCA purchased replacement chillers. (SUF at ¶'s 20, 30). PCCA even paid additional costs to expedite delivery of those chillers despite supply chain and logistical disruption caused by the global pandemic in order to have them installed as soon as possible. (SUF at ¶ 30).

In the interim, Plaintiff was provided alternative cooling methods for her apartment, as well as multiple forms of relief. First, Rigsby admits that PCCA provided her $200 to purchase a window air conditioner. (SUF at ¶ 33). Second, Rigsby admits she received and accepted a total of $500 in rent credit over the course of three months due to the air conditioning issue. (SUF at ¶ 33). And finally, Rigsby testified that PCCA offered to move her to a different apartment with working air conditioning, but *she* declined the new apartment. (SUF at ¶ 34). Given the actions taken to fix the problem and the laundry list of interim relief provided by PCCA, it is unclear what more PCCA could have done. Moreover, the fact that she declined alternative arrangements and chose to remain in her apartment is definitive evidence that her apartment was not uninhabitable. The Missouri Court of Appeals recently affirmed summary judgment on a breach of the implied warranty of habitability claim in strikingly similar circumstances, in *Seymour v. Switzer Tenant LLC*, No. WD 85134, 2023 WL 3064714. (Mo. Ct. App. Apr. 25, 2023).

In *Seymour*, the principal complaint by the tenant was that the unit at issue would not heat to the desired temperature during the winter. *Id.* at *2. The tenants in that case were given the opportunity to relocate to a different unit but declined. *Id.* Like Rigsby, the tenants stayed and worked in the unit, and did not stay elsewhere due to the lack of sufficient heating. *Id.* Also, the tenants in *Seymour* did not accept space heaters that were offered. *Id.* Rigsby, in contrast accepted the $200 reimbursement for the purchase of an air conditioner unit, which was sufficient to keep her apartment cool, *supra*, as indicated by her choice of not purchasing a second air conditioner like other residents. (SUF at ¶'s 33-35). The court affirmed summary judgment as the record did not show that there was any "risk to the tenants' life, health or safety," and that simply presenting the conclusory argument the lack of heat was a "dangerous and/or unsanitary condition" was insufficient to withstand summary judgment. *Seymour*, 2023 WL 3064714 at *6.

Here too, as a matter of law based on the uncontroverted facts, Plaintiff's apartment was not uninhabitable. To the extent Plaintiff contends she was offered an amenity she did not receive, *i.e.*, central air conditioning, that contention does not implicate warranty of habitability. Since Plaintiff has not identified any other habitability issues affecting her apartment, either, judgment should be granted in favor for Defendant with respect to this count.

### III. Count Two (Violations of the Missouri Merchandising Practices Act – Implied Warranty of Habitability) Fails Because Plaintiff Never Saw Any Deceptive Statements and Has No Underlying Claim for Breach of the Warranty of Habitability.

Plaintiff's first claim under the Missouri Merchandising Practices Act, Mo. Stat. § 407.020 ("MMPA"), is premised on an alleged breach of the warranty of habitability. Since Count Three (warranty of habitability) fails, Plaintiff has no underlying claim and Count Two fails as well.

But judgment should be entered against Plaintiff on this MMPA claim even if her warranty claim survives. Plaintiff's MMPA claim is defeated by her own testimony that she was never misled by anyone at PCCA about the condition of her apartment, the lack of any evidence of an unfair practice, and her admission that the only cause of her agreement to transact with PCCA was a true fact about Plaza Club's proximity to her law school campus. These uncontroverted facts mean Plaintiff cannot establish the causation element of her MMPA claim.

In order to establish a claim under the MMPA, a plaintiff must show that the defendant "used or employed a deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or a concealment, suppression, or omission of a material fact." *Cortinas v. Behr Process Corp.*, No. 4:16-CV-1718 (CEJ), 2017 WL 2418012, *2 (E.D. Mo. June 5, 2017) (citing Mo. Stat. § 407.020). Crucially, MMPA plaintiffs must show that they suffered injury "as a result of the use of" such act or practice. Mo. Stat. § 407.025(1)(b). Thus, "causation is a necessary element of an MMPA claim." *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 922 (8th Cir. 2008).

Here, the facts are simple: Plaintiff did not rely on any false promises by PCCA when entering into her lease, and was not even aware of any false promises ever having been made. (SUF at ¶ 7). In particular, Plaintiff concedes she was not misled with respect to the condition of the air conditioning in her apartment before signing her leases. To the contrary, Plaintiff admits she did not even *look* at any PCCA marketing materials. (*Id.*). Thus, there are no deceptive statements that could have caused her harm. Instead, the only reason Rigsby chose to move into Plaza Club is because it was "very close to campus." (*Id.*). No misrepresentations were made about the proximity to campus – Plaintiff agrees PCCA was indeed very close. (*Id.*).

Nevertheless, Plaintiff's Petition puts forward an MMPA claim based on alleged breach of the implied warranty of habitability. Without any misrepresentation or other unfair practice, however, such breaches are not *ipso facto* actionable under the MMPA. To the contrary, the Missouri Court of Appeals has expressly stated: "[w]e do not hold that every breach of contract constitutes an unfair practice under the MMPA[.]" *Schuchmann v. Air Services Heating & Air Conditioning, Inc.*, 199 S.W.3d 228, 234 (Mo. Ct. App. 2006). Accordingly, Missouri courts have repeatedly held that a breach of contract, without more, is not deceptive or otherwise-actionable conduct under the MMPA. In *Kiechle v Drago*, for example, an auto repair shop breached its contract by failing to do certain repair work for the agreed-upon price, but that did not give rise to an MMPA claim. 694 S.W.2d 292, 294 (Mo. Ct. App. 1985). The rule that a breach of contract does not automatically give rise to an MMPA claim applies in the context of a breach of warranty claim. *See, e.g., Jackson v. Hazelrigg Auto. Serv. Ctr., Inc.*, 417 S.W.3d 886, 895 (Mo. Ct. App. 2014) (defendant's "breach of its one-year warranty is not, as a matter of law, an unfair practice.").

Finally, even if Plaintiff could identify a deceptive or unfair practice, she cannot establish the causation element of an MMPA claim because she admits the only cause of her agreement to sign her lease was the proximity of PCCA to her campus. (SUF at ¶ 7). But Plaintiff concedes

20

PCCA really *was* close to her campus, meaning there is no dispute that the only fact she relied on was, in fact, true. (*Id.*). Because causation is an essential element of an MMPA claim, *see Owen*, 533 F.3d at 922, judgment should be granted in Defendant's favor with respect to Count II.

## IV. Plaintiff's Belief That Her Utility Charges Were "High" Cannot Support Her MMPA Claim Without Any Evidence That They Were Improper.

Plaintiff's second MMPA claim is based upon alleged improper determination of utility charges and fees (Count IV). This claim fails as well. First and foremost, there is no dispute that Paylease, not PCCA, was responsible for the utility bills issued to Plaintiff, except for an electricity bill issued directly by the electric company, Evergy. Second, there was no deception or unfair practice with respect to Plaintiff's utilities, which were properly billed in accordance with the terms of her lease. Finally, Plaintiff has suffered no ascertainable loss caused by utility billing practices. Despite tens of thousands of pages of records produced in this matter, there is no evidence that Plaintiff's utility charges were improper.

### a. It is undisputed that Paylease and Evergy, not PCCA, issued utility bills to Plaintiff.

Plaintiff's lease explained that her electricity bill would be issued directly to her by the electric company, Evergy, and that certain other utility charges would be billed by the service provider and allocated to her by a third-party billing company, Paylease. (SUF at ¶ 44). Paylease was responsible for processing utility bills, as it "allows for better utility usage tracking and [] provides [] residents with one designated place they need to go to make rent and utility payments." (SUF at ¶ 50). Thus, Paylease, not PCCA, determined the amount of each individual utility fee owned based upon the process described by the Utility Addendum to each tenant's lease agreement. (SUF at ¶ 51). Since PCCA was not responsible for utility billing and did not issue any utility bills to Plaintiff, Plaintiff has no claim against PCCA based on deceptive or unfair utility billing practices.

b.     **Plaintiff has no MMPA claim because the uncontroverted evidence shows she was properly charged in accordance with the terms of her lease.**

Plaintiff also has no claim based on deceptive or unfair utility billing practices because the evidence proves there was nothing unfair or deceptive about her utility billings. Again, Plaintiff's lease explained that certain utility charges would be billed by the service provider and allocated to the resident by Paylease. (SUF at ¶ 44). The allocation method varied by the charge: water, sewer, and stormwater were billed based on the number of persons residing in the unit using a ratio occupancy formula; trash was based on the number of persons residing in unit; and gas and cooling were based on unit square footage. (SUF at ¶'s 44, 45).  The lease says the allocation "is an estimate of usage by the resident," and that "we or our billing company will calculate your allocated share of the utilizes and services provided and all costs in accordance with state and local statutes." (SUF at ¶ 47).

Plaintiff was properly billed in accordance with these procedures. PCCA has produced every single utility bill for the property during the time Plaintiff lived there (collectively attached as **Exhibit GG**), "prebill" documents from Zego showing the amounts allocated to each and every resident during that month (collectively attached as **Exhibit HH**), and Plaintiff's own utility bills confirming that she properly was billed in accordance with the calculations on each month's prebill document (collectively attached as **Exhibit II**).

In contrast to this uncontroverted evidence, Plaintiff admitted at her deposition that she has no basis for asserting that her utility bills were not calculated in accordance with her lease. When asked whether she believed certain utility charges were improper, her sole basis for these allegations was she and her mom "thought" the charges were high:

> "Every month I received a bill. The same conversation occurred. I thought they were high. My mom thought they were high. So I just listened to my mom tell me that they were high, and I continued to pay my bills as they came due[.]"

(SUF at ¶ 55). Her mom based her belief on what she paid for her utilities for a "full large house." (SUF at ¶ 56). But that house was in Rolla, Missouri, and Plaintiff conceded she "did [not] know much was normal for the Kansas City area ...." (SUF at ¶ 57). Indeed, Plaintiff admits she attributed the cost of her utilities to the higher cost of living in a city like Kansas City vis-à-vis living in Rolla – not to any improper charges or miscalculations. (*Id.*).[2]

Since Plaintiff concedes she has no factual or evidentiary support for any assertion that the calculation of her utility bills involved any "deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or a concealment, suppression, or omission of a material fact," she cannot establish an MMPA claim based on them. *Cortinas*, 2017 WL 2418012 at *2 (citing Mo. Stat. § 407.020). Where, as here, there is no evidence of any unfair practice, false promise, or deception, there is no MMPA claim. *See, e.g., Lingo v. Hartford Fire Ins. Co.*, No. 4:10CV84MLM, 2011 WL 1642223, at *7 (E.D. Mo. May 2, 2011) (granting summary judgment where it was undisputed plaintiff was aware of loan terms, and presented no documents to substantiate claims related to purported deceptive fixed interest rate); *Kiechle*, 694 S.W.2d at 294 (affirming dismissal of claims where there was no evidence the defendant made any false promises or practiced deception). That is particularly so since the uncontroverted documentary evidence confirms Plaintiff was properly charged for utilities in accordance with the terms of her lease.

    c.    **Plaintiff also has no MMPA claim because she has no damages caused by utility billing practices.**

In addition, in order to establish a claim under the MMPA a private litigant must "show 'actual damages' encompassing 'an ascertainable loss' of money or property stemming from a violation of the [M]MPA." *Nixon v. Enter. Car Sales Co.*, No. 4:09CV1896 HEA, 2011 WL

---

[2] It should also be noted that Plaintiff's time at PCCA was during the height of the COVID pandemic, when people staying at home increased demand for utilities and drove up both usage and price worldwide.

4857941, at *7 (E.D. Mo. Oct. 13, 2011) (granting motion for summary judgment where plaintiff claimed "some amount of damage was done" but failed to show actual damages); *Lingo*, 2011 WL 1642223, *8 (granting summary because plaintiff did not suffer actual damages, even if defendant's conduct was deceptive); Mo. Stat. § 407.025 (allowing recovery of "actual" damages). In doing so, damages cannot be speculative or untethered to evidence. *Walsh v. Al W. Chrysler, Inc.*, 211 S.W.3d 673, 675 (Mo. Ct. App. 2007) (finding MMPA claim failed where the record lacked "sufficient evidence of the amount and value thereof to support any award").

However, Plaintiff has repeatedly refused to identify any purported damages. In May of 2022, Plaintiff said she is "gathering her utility charge information and does not have all information necessary to provide a full and complete answer[.]" (SUF at ¶ 58). She has not amended this response since May 2022, even though all of the "utility charge information" was produced to her at least eight months ago. Instead, she doubled down on her refusal on December 22, 2022, when she objected to a supplemental interrogatory seeking damages information pursuant to Mo. Stat. § 509.050(2) without providing any substantive response at all. Absent an explanation of damages, "the record lacks sufficient evidence of the amount and value thereof to support any award[,]" and judgment against Plaintiff is appropriate. *Walsh*, 211 S.W.3d at 675.

## V. Plaintiff's Mo. Stat. § 441.233(2) Fails As She Cannot Identify Any Willful Conduct And The Statute Does Not Apply to Air Conditioning.

In 1997, the General Assembly of Missouri amended the state's landlord-tenant law to include Mo. Stat. § 441.233, which outlaws self-help evictions. Paragraph 1 of that section outlaws the direct exclusion of a tenant or her property from the premises without due process, such as by changing the locks. Paragraph 2 addresses indirect eviction, preventing the situation of "landlord or its agent who willfully diminishes services to a tenant by interrupting or causing the interruption of essential services" and thereby constructive evicts the tenant without due process. *Turning off the*

*utilities*, 18A Mo. Prac., Real Estate Law – Transact. & Disputes § 52:15 (3d ed.); *In re Ferro*, 228 B.R. 700, 708 (Bankr. W.D. Mo. 1999) ("self-help eviction remedies are effectively prohibited in Missouri") (citing Mo. Stat. § 441.233). In other words, it prevents constructive eviction by intentionally cutting off the power.

Plaintiff's claim in Count Five twists both the text and the purpose of this statute beyond recognition. As to the purpose, PCCA obviously did not intend to constructively evict all of its residents, as Plaintiff alleges – where would it get money if it kicked out everyone who was paying rent? Common sense alone defeats this claim.

The plain text of the statute defeats Plaintiff's claim as well. Mo. Stat. § 441.233(2) provides that a landlord "who *willfully* diminishes services to a tenant by **interrupting** or **causing** the interruption of *essential services* . . . shall be deemed guilty of forcible entry and detainer as described in chapter 534[.]" (emphasis added). For three reasons, Plaintiff cannot show a violation of this statute. First, there is no evidence of a willful interruption of air-conditioning. Second, air conditioning is not an "essential service" within the meaning of the statute and nothing else was "interrupted." And third, PCCA promptly replaced Plaintiff's central air conditioner with a window air conditioner until the issue could be resolved.

**First**, Mo. Stat. § 441.233(2) expressly applies only to willful actions. When defining willfulness, courts have focused on *intentional* conduct – not negligence: "proceeding from a conscious motion of the will; voluntary; knowingly, deliberate; intending the result which actually comes to pass; designed; intentional; purposeful; not accidental or involuntary." *Mathews v. B & K Foods, Inc.*, 332 S.W.3d 273, 277 (Mo. Ct. App. 2011) (quoting BLACK'S LAW DICTIONARY 1599 (6th ed.1990)); *see also Hewitt Well Drilling & Pump Serv., Inc. v. Dir. of Revenue*, 847 S.W.2d 795, 799 (Mo. 1993) (no willful conduct where there was no intentional conduct).

There is no evidence that PCCA purposefully cut off Plaintiff's air conditioning. To the contrary, PCCA acted expeditiously to rectify the air conditioning issues, despite some setbacks beyond its control:

- April 27, 2021: In or about late-April 2021, residents report being without air-conditioning. PCCA has conversation with P1 regarding air-conditioning, and has on-site meeting on April 29, 2021. (SUF at ¶ 18).

- May 3, 2021: P1 identifies chillers in need of replacement and reports that the replacements are being priced. (SUF at ¶ 20).

- May 4, 2021, PCCA orders that "[h]ave PO's issues asap for the repairs required below. Once I get the chiller replacement costs, I will forward." (SUF at ¶ 21). That same day, P1 reports that "We will get the needed parts ordered and get started on this." (SUF at ¶ 22). PCCA alerts residents as to the progress and expected start date for the repairs. (SUF at ¶ 23).

- May 12, 2021: P1 secures Carrier chillers which are in stock. (SUF at ¶ 24).

- May 18, 2021: Some affected units affected have air conditioning restored. PCCA reports that the South and Manor buildings will be getting new chillers. (SUF at ¶ 26).

- June 4, 2021: PCCA informs affected residents they will receive a $150 credit, and an additional credit up to $200 to purchase an in-unit air conditioner. (SUF at ¶ 31).

- June 11, 2021: P1 writes that certain parts had arrived and they would be able to start repairs in the morning. (SUF at ¶ 36).

- June 14, 2021: P1 writes that chillers could not be repaired with the parts because "[t]he seal would not hold because the pump housing is damaged. (SUF at ¶ 37).

- June 16, 2021: PCCA reports to residents that it hopes to "receive chillers by Monday, the 21st" and that it had already secured the crane equipment to place the chillers on the roof. (SUF at ¶ 39).

- Chiller installation begins that Monday and by June 24, all systems are back up and running. (SUF at ¶ 40).

Throughout this period, PCCA regularly communicated with residents that they were working expeditiously but that there were shipping delays attributable to COVID, causing difficulty securing transportation for the chillers from New Mexico. (SUF at ¶ 42).

PCCA's repeated efforts to address the issue demonstrate that any "cutting off" of the air-conditioning was not intentional. The evidence shows that there was no willful conduct to purposefully discontinue air-conditioning to evict residents, *supra*. PCCA's conduct is not remotely in the realm implicated by Mo. Stat. § 441.233(2).

**Second**, as a matter of law, air-conditioning is not an "essential" service. Mo. Stat. § 441.233(2) defines "essential services" to include "electric, gas, water, or sewer service[.]" That list is not exclusive, but any unnamed "essential services" must be of a similar nature: when "several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well." *Beecham v. United States*, 511 U.S. 368, 371 (1994) (collecting cases); *see also Boyd v. State Bd. of Registration for Healing Arts*, 916 S.W.2d 311, 321 (Mo. Ct. App. 1995) (non-exhaustive list was "illustrative of the types of activities which would subject a physician's license to discipline."). The Kanas City Code of Ordinances Subdivision regarding Basic Sanitary and Comfort Facilities indicates that things like plumbing and heating might be comparable, but does not mention air conditioning. *See* K.C. Ordinance Code, §§ 56-181 through 56-189.

There are at least two crucial differences between air conditioning and the essential services identified in the statute. First, unlike a utility, a tenant can provide air-conditioning for herself, as plaintiff did here by purchasing a window unit, or can obtain comparable effects with a fan. Second, air-conditioning is not essential – as evidenced by as many as 41% of apartment listing for Kansas City that do not mention it, as well as the Kansas City ordinances that do not include it alongside the likes of electricity and water. While air conditioning requires *using* utilities, it is no

27

more a utility than a refrigerator or freezer which similarly use electricity. Because air-conditioning falls outside of the scope of Mo. Stat. § 441.233(2), summary judgment should be granted.

## VI.    Breach of Contract Is Unsupported by the Evidence Where PCCA Held Up Its End of the Bargain and Engaged in Repairs Immediately.

Plaintiff's lease does not contain any promise that her apartment would have central air conditioning – or air conditioning at all. (SUF at ¶ 9, *see generally* Rigsby Lease 2, RIGSBY 000044-RIGSBY 000088).  To the contrary, the lease expressly says that rent "will not abate in whole or in part" if "air conditioning or other equipment malfunctions," (*Id.*). Nevertheless, Plaintiff asserts a breach of contrary claim based on lease language providing that PCCA "will act with customary diligence to make repairs" to the air-conditioning should problems arise. (*See* Petition at ¶'s 104-108; *see* SUF ¶ 9, Rigsby Lease 2 at RIGSBY 000053, RIGSBY 00054.). However, for three separate reasons, Plaintiff cannot establish a breach of contract on this basis.

**First**, Plaintiff's lease does not contain any provision promising she will be provided air conditioning, meaning there is no specific, objective term that PCCA could have breached based on the facts here. The lease provides that PCCA will maintain and repair air-conditioning with customary diligence, but it does not promise the air conditioning will always be fully operational – to the contrary, the lease expressly says rent will not abate will not abate in whole or in part" if "air conditioning or other equipment malfunctions." (*Id.*). So Plaintiff's breach of contract claim for rent paid must rely on some other contractual term – but there is none. Because Plaintiff cannot identify any objective contractual term that was breached, there can be no breach of contract claim. *See, e.g., Pearl v. DST Sys., Inc.*, No. 06-0918-CV-W-SWH, 2008 WL 8602367, at *11 (W.D. Mo. Apr. 25, 2008) (granting summary judgment where, *inter alia*, plaintiff claimed lack of good judgment violated contractual term but could not identify what provision of the contract that

term was), *aff'd*, 359 F. App'x 680 (8th Cir. 2010); *Jennings v. Bd. of Curators of Mo. State Univ.*, 386 S.W.3d 796, 799 (Mo. Ct. App. 2012) (similar).

**Second**, Plaintiff did not provide any notice of the air conditioning issue through the tenant portal, which is a condition precedent for any claim for repair. Failure to adhere to condition precedent warrants summary judgment in favor of PCCA on this claim. *See, e.g., Greer v. Zurich Ins. Co.*, 441 S.W.2d 15, 32 (Mo. 1969) (affirming judgment for defendant where plaintiff did not satisfy condition precedent of providing notice of accident); *Billings Mut. Ins. Co. v. Cameron Mut. Ins. Co.*, 229 S.W.3d 138, 145 (Mo. Ct. App. 2007) (similar). The lease provides that that if one does experience problems with the air-conditioning, "you must notify [a PCCA] representative as soon as possible[.]" (SUF at ¶ 9, Rigsby Lease 2 at RIGSBY 000053). To properly submit a maintenance request, such request must be submitted either through the online tenant/maintenance portal, or signed and in writing to a PCCA representative. (*Id.*).

On July 29, 2021, Plaintiff *first* submitted an air-conditioning maintenance request *after* it was restored on or about June 24, 2021, to address subsequent spot issues that came up sporadically. (SUF at ¶ 43). There is no documentary evidence that Plaintiff ever submitted any request before the initial air conditioning outage was resolved, and also no evidence that the subsequent spot issues were not properly addressed.

**Third**, PCCA did in fact repair the air conditioning in Plaintiff's apartment with customary diligence. There is no factual dispute that PCCA provided Plaintiff with a window air-conditioner almost immediately and repaired the central unit by June 24, 2021, as soon as a replacement chiller was available. (SUF at ¶'s 30-33, 39-40). The diligence displayed by PCCA to address this issue is more fully outlined in Section V, *supra*, but in brief: PCCA completely replaced chiller units as required in under two months, despite nationwide supply chain issues caused by the pandemic, and communicated regularly with Rigsby and other tenants during that process. *See* S.

29

Helper, *Why the Pandemic Has Disrupted Supply* Chains, THE WHITE HOUSE (June 17, 2021), *available at* https://www.whitehouse.gov/cea/written-materials/2021/06/17/why-the-pandemic-has-disrupted-supply-chains/.

While it's unfortunate that Rigsby's air conditioning failed, PCCA worked immediately to rectify the issue by securing P1 as its contractor within days, rapidly approving the substantial costs of obtaining the chillers, attempting to expedite the process by securing chillers which were in stock, and constantly seeking updates as to the shipment progress for the new chillers from New Mexico, having repairs commenced immediately upon receipt of the chillers, and approving overtime for workers to accomplish all of this as quickly as possible, *supra.* (SUF at ¶'s 30-33, 39-40). Thus, the uncontroverted facts demonstrate that PCCA acted with customary diligence in making repairs under unprecedented worldwide supply chain conditions – indeed, it is unclear what more PCCA could possibly have done under these difficult circumstances. Summary judgment in PCCA's favor is appropriate. *See, e.g., Hines v. Mercedes-Benz USA, LLC,* 358 F. Supp. 2d 1222, 1231 (N.D. Ga. 2005) (finding repairs were completed in a "reasonable time" such that there was no genuine issue of material fact where repairs were performed starting from May 2003 to June 2003, with subsequent repairs thereafter).

## CONCLUSION

WHEREFORE, for the reasons set forth above, Plaza City Club Apartments, LLC, respectfully requests this Court grant its Motion for Summary Judgment pursuant to FED. R. CIV. P. 56.

Respectfully submitted,

**AMUNDSEN DAVIS, LLC**

/s/ Ronald D. Balfour
Ronald D. Balfour
IL Bar No. 6307658 (admitted *pro hac vice*)
Michael M. Chang
IL Bar No. 6323721 (admitted *pro hac vice*)
150 North Michigan Avenue, Suite 3300
Chicago, Illinois  60601
Telephone: (312) 894-3200
Facsimile:  (312) 894-3210
Email:  RBalfour@amundsendavislaw.com
          MChang@amundsendavislaw.com

**WATTERS WOLF BUB HANSMANN LLC**

Joseph J. Roper              #36995
Abbigale A. Gentle          #47879
4435 Main St., Suite 920
Kansas City, Missouri 64111
Telephone: (816) 782-8881
Facsimile:  (636) 798-0693
Email: jroper@wwbhlaw.com
          agentle@wwbhlaw.com

**ATTORNEYS FOR DEFENDANT PLAZA CLUB CITY APARTMENTS, LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing document was electronically filed with the United States District Court, Western District of Missouri, via the Court's CM/ECF Filing system, which will send notification of such filing to counsel of record, on June 30, 2023.

/s/Ronald D. Balfour