**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **RYANN RIGSBY,** | ) | |
| | ) | |
| **individually and on behalf of those similarly situated,** | ) | |
| | ) | |
| | ) | **Case No. 4:23-cv-00061-BCW** |
| **Plaintiff** | ) | |
| **v.** | ) | |
| | ) | |
| **PLAZA CLUB CITY APARTMENTS, LLC** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT PLAZA CLUB CITY APARTMENTS, LLC'S**
**MOTION FOR SUMMARY JUDGMENT**

Dated: August 2, 2023

    */s/ Taylor P. Foye*
Joseph A. Kronawitter     MO Bar #49280
Taylor P. Foye            MO Bar #71527
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Ste. 1100
Kansas City, MO 64108
Telephone: (816) 421-0700
Facsimile: (816) 421-0899
jkronawitter@hab-law.com
tfoye@hab-law.com

# TABLE OF CONTENTS

PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS ........1

PLAINTIFF'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS .....................16

Historical Issues at PCCA...............................................................................................16

PCCA's Lease Agreements and (Self-Imposed) Obligations Thereunder ...................18

Utilities at PCCA ...........................................................................................................19

The Summer of 2021 ......................................................................................................20

Continued Habitability Issues at PCCA........................................................................23

INTRODUCTION ..........................................................................................................24

LEGAL STANDARD......................................................................................................25

ARGUMENT ..................................................................................................................25

    I.    Ms. Rigsby Is Entitled to Seek Injunctive Relief.........................................25

        A.  The "Capable of Repetition, But Evading Review" Exception............................25

        B.  The "Inherently Transitory" Exception .................................................................27

    II.    The Implied Warranty of Habitability Is Not Disclaimed ...........................28

    III.    A Lack of Air Conditioning Violates Missouri's Implied Warranty of Habitability ..31

        A.  Missouri's Implied Warranty of Habitability Is Not Limited to Singular Issues ...31

        B.  A Violation of the Implied Warranty of Habitability is a Jury Question ...............35

        C.  A Lack of Air Conditioning Violates the Implied Warranty of Habitability..........36

    IV.    Ms. Rigsby's Attempts to Mitigate Her Damages Does Not Provide for Summary Judgment in PCCA's Favor .........................................................................................38

    V.    Ms. Rigsby Has a Valid MMPA Claim Based on the Implied Warranty of Habitability .....................................................................................................................40

Case 4:23-cv-00061-BCW   Document 48   Filed 08/02/23   Page 2 of 50

VI.     Ms. Rigsby Has a Valid MMPA Claim Regarding Her Utility Bills...........................41

VII.    PCCA's Inability to Provide Working Air Conditioning Was Willful Under R.S.Mo.

        § 441.233.................................................................................................................42

VIII.   Ms. Rigsby's Breach of Contract Claim Is Supported by the Evidence.....................43

        CONCLUSION...........................................................................................................44

Case 4:23-cv-00061-BCW   Document 48   Filed 08/02/23   Page 3 of 50

# TABLE OF AUTHORITIES

*Arvest Bank v. Uppalapati*, No. 11-03175-CV-S-DGK, 2013 WL 85336
 (W.D. Mo. Jan. 7, 2013) ...........................................................................25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................25

*Chiodini v. Fox*, 207 S.W.3d 174 (Mo. App. E.D. 2006) ........................ *passim*

*Crawford v. Whittaker Const., Inc.*, 772 S.W.2d 819 (Mo. App. E.D. 1989)................30

*Crowder v. Vandendeale*, 564 S.W.2d 879 (Mo. banc 198) ........................30

*Cruz v. Hauck*, 627 F.2d 710 (5th Cir. 1980) ...............................26

*Detling v. Edelbrock*, 671 S.W.2d 265 (Mo. banc 1984)........................ *passim*

*Edmonds v. Hough*, 344 S.W.3d 219 (Mo. App. 2013)................................40

*Fuentes v. KM-T.E.H. Realty 8, LLC,* #1916cv-29273, Circuit Court of
Jackson County, Missouri,................................................................32

*Fuller v. TLC Property Management, LLC*, 402 S.W.3d 101 (Mo. App. S.D. 2013) .......... *passim*

*Gerstein v. Pugh*, 420 U.S. 103 (1975).........................................26

*Huffman v. Credit Union of Texas*, 2013 WL 1121268 (W.D. Mo. Mar. 18, 2013) ...................41

*King v. Moorehead*, 495 S.W.2d 65 (Mo. App. 1973). .......................... *passim*

*Lloyd v. Roosevelt Properties, Ltd.*, 2018 WL 3814972 (Oh. App. Aug. 9, 2018) .....................32

*Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982) ................................26

*Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566
(8th Cir. 1991)..............................................................................25

*Morgan v. Vogler Law Firm, P.C.*, 2017 WL 4387351 (E.D. Mo. Oct. 3, 2017) ........................40

*Moser v. Cline*, 214 S.W.3d 390 (Mo. App. W.D. 2007).........................28, 40

*Murphy v. Aaron's Automotive Products*, 232 S.W.3d 616 (Mo. App. S.D. 2007) ....................43

*Olson v. Brown*, 594 F.3d 577 (7th Cir. 2010) ................................27

iv

*Peviani v. Arbors at California Oaks Property Owner, LLC*, 62 Cal. App. 5th 874 (Cal. App. 2021) ....................................................................................................32

*Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237 (Mo. banc 2001) ............................40

*Rafos v. Outboard Marine Corp.*, 1 F.3d 707 (8th Cir. 1993) ........................................25

*Seymour v. Switzer Tenant LLC*, 667 S.W.3d 619 (Mo. App. W.D. 2023) ..................................39

*Smith v. City of Chicago*, 273 F.R.D. 413 (N.D. Ill. 2011)............................................27

*Smith v. Old Warson Dev. Co.*, 479 S.W.2d 795 (Mo. banc 1972) ......................................36

*Sosna v. Iowa*, 419 U.S. 393 (1975) ..............................................................26

*U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980) ...............................................25

*Warren v. Paragon Tech. Group, Inc.*, 950 S.W.2d 844 (Mo. banc 1997) ................................30

*Weinstein v. Bradford*, 423 U.S. 147 (1975)........................................................25

## FEDERAL STATUTES

Fed. R. Civ. P. 56...............................................................................25

R.S.Mo. § 407.010(4) ...........................................................................40

R.S.Mo. § 441.233 ..........................................................................42, 43

<strong>PLAINTIFF'S RESPONSE TO DEFENDANT'S<br><u>STATEMENT OF MATERIAL FACTS</u></strong>

1. Defendant Plaza Club City Apartments, LLC ("PCCA") owns apartment buildings located at 604 W. 46th Street and 4621 Jefferson Street, in Kansas City, Missouri. (Petition, ¶ 13, attached as Exhibit A.).

**Response: Uncontroverted.**

2. These buildings, together with the apartment building located at 4619 Jefferson Street in Kansas City, Missouri, form an apartment complex called "Plaza Club City Apartments" ("Plaza Club") (Id. ).

**Response: Controverted. PCCA also owns the apartment building located at 4619 Jefferson Street in Kansas City, Missouri. (Exhibit 1, Corp. Rep. Depo, 17:22 – 18:20)**

3. Plaintiff Ryann Rigsby ("Rigsby") is a law student at University of Missouri – Kansas City. (Deposition of Ryann Rigsby ("Rigsby Dep.") at 8:17-21, attached as Exhibit B.).

**Response: Controverted. Ms. Rigsby was a law student at the time of her deposition. She has since graduated and taken the July 2023 bar exam. Moreover, this proposed "fact" is not material to any genuine issue.**

4. Rigsby found Plaza Club by searching the internet for places to live in Kansas City, and chose to live at Plaza Club due to its proximity to her law school campus. (Rigsby Dep. at 19:8-13; 20:21-21:7.).

**Response: Uncontroverted, but immaterial since this proposed "fact" is not material to any genuine issue.**

5. Rigsby toured Plaza Club in May of 2020. (Rigsby Dep. at 12:23-20:8.).

**Response: Uncontroverted.**

6. Rigsby signed a lease to share an apartment at Plaza Club with MacKenzie Leonard on July 28, 2020, for a lease term beginning August 8, 2020, and moved in on August 8, 2020. (Rigsby Dep. at 21:21-22:17, ref. Exh. 1; see also id. at Exh. 1, RIGSBY 000001-0000043 ("Rigsby Lease 1").).

**Response: Uncontroverted, but immaterial since this proposed "fact" is not material to any genuine issue.**

1

7. Rigsby did not review any Plaza Club marketing material before entering into her lease agreement with PCCA, is not aware of any false promises ever being made to her by PCCA, and entered into her lease agreement with PCCA solely because of Plaza Club's proximity to the University of Missouri – Kansas City Law School campus. (Rigsby Dep. at 19:3-13; 19:23-20:17; 20:21-21:7.).

**Response: Controverted. Ms. Rigsby did not testify that she did not review any PCCA marketing material before entering into her lease agreement. She testified:**

> **Q. Did you see any marketing materials specifically put out by Plaza Club?**
> **A. Not randomly. I would just -- if I was searching for an apartment, I would see the name come up.**

**(PCCA Exhibit B, Rigsby Depo, 19:9-13). Further, Ms. Rigsby did not testify that she was "not aware of any false promises ever being made to her by PCCA" as that question was never posed to her. (PCCA Exhibit B, Rigsby Depo., 19:3-13, 19:23 – 20:17, and 20:21 – 21:7). Last, Ms. Rigsby testified that she chose to live at Plaza Club City Apartments because of its proximity to her law school, because she had a roommate, and other unspecified reasons. (PCCA Exhibit B, Rigsby Depo, 20:21 – 21:7).**

8. Rigsby lived in her first apartment at Plaza Club without problems for about a month until she had problems with her roommate, MacKenzie, and asked to be moved into a unit by herself. (Rigsby Dep. at 23:2-22; 24:5-15.).

**Response: Uncontroverted.**

9. Rigsby signed a second lease for an apartment at Plaza Club on September 10, 2020, for a lease term of September 11, 2020 through September 15, 2021. (Rigsby Dep. at 28:7-12, ref. Exh. 3; see also id. at Exh. 3 at RIGSBY 000044-000088 ("Rigsby Lease 2").).

**Response: Uncontroverted.**

10. Both of Rigsby's leases contained the following language in bold, capital letters:

TO THE EXTENT PERMITTED BY LAW, WE DISCLAIM ANY AND ALL IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO…THE IMPLIED WARRANTY THAT THE PREMISES IS SUITABLE FOR RESIDENT'S HABITABILITY OR (IF APPLICABLE) ANY IMPLIED WARRANTY OF MERCHANTABILITY.

(Rigsby Dep. at 32:9-33:4; 34:7-12, ref. Exhs. 1 and 3; see Rigsby Lease 1 at RIGSBY_000010,

2

Rigsby Lease 2 at RIGSBY_000054.).

**Response:** **Controverted. The complete provision is as follows:**

> **25. CONDITION OF THE PREMISES AND ALTERATIONS.**
>
> **YOU ACCEPT THE APARTMENT, FIXTURES, AND FURNITURE AS IS, EXCEPT FOR CONDITIONS MATERIALLY AFFECTING THE HEALTH OR SAFETY OF ORDINARY PERSONS. TO THE EXTENT PERMITTED BY LAW, WE DISCLAIM ANY AND ALL IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO (IF APPLICABLE) THE IMPLIED WARRANTY THAT THE PREMISES IS SUITABLE FOR RESIDENT'S HABITABILITY OR (IF APPLICABLE) ANY IMPLIED WARRANTY OF MERCHANTABILITY.**

**(Exhibit 2, Rigsby Lease, p. 4).**

11. Rigsby specifically read this language before signing each lease, knew what it meant, and specifically agreed to it. (Rigsby Dep. at 33:14-34:5; 34:13-23.).

**Response:** **Controverted. First, this purported "fact" is ambiguous as to what is intended by the statement "this language." Second, as a matter of law, PCCA cannot "disclaim" the implied warranty of habitability as explained in Ms. Rigsby's opposition to PCCA's motion for summary judgment.**

12. Both of Rigsby's leases also provided that notices or requests needed to be submitted through "either the online tenant/maintenance portal, or signed in writing and delivered to [PCCA's] designated representative." (Rigsby Dep. at 36:1-21; see Rigsby Lease 1 at RIGSBY_000009, Rigsby Lease 2 at RIGSBY_000053.).

**Response:** **Controverted. The complete provision includes an exception for emergencies:**

> 26. REQUESTS, REPAIRS, AND MALFUNCTIONS. IF YOU OR ANY OCCUPANT NEEDS TO SEND A NOTICE OR REQUEST—FOR EXAMPLE, FOR REPAIRS, INSTALLATIONS, SERVICES, OR SECURITY-RELATED MATTERS—IT MUST BE SUBMITTED THROUGH EITHER THE ONLINE TENANT/MAINTENANCE PORTAL, OR SIGNED AND IN WRITING AND DELIVERED TO OUR DESIGNATED REPRESENTATIVE (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, or crime in progress, or like emergency). Our written notes on your oral request do not constitute a written request from you.

**(Exhibit 2, Rigsby Lease, p. 4).**

13. Plaza Club has a total of six "chillers" that provide air conditioning to the property – two for each building. (PCCA 023447, attached as Exhibit C.).

**Response: Uncontroverted.**

14. The chillers are shut down in or about every October for the fall and winter season, and turned back on in or about April. (PCCA 040878, attached as Exhibit D.).

**Response: Uncontroverted.**

15. In 2020, there were no widespread air-conditioning problems at Plaza Club, and third-party contractor Lippert Mechanical worked at PCCA's direction to promptly fix any spot issues that certain residents experienced throughout the summer. (PCCA 048138, PCCA 040877, PCCA 023788; PCCA 034917, PCCA 034895, PCCA 040738, PCCA 041186, attached as Exhibit E.).

**Response: Controverted. Plaza Club City Apartments received numerous complaints regarding a lack of air conditioning during the summer of 2020 which indicate widespread problems. (Exhibit 3, 2020 AC Complaints). Further, one tenant asked to move to a new unit in September 2020 as that unit was "on the side of the building with a working chiller." (Exhibit 4, 805 Amenities Email). PCCA acknowledged this outage in an email to another complaining tenant. (Exhibit 5, Email PCCA 051828).**

16. About a week before chillers were scheduled to be turned back on, on April 22, 2021, third-party contractor P1 performed maintenance work on all six chillers (condenser coil cleaning), and was working on providing a list of proposed repairs for the property. (PCCA 023680, attached as Exhibit F.).

**Response: Uncontroverted.**

17. In or about late April 2021, as per schedule, PCCA began in the process of turning the chillers on. (PCCA 034921, attached as Exhibit G.).

**Response: Uncontroverted.**

18. In or about late-April 2021, residents reported being without air conditioning and PCCA had conversations with P1 regarding air-conditioning, and had on-site meetings on April 29, 2021. (PCCA 035315, attached as Exhibit H.).

**Response: Uncontroverted.**

4

19. On April 30, 2021, PCCA assessed that two of the oldest chillers had "failed tube bundles and [were] leaking water profusely when attempting to fill." (PCCA 022193, attached as Exhibit I.).

**Response: Controverted to the extent that April 30, 2021, was the first time that PCCA assessed that a chiller was failing. On February 11, 2020, Lippert provided two bids to replace a chiller on the Manor building with either a York or Carrier chiller model. (Exhibit 6, 2020 Manor Building Lippert Bid; Exhibit 7, 2020 Manor Building Lippert Bid No 2). Also, on June 4, 2019, U.S. Engineering recommended a complete chiller replacement. (Exhibit 8, U.S. Engineering Note). Otherwise, uncontroverted.**

20. On May 3, 2021, P1 indicated that these two chillers would need to be replaced instead of repaired and reported that the replacements were being priced, while the others needed repair work. (PCCA 021458, PCCA 021478, PCCA 021493, attached as Exhibit J.).

**Response: Controverted to the extent that May 3, 2021, was the first time that PCCA was told of the need for a chiller replacement. On February 11, 2020, Lippert provided two bids to replace a chiller on the Manor building with either a York or Carrier chiller model. (Exhibit 6, 2020 Manor Building Lippert Bid; Exhibit 7, 2020 Manor Building Lippert Bid No 2). Also, on June 4, 2019, U.S. Engineering recommended a complete chiller replacement. (Exhibit 8, U.S. Engineering Note). Otherwise, uncontroverted.**

21. On May 4, 2021, PCCA orders that "[h]ave PO's issues asap for the repairs required below. Once I get the chiller replacement cost, I will forward." (PCCA 021478, attached as Exhibit K.).

**Response: Uncontroverted. For clarity, the quoted language appears at PCCA021479.**

22. On May 4, 2021, P1 reports that "We will get the needed parts ordered and get started on this." (Id.).

**Response: Uncontroverted.**

23. At that time, PCCA promptly alerted residents that "Purchase orders for all needed repairs have been made today. I am awaiting the official start time for the repairs, I expect repairs to start sometime this week before the weather spikes again. I will send and update with the specific days and times once I receive that today and/or tomorrow from our third party vendor." (PCCA 042690, attached as Exhibit L.).

**Response: Controverted. PCCA had not placed any purchase orders at that point in time. (PCCA Exhibit M, pp. 2-8). Uncontroverted to the extent that PCCA sent an email to its**

tenants that included the quoted language.

24. On May 12, 2021, P1 worked with Carrier to secure chillers which were in stock. PCCA 050881, attached as Exhibit M.).

**Response: Controverted. The attached email only shows that P1 communicated with Carrier representatives to see if there were chillers in stock and communicated to PCCA that if "this job was getting greenlighted they would put a 48 hour hold on these three chillers." The document does not prove that P1 "secured" the chillers. Further, a June 16, 2021, email from PCCA indicated that PCCA "secured the new chiller equipment for [the South and Manor] buildings two weeks ago." (PCCA Exhibit V). That is, PCCA secured new chillers for two of three buildings in the first week of June.**

25. On May 14, 2021, P1 submitted to PCCA revised pricing for these in-stock Carrier units. (PCCA 050888, attached as Exhibit N.).

**Response: Controverted. PCCA Exhibit N is a May _11_, 2021, inspection report to PCCA recommending chiller replacement.**

26. On May 18, 2021, some units affected had air conditioning operational again and PCCA reported that the South and Manor buildings would be getting new chillers. (PCCA 035310, attached as Exhibit O.).

**Response: Controverted. PCCA's email indicates that half of the North and South buildings have air conditioning. However, Plaintiff testified that the air condition was not working despite receiving emails that it was:**

> **A: They sent out several emails regarding the chillers working again, and that goes back to when I would talk to, I believe her name was, Mariah. Whenever they would send emails out, they would say you do have air. We never had air when they said we should be having air.**

**(PCCA Exhibit B, Rigsby Depo, 104:19-24).**

27. The air conditioning in Rigsby's apartment was not working when she tried to turn it on in April or May of 2021 due to a failure of the chiller that served her unit. (Rigsby Dep. at 116:17-21.).

**Response: Uncontroverted.**

6

28. The KCMO Health Department issued a Healthy Homes Rental Inspection Report indicating that the lack of air conditioning in Rigsby's apartment was "non-health hazardous." (Rigsby Dep. at 92:4-6, ref. Exh. 11 (Jun. 16, 2021, Health Homes Inspection Report)).

**Response: Controverted. While the document referenced may have used the language "non-health hazardous," it does not define that term. Moreover, the document demonstrates that the KCMO Health Department found PCCA's air-conditioning to be out of compliance and ordered it to be fixed within 10 days.**

29. PCCA made purchase orders for repairs to the chillers on or about May 4, 2021, and repairs began on or about May 6, 2021. (PCCA 021465, attached as Exhibit P; see also Def.'s Answers to Pl.'s First Set of Interrogs. ("PCCA Interrogs."), ¶ 9, attached as Exhibit Q.).

**Response: Controverted. PCCA has not attached the purported purchase orders and its answer to Plaintiff's Interrogatory No. 9 indicates that it "was subsequently determined that the chillers should be replaced instead."**

30. Once it was determined that the chillers should be replaced instead of repaired, PCCA purchased replacement chillers, paid additional costs to expedite delivery of those chillers despite supply chain/logistical disruption caused by the pandemic, had them installed as soon as possible, and approved overtime for workers to accomplish all of this as quickly as possible. (PCCA 021493, attached as Exhibit R; see also PCCA Interrogs. at ¶ 9; Exh. N, PCCA 05088.).

**Response: Controverted. PCCA knew that its chillers needed to be replaced prior to the summer of 2021. On February 11, 2020, Lippert provided two bids to replace a chiller on the Manor building with either a York or Carrier chiller model. (Exhibit 6, 2020 Manor Building Lippert Bid; Exhibit 7, 2020 Manor Building Lippert Bid No 2). Also, on June 4, 2019, U.S. Engineering recommended a complete chiller replacement. (Exhibit 8, U.S. Engineering Note). Otherwise, uncontroverted.**

31. Plaintiff and other residents whose apartments were affected by the chiller outage were informed by PCCA that they would receive a $150 rent credit, and an additional $200 credit to reimburse them for purchasing an in-unit air-conditioner. (PCCA 023531, attached as Exhibit S.).

**Response: Uncontroverted.**

32. An additional $150 rent credit was provided in July: in total, affected residents received $300 in rent credits, $200 reimbursement for window unit air conditioners, and PCCA

worked with affected tenants to relocate them to vacant apartments not affected. (PCCA Interrogs. at ¶ 9; see also Rigsby Dep. at 102:6-103:12.).

**Response: Controverted. The cited testimony of Ms. Rigsby only indicates that PCCA offered to move her to a different apartment complex owned by PCCA in Kansas City, Missouri, but that Plaintiff already determined she was moving. (PCCA Exhibit B, Rigsby Depo, 22:7-13, 59:10-16, 103:9-18).**

33. Rigsby received both of the $150 rent credits, as well as the $200 reimbursement for purchasing an air conditioner for her apartment. (Rigsby Dep. at 100:9-20; 101:5-14; 102:6-13, ref. Exh. 18; see also, Exh. 18 to Rigsby Dep. (Email from Rigsby Regarding Rental Credits).).

**Response: Uncontroverted.**

34. Rigsby chose not to purchase a second air conditioner like some other tenants did, and also chose not to accept PCCA's offer to relocate her to an apartment with central air conditioning. (Rigsby Dep. at 100:11-20; 103:9-16.).

**Response: Uncontroverted.**

35. The air conditioner Rigsby purchased was effective at keeping the area where she had it cool. (Rigsby Dep. at 102:24-103:8.).

**Response: Controverted. First, the purported "fact" does not define what is meant by "the area where she had it," since Ms. Rigsby testified the unit could not completely cool one room, and therefore this "fact" lacks the necessary concision under FRCP 56. Moreover, Ms. Rigsby testified that in terms of whether the portably unit kept one room cool, she said "I wouldn't say comfortable cool." (PCCA Exhibit B, Rigsby Depo, 103:7).**

36. By June 11, 2021, P1 reported that certain parts had arrived and "plan[ned] on getting this repair made tomorrow morning. It is supposed to storm tonight, so that is not an option. Josh will be there at 7am tomorrow morning to get started." (PCCA 022051, attached as Exhibit T.).

**Response: Uncontroverted.**

37. On June 14, 2021, P1 reported that some of the repairs could not be completed because "[t]he seal would not hold because the pump housing is damaged. We are still looking for a replacement pump. Josh was out there most of the day Saturday trying to get it to work but just couldn't get it to stop leaking." (PCCA 045151, attached as Exhibit U.).

8

**Response: Uncontroverted. For clarity, the quoted language appears at PCCA045152-53.**

38. At that time, everyone was hoping the replacement chillers would arrive that week but "[t]his is dependent on the trucking industry and locking in a driver." (Id.).

**Response: Controverted. First, the purported "fact" does not identify what time is intended to be referenced, and therefore lacks the necessary concision under FRCP 56. In addition, The email containing the quoted language was sent from Roger Remblake, VP Facilities and Construction Management at City Club Apartments, and does not reflect that "everyone was hoping" for replacement.**

39. On June 16, 2021, PCCA communicated to its residents that it was hoping to "receive chillers by Monday, the 21st. [PCCA has] already secured the crane equipment for Monday through Wednesday to place the chillers on the roof." (PCCA 037321, attached as Exhibit V.).

**Response: Uncontroverted.**

40. On June 21, 2021, replacement chillers began being installed and by June 24, all systems were back up and running. (PCCA 046929, PCCA 037322, attached as Exhibit W; PCCA Interrogs. at ¶ 8.).

**Response: Controverted. One tenant in the South building left a review of PCCA on July 1, 2021, wherein she indicated that there was a "lack of air conditioning during May, June, and soon to by July of 2021." (Exhibit 9, email at PCCA 044685). On July 12, 2021, PCCA received an email from KCTV5 explaining that at least one tenant communicated to KCTV5 that air conditioning was not restored. (Exhibit 10, KCTV5 Email). Further, the Interrogatory answer referred to states that one building was never affected; however, PCCA emails indicate that all three buildings were affected. (Exhibit 11, Email PCCA 03464)**

41. On June 24, 2021, at 7:09pm, Rigsby sent her mother a text message stating that her air conditioning was working. (Rigsby Dep. at 105:15-106:5.).

**Response: Uncontroverted, but immaterial as to Plaintiff's communications with her mother.**

42. Throughout this entire period, PCCA regularly communicated (sending weekly updates) with residents that they were working expeditiously but there had been shipping delays attributable to COVID, causing difficulty securing transportation for the chillers from New Mexico. (PCCA 037251, PCCA 035163, PCCA 022046, attached as Exhibit X.).

9

**Response:** **Controverted. The purported "fact" does not identify what is intended by the term "Throughout this entire period," and therefore lacks the necessary concision under FRCP 56.**

43. On July 29, 2021, Plaintiff first submitted an air-conditioning maintenance after it was restored on or about June 24, 2021, to address subsequent spot issues that came up sporadically. (PCCA 000004, attached as Exhibit Y.).

**Response:** **Controverted. Ms. Rigsby testified that after her text of June 24, 2021, she experienced additional air conditioning outages but does not recall the exact dates of those outages. (PCCA Exhibit B, Rigsby Depo., 106:2-23).**

44. Plaintiff's lease explained that certain utility charges would be billed by the service provider and allocated to the resident by a third-party billing company, Paylease. (Rigsby Lease 2 at RIGSBY_00061- RIGSBY_00062.).

**Response:** **Uncontroverted.**

45. Specifically, water, sewer, and stormwater were billed based upon the number of persons residing in the unit using a ratio occupancy formula; trash was billed based upon the number of persons residing in unit; and gas and cooling are based upon unit square footage. (Rigsby Lease 2 at RIGSBY_00061- RIGSBY_00062; PCCA 034184, attached as Exhibit Z.)

**Response:** **Controverted to the extent this proposed "fact" is vague as to what is being referenced and therefore lacks the necessary concision under FRCP 56. In addition to the utilities listed above, Evergy charged PCCA for electricity provided to the complex as a whole which PCCA denominates as a "cooling charge." (PCCA Exhibit GG; Exhibit 2, Rigsby Lease, p. 13). PCCA passed these charges along to its tenants. (PCCA Exhibit II).**

46. Electricity was billed by the utility company directly to Plaintiff. (Id.)

**Response:** **Controverted to the extent this proposed "fact" is vague as to what is being referenced in terms of "the utility company" and therefore lacks the necessary concision under FRCP 56. Moreover, Ms. Rigsby paid Evergy for electricity provided to her specific unit and paid PCCA for electricity provided to the apartment complex. (PCCA Exhibits GG, II; Exhibit 12, Rigsby Evergy Bill)**

47. The lease explains that the allocation "is an estimate of usage by the resident," and to the extent an allocation is used "we or our billing company will calculate your allocated share

of the utilizes and services provided and all costs in accordance with state and local statutes." (Rigsby Lease 2 at RIGSBY_00062.)

**Response: Uncontroverted.**

48. This billing process includes an accounting for the deduction of certain percentages attributable to common areas which are not allocated to residents, using amounts determined in accordance with industry standards. (Def.'s Supp. Answer to Pl.'s First Set of Interrogs. ("Def.'s Supp. Interrogs."), ¶ 6, attached as Exhibit AA.).

**Response: Controverted to the extent this proposed "fact" is vague as to what is being referenced in terms of the "billing process" and therefore lacks the necessary concision under FRCP 56.**

49. Specifically, for electric and cooling, up to 75% of the total utility charge incurred by PCCA for the property is allocated among the residents according to the terms of their leases as described above, while the remainder is paid by PCCA; up to 95% for gas and trash; and up to 90% for water and sewer. (Def.'s Supp. Interrogs., ¶ 6.).

**Response: Controverted to the extent that this statement of fact purports to state that utility charges are allocated among the residents "according to the terms of their leases." (PCCA Exhibit GG, pp. 263-264, 215-216 to Exhibit 13, "Plaza Club City Apartments – Billable Expense"; and PCCA Exhibit GG, pp. 87-88 to Exhibit 13, "Plaza Club City Apartments – Billable Expense"). Uncontroverted to the extent that PCCA purportedly conducts a common area deduction.**

50. Paylease was responsible for processing utility bills, as it "allows for better utility usage tracking and [] provides [] residents with one designated place they need to go to make rent and utility payments." (PCCA 033893, PCCA 034184, attached as Exhibit BB.).

**Response: Controverted. Plaintiff's contract was with Defendant, not Paylease, and therefore, Defendant was responsible for ensuring Plaintiff was properly billed for utilities.**

51. Paylease, not PCCA, determined the amount of each individual utility fee owned based upon the process described by the Utility Addendum to each tenant's lease agreement. (PCCA Interrogs. at ¶ 14.).

**Response: Controverted. PCCA contracted with Paylease to provide third-party payment processing of utility bills but is in contractual privity with its tenants. (Exhibit 2, Rigsby Lease, pp. 13-14; Exhibit 14, Zego Contract).**

11

52. "Paylease is a known best practice vendor throughout the Multifamily Industry that follows the National Apartment Association rules for billing back utilities. This means all [of PCCA]'s utility billing methodologies are approved practices by the National Apartment Association." (Exh. BB, PCCA 033893; PCCA 034184.).

**Response: Controverted. This proposed "fact" is simply quoting from a document prepared by Defendant, and is not material to any genuine issue.**

53. Rigsby has no reason to believe any of her utility charges were inconsistent with the terms of her lease. (Rigsby Dep. at 46:18-20; 48:24-49:11; 51:5-12; 52:12-54:24.).

**Response: Controverted. PCCA has issued credits in the past for improperly charging tenants on their share of gas utilities. (Exhibit 15, Gas Credit Email, at PCCA 023111—PCCA 023112). PCCA's records also indicate an overbilling on gas charges. For example, PCCA was charged a total of $7,858.02 between Constellation and Spire for the supply month of April 2021. (PCCA Exhibit GG, pp. 263-264, 215-216). Yet, for that service month, PCCA identified a total provider expense for gas in the amount of $8,464.53. In addition, KC Water charges PCCA for water and wastewater in a single bill but PCCA curiously charges for these items separately. (PCCA Exhibit II, p. 3). The combined KC Water water and wastewater bill for the November 2020 service month was $5,454.42. (PCCA Exhibit GG, pp. 87-88). Yet, PCCA's utility billing spreadsheet shows separate charges for water (███████) and sewer (███████) which total ███████. (Exhibit 13). The roughly ███████ markup on the actual amount charged by KC Water is then used in the calculation of the pro rata share each tenant is expected to pay. This results in a net gain to PCCA and an overpayment by Plaintiff. In addition, it is immaterial whether Plaintiff individually believes her utilities were excessively high, since her specific knowledge of the overcharges is not an element of her claim.**

54. Rigsby paid each of her utility bills in full without speaking to anyone at Paylease, PCCA, or any of the utility companies regarding any concerns about the amount of her bills. (Rigsby Dep. at 49:13-50:11.).

**Response: Uncontroverted, but immaterial, since her specific knowledge of the overcharges is not an element of her claim.**

55. Plaintiff's sole basis for alleging her utility bills were improper was that was she and her mom "thought" the charges were high. (Rigsby Dep. at 48:1-11, 49:7-11, 52:23-53:5.).

**Response: Controverted. PCCA has issued credits in the past for improperly charging tenants on their share of gas utilities. (Exhibit 15, Gas Credit Email, at PCCA 023111—PCCA 023112). PCCA's records also indicate an overbilling on gas charges. For example, PCCA was charged a total of $7,858.02 between Constellation and Spire for the supply month of April 2021. (PCCA Exhibit GG, pp. 263-264, 215-216). Yet, for that service month,**

PCCA identified a total provider expense for gas in the amount of $8,464.53. In addition, KC Water charges PCCA for water and wastewater in a single bill but PCCA curiously charges for these items separately. (PCCA Exhibit II, p. 3). The combined KC Water water and wastewater bill for the November 2020 service month was $5,454.42. (PCCA Exhibit GG, pp. 87-88). Yet, PCCA's utility billing spreadsheet shows separate charges for water (████████) and sewer (████████) which total ████████. (Exhibit 13). The roughly ████ markup on the actual amount charged by KC Water is then used in the calculation of the pro rata share each tenant is expected to pay. This results in a net gain to PCCA and an overpayment by Plaintiff. In addition, it is immaterial whether Plaintiff individually believes her utilities were excessively high, since her specific knowledge of the overcharges is not an element of her claim.

56. Plaintiff's mom based her belief that the utility bills were high on comparison to her utility bills for a "full large house" in Rolla, Missouri (Rigsby Dep. at 53:13-15.).

**Response: Uncontroverted, but immaterial as to what Plaintiff's mother believed regarding Plaintiff's utility bills.**

57. Plaintiff "did [not] know much was normal for the Kansas City area" and attributed the seemingly-high cost of her utilities to the higher cost of living in a city like Kansas City vis-à-vis living in Rolla – not to any improper charges or miscalculations. (Rigsby Dep. at 48:6-11; 49:7-11.).

**Response: Controverted. This proposed "fact" is not concise and vague as to the subject of the statement. In addition, PCCA has issued credits in the past for improperly charging tenants on their share of gas utilities. (Exhibit 15, Gas Credit Email, at PCCA 023111— PCCA 023112). PCCA's records also indicate an overbilling on gas charges. For example, PCCA was charged a total of $7,858.02 between Constellation and Spire for the supply month of April 2021. (PCCA Exhibit GG, pp. 263-264, 215-216). Yet, for that service month, PCCA identified a total provider expense for gas in the amount of $8,464.53. In addition, KC Water charges PCCA for water and wastewater in a single bill but PCCA curiously charges for these items separately. (PCCA Exhibit II, p. 3). The combined KC Water water and wastewater bill for the November 2020 service month was $5,454.42. (PCCA Exhibit GG, pp. 87-88). Yet, PCCA's utility billing spreadsheet shows separate charges for water (████████) and sewer (████████) which total ████████. (Exhibit 13). The roughly ████ markup on the actual amount charged by KC Water is then used in the calculation of the pro rata share each tenant is expected to pay. This results in a net gain to PCCA and an overpayment by Plaintiff.**

58. Plaintiff has not identified any damages related to her utility bills. (Pl.'s Supp. Answer to Def.'s First Set of Interrogs. ("Rigsby Interrogs."), ¶ 4 attached as Exhibit CC.)

**Response: Controverted. First, the citations to the record do not support the proposed "fact."**

13

**Second, PCCA has issued credits in the past for improperly charging tenants on their share of gas utilities. (Exhibit 15, Gas Credit Email, at PCCA 023111—PCCA 023112). PCCA's records also indicate an overbilling on gas charges. For example, PCCA was charged a total of $7,858.02 between Constellation and Spire for the supply month of April 2021. (PCCA Exhibit GG, pp. 263-264, 215-216). Yet, for that service month, PCCA identified a total provider expense for gas in the amount of $8,464.53. In addition, KC Water charges PCCA for water and wastewater in a single bill but PCCA curiously charges for these items separately. (PCCA Exhibit II, p. 3). The combined KC Water water and wastewater bill for the November 2020 service month was $5,454.42. (PCCA Exhibit GG, pp. 87-88). Yet, PCCA's utility billing spreadsheet shows separate charges for water (████) and sewer (████) which total ████. (Exhibit 13). The roughly ████ markup on the actual amount charged by KC Water is then used in the calculation of the pro rata share each tenant is expected to pay. This results in a net gain to PCCA and an overpayment by Plaintiff.**

59. Before the air conditioning stopped working, Plaintiff had not encountered any problems that made her apartment at Plaza Club "unlivable." (Rigsby Dep. at 62: 11-15; 62:22-63:2.).

**Response: Controverted. The citations to the record do not support the proposed "fact." The question posed to Ms. Rigsby was "Before the air conditioning went out at your apartment, there was nothing _that made you go home to Rolla_ due to the unlivable nature of the apartment, correct?" (PCCA Exhibit B, Rigsby Depo, 62:22 – 63:1) (emphasis added).**

60. Plaintiff identified several conditions other than the air conditioning outage that she noticed during her time at Plaza Club, but none of them affected her health, safety, or ability to inhabit her apartment. (Rigsby Interrogs. at ¶ 3; Rigsby Dep. at 75:9-12; 79:22-80:6; 82:24-83:6; 86:3-24; 87:5-8.).

**Response: Controverted. Ms. Rigsby testified that the condition of the parking gate "impacted my thought of parking in a parking garage provide by my complex . . . because it wasn't safe." (PCCA Exhibit B, Rigsby Depo, 75:12-15). Ms. Rigsby testified that the mold infestation has not been fixed and "the Health Department had to keep coming back" because PCCA did not comply with directives. (PCCA Exhibit B, Rigsby Depo., 82:12-23). These individual conditions are a part of the overall failure to properly invest in the premises.**

61. When Rigsby moved into her second apartment at Plaza Club, there was a cockroach infestation in her kitchen and dining room. (Rigsby Interrogs. at ¶ 3; Rigsby Dep. at 83:13-20.).

**Response: Uncontroverted.**

62. PCCA repeatedly sprayed Rigbsy's apartment to eliminate the cockroaches, and the cockroaches were effectively removed when an exterminator was brought in, determined

14

the cockroaches were coming from the unit below Rigsby's and sprayed that unit was well (Rigsby Dep. at 84:18-20.).

**Response: Controverted. Ms. Rigsby testified that she contacted management numerous times and PCCA would spray, but not ameliorate the infestation. (PCCA Exhibit B, Rigsby Depo., 83:18-24). Only after PCCA sorted out its prior nonpayment with Blue Beetle, did Blue Beetle come spray all three buildings and resolved the issue. (PCCA Exhibit B, Rigsby Depo., 83:24 – 84:20).**

63. Except for the cockroach issue and the air conditioning, Plaintiff never complained to PCCA, through the tenant portal or otherwise, about any of the conditions she identified, and did not consider any of the other issues a "huge problem." (Rigsby Dep. at 64:13-18; 65:3-6; 75:19-21; 79:34-8; 82:9-11; 83:13-84:10; 84:18-20; 85:21-86:2.).

**Response: Controverted. Ms. Rigsby testified that she made additional complaints which do not appear in PCCA's records. (PCCA Exhibit B, Rigsby Depo., 40:12-24). Also, PCCA takes Ms. Rigsby's testimony regarding a "huge problem" out of context as she actually testified: "And the roaches. I mean, that was a huge problem." (PCCA Exhibit B, Rigsby Depo., 65:5-6).**

64. On June 6, 2021, Rigsby wrote a move-out letter to PCCA stating that her apartment was in good condition. (Rigsby Dep. at 59:9-24, ref. Exh. 8; see also id. at Exh. 8 (Rigsby Notice to Vacate).).

**Response: Uncontroverted.**

65. Rigsby moved out of Plaza Club on either July 31 or August 1, 2021. (Rigsby Dep. at 61:10-18.).

**Response: Uncontroverted.**

66. Rigsby made her last rent and utility payment for tenancy at Plaza Club on August 20, 2021 (PCCA 022210, attached as Exhibit DD.).

**Response: Uncontroverted.**

# PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Historical Issues at PCCA

1. In March **2015**, a property condition report was created which indicated that, of the six chillers, one was not operable and four were reaching the end of their service life. (Exhibit 16, GRS Group Property Condition Report, pp. 1, 17).

2. In February **2017**, as City Club Apartments took over managing the Plaza Club City Apartments, LLC ("PCCA") property (the three apartment buildings located at the intersection of 46th Street and Jefferson Street in Kansas City, Missouri "the Plaza"), it received an email from Block MultiFamily Group identifying issues with the buildings' electrical, plumbing, boiler, and air conditioning systems accompanied with a list of 23 remediation recommendations. (Exhibit 17, 2017 Block Family Email).

3. The February 2017 Block MultiFamily Group email specifically identified the fact that the boiler systems in each of the three buildings did not provide "adequate heat." (Exhibit 17, 2017 Block Family Email, pp. 2-3).

4. The February 2017 Block MultiFamily Group email also recognized a more serious problem with each boiler: "the system does not have a backflow preventer . . . and now that we are chemically treating the boiler water any backflow into the fresh water could cause serious injury or death." (Exhibit 17, 2017 Block Family Email, p. 2).

5. Since **2017**, there have been more than 25 instances when the air conditioning for at least one of the three apartment buildings has been out for longer than a day. (Exhibit 18, Foye Declaration, pp. 1-2; Exhibit 3, 2020 AC Complaints).

6. In May **2018**, PCCA's then Chief Engineer provided an exit interview wherein he provided his reasons for leaving:

When and why did you begin looking for a new job? . . . **On any given day there are least three active water leaks. Plumbing, chillers are breaking down often.** No longer has approval to fix anything that's an emergency without approval. . . . **there are units that have had no AC for three weeks**. . . ██████████ **There are 35-40 apts with no air**. **No contractor will come on site.** ██████████ For AC repairs, has to get a hold of Tom, Tom to Roger, Roger to Jonathan Sherman, Takes 4-5 days for response and approval. **Currently 10 apartments with water leaks.**

(Exhibit 19, Exit Interview, p. 1) (emphasis added).

7.     On June 15, 2018, Melissa Merkys, Property Manager at PCCA, recognized that she could not "keep the residents happy with sub-par cooling." (Exhibit 20, Sub-Par Cooling Email, p. 2).

8.     In 2020, PCCA looked into some repairs for its heating and cooling chillers, but acknowledged that it "can't use Vaugn anymore though, we owe them too much money. ☹ It sucks because they were really good to us." (Exhibit 21, Vaughn Email).

9.     Since **2017**, PCCA has been sued by the following nine contractors for failing to pay its bills: RJM Roofing, LLC; ServPro of West PASCO; Build Wiser Construction, LLC; Atronic Alarms, Inc.; DH Pace Company; Absolute Comfort Technologies, Inc.; Surface Restoration; U.S. Engineering Service, LLC; and American Boiler Services, Inc. (Exhibit 22, Collection of Contractor Suits).

10.    Between January 2016 and August 2022, the word "mold" appears more than 300 times in PCCA's work orders. (Exhibit 18, Foye Declaration, p. 3).

11.    PCCA's favorite four-letter word is mold. (Exhibit 23, Mold Email, p. 1).

12.    The Plaza experienced air conditioning failures in the summer of **2020**. (Exhibit 3, 2020 AC Complaints).

13.    PCCA had knowledge of air conditioning failures through the summer of **2020**. (Exhibit 3, 2020 AC Complaints).

17

14.     In October 2020, the air conditioning was out for multiple days in the North building. (Exhibit 24, Duncan 2020 Email).

15.     In November 2020, the water heaters in both the North and South buildings were not working for multiple days. (Exhibit 25, Duncan November Email).

16.     In December 2020, the North building was without hot water for multiple days. (Exhibit 26, Duncan Water Email).

17.     In 2020, PCCA *knew* it would have to replace its chillers in 2021. (Exhibit 27, 2021 Replacement Plan).

18.     In February 2020, PCCA received a bid to replace one of its air conditioning chillers. (Exhibit 6, 2020 Manor Building Lippert Bid; Exhibit 7, 2020 Manor Building Lippert Bit No. 2).

PCCA's Lease Agreements and (Self-Imposed) Obligations Thereunder

19.     PCCA is obligated to provide habitable apartments to its tenants. (Exhibit 1, Corp. Rep. Depo., 112:14-20).

20.     PCCA created self-imposed habitability standards which are set forth in its operating manual. (Exhibit 1, Corp. Rep. Depo., 113:5-12).

21.     PCCA defines a "maintenance emergency" as, among other things, a lack of "heat or air conditioning when outside temperature is extreme (55 degrees below and 85 degrees above)." (Exhibit 28, Operating Manual, p. 360).

22.     Ms. Rigsby's lease contains the following provision regarding the condition of the premises:

**25. CONDITION OF THE PREMISES AND ALTERATIONS.**

**YOU ACCEPT THE APARTMENT, FIXTURES, AND FURNITURE AS IS, EXCEPT FOR CONDITIONS MATERIALLY AFFECTING THE**

**HEALTH OR SAFETY OF ORDINARY PERSONS. TO THE EXTENT PERMITTED BY LAW, WE DISCLAIM ANY AND ALL IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO (IF APPLICABLE) THE IMPLIED WARRANTY THAT THE PREMISES IS SUITABLE FOR RESIDENT'S HABITABILITY OR (IF APPLICABLE) ANY IMPLIED WARRANTY OF MERCHANTABILITY**

(Exhibit 2, Rigsby Lease, p. 4).

23.     Ms. Rigsby accepted the premises "as is, except for conditions materially affecting the health or safety of ordinary persons. (Exhibit 2, Rigsby Lease, p. 4).

24.     PCCA's form lease agreement contains an implied provision: the implied warranty of habitability. *Chiodini v. Fox*, 207 S.W.3d 174, 176 (Mo. App. E.D. 2006); *King v. Moorehead*, 495 S.W.2d 65, 75 (Mo. App. 1973).

25.     PCCA obligated itself to "act with customary diligence to" "maintain fixtures, hot water, heating and A/C equipment." (Exhibit 2, Rigsby Lease, p. 5).

26.     The "premises" Ms. Rigsby rented from PCCA include, during the respective tenancies, apartment number 801M at 609 W 46th Street, Kansas City, Missouri, 64112 and apartment number 408N at 4609 Jefferson Street, Kansas City, Missouri 64112. (Exhibit 2, Rigsby Lease, p. 1; Exhibit 39, First Rigsby Lease, p. 7).

27.     Ms. Rigsby chose not to accept PCCA's offer to relocate to the City Club Apartments Crossroads Kansas City location because she was already planning to vacate the Plaza location. (PCCA Exhibit B, Rigsby Depo., 103:9-18).

28.     Ms. Rigsby moved out of PCCA on July 31 or August 1, 2021. (PCCA Exhibit B, Rigsby Depo., 61:6-18).

<u>Utilities at PCCA</u>

29.     Paylease, LLC d/b/a Zego ("Paylease") is PCCA's limited agent with respect to utility bills and their processing at the Plaza. (Exhibit 14, Zego Contract, pp. 1-2).

19

30.     PCCA has issued credits in the past for improperly charging tenants on their share of gas utilities. (Exhibit 15, Gas Credit Email).

31.     PCCA was charged a total of $7,858.02 between Constellation and Spire for the service month of April 2021. (PCCA Exhibit GG, pp. 263-264, 215-216).

32.     For the April 2021 service month, PCCA identified a total provider expense for gas in the amount of ▇▇▇▇▇▇. (Exhibit 13).

33.     KC Water charges PCCA for water and wastewater in a single bill but PCCA charges for these items separately. (PCCA Exhibit II, p. 3).

34.     The combined KC Water water and wastewater bill for the November 2020 service month was $5,454.42. (PCCA Exhibit GG, pp. 87-88).

35.     PCCA's utility billing spreadsheet shows separate charges for water (▇▇▇▇▇▇) and sewer (▇▇▇▇▇▇) which total ▇▇▇▇▇▇. (Exhibit 13).

The Summer of 2021

36.     On May 26, 2021, James Ellsberry, Property Manager at Plaza Club City Apartments, complained of the "frustrating" issues at the Plaza, and it was difficult to renew leases at the Plaza when residents were experiencing 90-degree temperatures in their apartments. (Exhibit 29, Frustrations Email).

37.     In 2021, Roger Remblake, Vice President of Facilities and Construction Management, confessed PCCA's "equipment overall is in poor shape from domestic hot water systems, to hydronic heating and cooling." (Exhibit 30, 2021 Remblake Email, p. 2).

38.     PCCA was not maintaining its domestic hot water systems, hydronic heat, and chillers as it should. (Exhibit 30, 2021 Remblake Email, p. 2).

39.     In 2021, the equipment supporting PCCA's heating and cooling system was "either not working, turned off, bypassed or severely deteriorated." (Exhibit 30, 2021 Remblake Email, p. 2).

40.     In 2021, Roger Remblake, found it imperative to bring this equipment "back to our operating standards" despite the fact that the boiler system failed to provide adequate heat and could have caused serious injury or death since, at least, February 2017. (Exhibit 30, 2021 Remblake Email, p. 2).

41.     According to the National Weather Service's historical weather data, there were twenty-one (21) days in June 2021 and twenty-seven (27) days in July 2021 which were 85-degress Fahrenheit or above. (Exhibit 31, National Weather Data, https://www.weather.gov/wrh/Climate?wfo=eax, last visited July 20, 2023).

42.     PCCA failed to live up to its self-imposed standard of habitability on forty-eight (48) of the sixty-one (61) days in June and July 2021. (Exhibit 31, National Weather Data; Exhibit 28, Operating Manual, p. 360).

43.     Extreme and dangerous heat is such an issue in the Midwest during the summer that Kanas City has dozens of cooling centers. https://data.mo.gov/Health/Missouri-Cooling-Centers-Map/2wki-9iz8, last visited July 24, 2023.

44.     On June 16, 2021, the KCMO Health Department found that PCCA's lack of air conditioning was "not in compliance" with its standards. (PCCA Exhibit B, p. 283).

45.     On June 16, 2021, the KCMO Health Department **ordered** PCCA to remedy the air conditioning issue within 10 days. (PCCA Exhibit B, p. 284).

46.     On June 16, 2021, the KCMO Health Department found that Ms. Rigsby's apartment walls were registering moisture between 18 – 44 percent, and **ordered** the violation be remedied within 10 days. (PCCA Exhibit B, p. 284).

47.     PCCA sent several emails stating that the air conditioning chillers were working again, but that was false. (PCCA Exhibit B, Rigsby Depo, 104:19-24).

48.     Ms. Rigsby purchased a $500 portable air conditioner and was not reimbursed the full amount by PCCA. (PCCA Exhibit B, Rigsby Depo., 100:1-24).

49.     Ms. Rigsby's portable air conditioner could not cool her entire apartment. (PCCA Exhibit B, Rigsby Depo., 100:16).

50.     Ms. Rigsby complained to PCCA about the air conditioning via the online portal, through emails, through phone calls, and in person. (PCCA Exhibit B, Rigsby Depo., 40:14-24).

51.     PCCA was provided with notice by Ms. Rigsby regarding the lack of air conditioning. (PCCA Exhibit B, Rigsby Depo., 40:14-24).

52.     Ms. Rigsby returned home to Rolla, Missouri on the weekends in the Summer of 2021 to avoid the excessive and dangerous heat at PCCA. (PCCA Exhibit B, Rigsby depo., 61:19 – 63:4).

53.     PCCA issued partial rental credits to its tenants for June and July 2021. (Exhibit 32, June-July Credit, p. 1; Exhibit 33, Email PCCA 021538).

54.     The air conditioning chillers at the Plaza were <u>not</u> fixed in June 2021 and air conditioning issues persisted thereafter. (Exhibit 34, Anonymous Review; Exhibit 18, Foye Declaration).

55.     On October 21, 2021, Becky Chalou, Assistant Vice President at City Club Apartments, expressed her frustration with the conditions on the Plaza when she wrote: "Otherwise

we simply won't have trash collected among the other nightmares that are Plaza." (Exhibit 35, Nightmares Email, p. 1).

Continued Habitability Issues at PCCA

56.     Air conditioning failures at the Plaza continued in the summer of 2022. (Exhibit 18, Foye Declaration).

57.     PCCA's boilers in the South building failed in 2022 leading to a lack of hot water. (Exhibit 36, Hot Water Email).

58.     PCCA issued a rental credit to tenants in the South building relating to the lack of hot water. (Exhibit 36, Hot Water Email).

59.     Certain potential purchasers have looked at purchasing PCCA's three buildings, but ███████████████████████████████████████████████████████ ██████████████████████████████████████ (Exhibit 37, Investors Email, pp. 4-5).

60.     At least one potential purchaser has identified ███████████████████████ ███████████████████████████████████████████████████████ ██████████████." (Exhibit 37, Investors Email, pp. 4-5).

# INTRODUCTION

This "straightforward case," as PCCA now sees it, has previously been the stuff of self-described "nightmares that are Plaza [sic]."

Plaintiff Ryann Rigsby's ("Ms. Rigsby") putative class action is the culmination of years of disinvestment in PCCA's real estate on the Kansas City Country Club Plaza. PCCA purchased its "asset" in 2015 and turned over the reins to its management company, City Club Apartments, LLC. At least as far back as **2017**, the air conditioning chillers (the cooling portion of an air conditioning system) on PCCA's rooftops failed creating outages in PCCA's three buildings. Rather than appropriately repair and replace the broken units, PCCA took a wait-and-see approach permitting its tenants to go without air conditioning in stifling summer temperatures for days and weeks on end. That is, until May 2021, when each chilling unit failed to turn on, leaving the tenants without air conditioning through July of that year. PCCA also inherited a failing boiler system that left the three buildings "without adequate heat" and posed a threat of "serious injury or death." PCCA, again, did nothing. Over the years, and amidst the hot summers and freezing winters, PCCA received over 300 complaints of mold in its buildings. The complaints piled so high that mold became PCCA's "favorite four letter word!" It is with this context that PCCA rented an apartment to Ms. Rigsby who experienced the results PCCA pattern of disinvestment at the Plaza.

PCCA asks this Court to grant it summary judgment on each of Ms. Rigsby's causes of action because, as PCCA sees it, this is a "straightforward case" where one complaining tenant experienced a short-term inconvenient loss of an amenity. But contrary to PCCA's erroneous characterization, there *are* genuine issues of material fact with respect to the lack of air conditioning (along with other habitability issues) and PCCA's excessive utility charges, as set forth below. Given the plethora of fact issues, summary judgment simply is not appropriate.

A party is entitled to summary judgment if there is **no** genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Rafos v. Outboard Marine Corp.*, 1 F.3d 707, 708 (8th Cir. 1993) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

The party seeking summary judgment bears the burden to establish the absence of a genuine issue of fact and entitlement to judgment as a matter of law. *Celotex*, 477 U.S. at 323. "When considering a motion for summary judgment, a court must evaluate the evidence in the light most favorable to the nonmoving party and must afford the nonmoving party 'the benefit of all reasonable inferences.'" *Arvest Bank v. Uppalapati*, No. 11-03175-CV-S-DGK, 2013 WL 85336, *1 (W.D. Mo. Jan. 7, 2013) (citing *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991)).

## ARGUMENT

### I. Ms. Rigsby Is Entitled to Seek Injunctive Relief.

Ms. Rigsby acknowledges that she is a former tenant, but that fact does not foreclose her from seeking injunctive relief. There are two situations in which a class may be certified despite the mooting of the named plaintiff's claim prior to a district court's class certification decision: (1) when the plaintiff's claim is "capable of repetition, yet evading review," and (2) when the plaintiff's claim is "inherently transitory [such] that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 400 (1980). Both apply here.

### A. The "Capable of Repetition, But Evading Review" Exception

The "capable of repetition, but evading review" exception is an exception to the standing doctrine. *Weinstein v. Bradford*, 423 U.S. 147, 348-49 (1975). Ordinarily, a *named plaintiff* must have a personal stake in the outcome of the case at the time the district court rules on class

certification in order to prevent mootness of the action. *Sosna v. Iowa*, 419 U.S. 393 (1975) (mootness of the named plaintiffs' individual claims after certification did not render the class action moot). However, a named plaintiff need not have a personal stake in the injunctive portion of the litigation where the injury is capable of being repeated onto others but evading judicial review. *Gerstein v. Pugh*, 420 U.S. 103, 110–11 n. 11 (1975); *Cruz v. Hauck*, 627 F.2d 710 (5th Cir. 1980) (case was not moot even though the individual's claims were mooted prior to class certification where there had been ten years of litigation and the individual claims of the named plaintiffs were "capable of repetition, yet evading review"). For example, in *Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982), the Tenth Circuit applied the capable of repetition, but evading review exception to an uncertified class action challenging the "conditions of confinement of juvenile boys placed at" a school after the plaintiff left the school. *Id.* at 934, 936-37.

Here, the "capable of repetition, but evading review" exception applies because a class action lawsuit seeking injunctive relief, such as the present suit, will take years to resolve but a tenant facing unhabitable living conditions in an apartment complex, such as PCCA's, is not going to renew his/her one-year lease agreement and continue to remain in an uninhabitable environment for the purpose of maintaining standing to sue for injunctive relief. Take Ms. Rigsby's situation for example. She moved into PCCA in August 2020 and provided her move-out notice in June 2021.[1] While she was offered to relocate to a different apartment building, she chose not to accept that offer because she already found habitable housing elsewhere.[2] Even PCCA's Property Manager, James Ellsberry, understood: "**It is impossible to renew [leases] when residents are experiencing 90-degree temperatures in their apartments**."[3] (emphasis added).

---

[1] PCCA Exhibit B, Rigsby Depo, 22:7-13, 59:10-16.
[2] PCCA Exhibit B, Rigsby Depo, p. 103:9-18; Exhibit 2, Rigsby Lease, p. 4.
[3] Exhibit 29, Frustrations Email, p. 1.

26

This litigation was originally filed in the Circuit Court of Jackson County, Missouri, on July 2, 2021 (when Ms. Rigsby was still a tenant). (Doc. 1-1). After initial class-wide discovery, Ms. Rigsby filed her motion for class certification. (Doc. 1-2). PCCA removed this action to federal court, where a new scheduling order has been entered, and PCCA has now filed the present motion for summary judgment. (Docs. 1, 34, and 40). Thus, no court has had the opportunity to rule on class certification, and no tenant would have remained in the uninhabitable conditions at PCCA just to ensure standing is met prior thereto. Thus, the capable of repetition, but evading review exception logically applies to a case such as this one.

There is additional evidence that the complained-of harm is capable of repetition. Namely,

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████.[4] ███

█████████████████████████████████████████████████████████████

██████████████████████████████████████████"[5] In addition, PCCA tenants have complained to PCCA—after the filing of Ms. Rigsby's Petition—that the air conditioning units in the buildings were still not working.[6] Thus, not only are the habitability issues complained of by Ms. Rigsby *capable* of being repeated, they *are* being repeated.

### B.     The "Inherently Transitory" Exception

Under the "inherently transitory" exception, "if there is 'a constant class of persons suffering the deprivation complained of in the compliant,' but there is unlikely to be any claim that survives long enough for a court to grant class certification, mootness of an individual claim does not moot a class claim." *Smith v. City of Chicago*, 273 F.R.D. 413, 414 (N.D. Ill. 2011) (quoting *Olson v. Brown*, 594 F.3d 577, 583 (7th Cir. 2010). In *Olson*, the Seventh Circuit reversed and

---

[4] Exhibit 37, Investors Email, pp. 4-5.
[5] Exhibit 37, Investors Email, pp. 4-5.
[6] Exhibit 18, Foye Declaration, pp. 1-2.

remanded a district court's dismissal of a putative class action brought by inmates challenging the constitutionality of certain jail procedures because it was unlikely that the court would be able to certify an inmate's claim before it was rendered moot. *Id.* at 582-83.

Likewise, here, a PCCA tenant is not going to "stick it out" at PCCA just to bring an injunctive relief claim against PCCA. Further, the evidence shows that PCCA's chilling units have continued to fail and current tenants continue to suffer from the same outages as Ms. Rigsby.[7]

As such, the inherently transitory exception applies.

## II.     The Implied Warranty of Habitability Is Not Disclaimed.

PCCA takes issue with the "well-settled [law] in Missouri 'that a landlord impliedly warrants the habitability of leased residential property.'" *Chiodini v. Fox*, 207 S.W.3d 174, 176 (Mo. App. E.D. 2006). Missouri law embeds "in every residential lease" "an implied warranty by the landlord that the dwelling is habitable and fit for living at the inception of the term and that it will remain so during the entire term." *King v. Moorehead*, 495 S.W.2d 65, 75 (Mo. App. 1973). As part of this implied warranty, a "landlord agrees to provide facilities and services that are 'vital to the life, health, and safety of the tenant and to the use of the premises for residential purposes.'" *Fuller v. TLC Property Management, LLC*, 402 S.W.3d 101, 111 (Mo. App. S.D. 2013) (quoting *Moser v. Cline*, 214 S.W.3d 390, 394 (Mo. App. W.D. 2007).

Despite this well-settled law implied in every residential lease, PCCA argues that its form leases include a "disclaimer" that, "to the extent permitted by law," the implied warranty of habitability is disclaimed. (Doc. 40, pp. 22-23). Split between opposite corners in PCCA's form lease is the following "disclaimer:"

**25. CONDITION OF THE PREMISES AND ALTERATIONS.**

**YOU ACCEPT THE APARTMENT, FIXTURES, AND FURNITURE AS IS,**

---

[7] Exhibit 18, Foye Declaration, pp. 1-2.

**EXCEPT FOR CONDITIONS MATERIALLY AFFECTING THE HEALTH OR SAFETY OF ORDINARY PERSONS. TO THE EXTENT PERMITTED BY LAW, WE DISCLAIM ANY AND ALL IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO (IF APPLICABLE) THE IMPLIED WARRANTY THAT THE PREMISES IS SUITABLE FOR RESIDENT'S HABITABILITY OR (IF APPLICABLE) ANY IMPLIED WARRANTY OF MERCHANTABILITY.[8]**

Ironically, the same provision which purports to disclaim the implied warranty of habitability begins by stating that a tenant accepts the premises as is, *except for* "conditions materially affecting the health or safety of ordinary persons."[9] That is Missouri's definition of habitability: "the subsequent development of dangerous or unsanitary *conditions on the premises materially affecting the life, health and safety of the tenant*." *Detling v. Edelbrock*, 671 S.W.2d 265, 270 (Mo. banc 1984) (emphasis added). Furthermore, PCCA's lease nonetheless obligates itself to "act with customary diligence to" "maintain fixtures, furniture, hot water, heating and A/C equipment."[10] This self-defeating language is important because contracts of adhesion (and their waiver provisions) are strictly construed against the drafter. *Fuller*, 402 S.W.3d at 104. The "language in an exculpatory clause must be unambiguous, unmistakable, and conspicuous." *Id.* "Language is ambiguous if it is reasonably open to different constructions." *Id.*

Here, though, PCCA's lease agreement is ambiguous. The lease forces a tenant to accept the premises without the benefit of the implied warranty of habitability *and also* accept the premises "as is" *except* as subject to the very definition of the implied warranty of habitability and while also obligating PCCA to maintain the property "with customary diligence."[11] These provisions contradict each other and render them ambiguous, confusing, and unenforceable to the benefit of PCCA.

---

[8] Exhibit 2, Rigsby Lease, p. 4.
[9] Exhibit 2, Rigsby Lease, p. 4.
[10] Exhibit 2, Rigsby Lease, p. 5.
[11] Exhibit 2, Rigsby Lease, pp. 4-5.

PCCA cites three Missouri cases to support its argument, but each case actually supports Plaintiff's position, because in each case the courts held that such "boilerplate clauses, however worded, are rendered ineffective, thereby affording the consumer the desired protection without denying enforcement of what is in fact the intention of both parties." *Crowder v. Vandendeale*, 564 S.W.2d 879, 881 (Mo. banc 198); *Crawford v. Whittaker Const., Inc.*, 772 S.W.2d 819, 822 (Mo. App. E.D. 1989); *Warren v. Paragon Tech. Group, Inc.*, 950 S.W.2d 844, 849 (Mo. banc 1997) (White, concurring in part and dissenting in part). The holdings in each case were premised upon Missouri's Uniform Commercial Codes paternalistic approach to new home purchasers, the movement away from *caveat emptor*, and the great burden placed on drafters of adhesion contracts who wish to enforce the unscrupulous terms in their contracts. *Id.* "It defies belief to think that the legislature would provide for good faith in contracts between people with equal bargaining power and for public contracts but force tenants to accept contracts with no negotiation and an absence of good faith from landlords who are allowed to escape any liability for their future negligence." *Fuller*, 402 S.W.3d at 112 (Rahmeyer, J. concurring).[12] Accordingly, PCCA's case law is inapposite.

Further, the lease provision PCCA relies on relates to the conditions of the "premises" which are defined earlier in the lease agreement as the apartment which is rented.[13] However, the defects which caused the habitability issues were **outside of the apartment itself**—*e.g.*, the air conditioning chillers on the roof, the boilers in the basement, and water leaks causing the mold infestations.[14] This fact is crucial because the exculpatory clause in *Fuller* was found inapplicable,

---

[12] "The average consumer would not understand that signing a lease for the rental of an apartment unit would effectively negate all prior negligence law and allow the landlord to show no regard for the tenant's safety." *Fuller*, 402 S.W.3d at 114 (Rahmeyer, J. concurring). "This clause is clearly unconscionable and, as such, is against public policy." *Id.*
[13] Exhibit 2, Rigsby Lease, p. 1.
[14] Exhibit 1, Corp. Depo., 20:12-24.

in part, because "premises" was defined as the interior of the apartment and the plaintiff was injured in a slip-and-fall in the parking lot. *Fuller*, 402 S.W.3d at 103, 107-08. Here, Ms. Rigsby entered into a lease agreement with PCCA for the rental of a single apartment unit, but PCCA's failures in the **common areas**—and areas exclusively possessed by PCCA which contained the air conditioning chillers—rendered the apartment uninhabitable. It would be unconscionable to permit PCCA to enforce the contradictory and ambiguous terms of its "disclaimer" against Ms. Rigsby who had no control over the mechanisms that rendered her apartment uninhabitable.

### III. A Lack of Air Conditioning Violates Missouri's Implied Warranty of Habitability.

PCCA wrongly suggests that a lack of air conditioning, alone, is not a violation of Missouri's implied warranty of habitability. PCCA is wrong on two counts. First, Missouri's implied warranty of habitability is not limited to singular issues; and singular issues are not alleged here. Second, a lack of air conditioning by itself may constitute a violation of the implied warranty of habitability. PCCA has not carried its burden of showing that there is no genuine issue of material fact.

#### A. *Missouri's Implied Warranty of Habitability Is Not Limited to Singular Issues.*

PCCA wrongly focuses its summary judgment argument solely on the issue of air conditioning. The implied warranty of habitability is broader than singular issues.

To be successful, a tenant must satisfy the following elements: "(1) entry into a lease for residential property; (2) the subsequent development of dangerous or unsanitary *conditions* on the premises materially affecting the life, health and safety of the tenant; (3) reasonable notice of the defects to the landlord; and (4) subsequent failure to restore the premises to habitability." *Detling*, 671 S.W.2d at 270 (emphasis added). "To constitute a breach of the warranty, a tenant must allege and prove *conditions* of such a nature as to render the premises unsafe or unsanitary." *Detling*, 671

S.W.2d at 270 (emphasis added).

Courts around the United States—including in Jackson County, Missouri—have determined that complaining of various habitability issues under a single claim for breach of the implied warranty of habitability is cognizable. For example, in the class action case styled *Fuentes v. KM-T.E.H. Realty 8, LLC, et al.*, Case No. 1916-CV29273, the Circuit Court of Jackson County, Missouri identified (and certified) the following common questions of fact and law, among others:

> (a) whether the living conditions at Ruskin Place Apartments are unsafe for tenants;
> (b) Whether the living conditions at Ruskin Place Apartments are unsafe for the tenants because they contain mold in units; (c) Whether the living conditions at Ruskin Place Apartments are unsafe for the tenants because of lacking air conditioning to the units; . . . and (g) Whether the living conditions at Ruskin Place Apartments are unsafe which conditions constituted a breach of the implied warranty of habitability.[15]

In *Peviani v. Arbors at California Oaks Property Owner, LLC*, 62 Cal. App. 5th 874, 892-93 (Cal. App. 2021), the California Court of Appeals reversed a district court's finding that commonality did not exist in a putative implied warranty of habitability class action case where "declarants cited a combination of dog feces, trash, and pests in the common areas." The court reasoned that these various issues "are common questions of fact because the condition of the dumpsters and the grounds is not an individualized issue—it is the same for everyone." *Id.*

In *Lloyd v. Roosevelt Properties, Ltd.*, 2018 WL 3814972, *5 (Oh. App. Aug. 9, 2018), the Ohio Court of Appeals found that "cigarette smoke, heat, and water issues" constituted various conditions supporting the trial court's reasonable determination that the implied warranty of habitability was breached. Importantly, the Ohio Court of Appeals also found that though those issues were not code violations, that fact was not dispositive of whether the implied warranty of habitability was breached. *Id.*

---

[15] Exhibit 40, KM THE Class Cert Order, pp. 7-8.

32

Missouri law plainly speaks to uninhabitable conditions, plural, and not to a single one-off condition. As such, PCCA's argument that Ms. Rigsby's *entire* implied warranty of habitability claim must come down to a lack of air conditioning is unsupported. PCCA's apartment complex suffered from a **pattern** of disinvestment (*i.e.*, neglect) that manifested in a lack of air conditioning, a lack of heat, and mold infestations, etc.

In its own words, PCCA has been the stuff of "nightmares."[16] In February 2017, as City Club Apartments took over managing the Plaza, it received an email from Block MultiFamily Group identifying issues with the buildings' electrical, plumbing, boiler, and air conditioning systems accompanied with a list of 23 remediation recommendations.[17] The email specifically identified the fact that each of the three buildings were "without adequate heat."[18] In addition to lack of heat, the boiler failures led to a lack of hot water at PCCA in 2022.[19] This led PCCA to issue a rental credit to tenants in the affected building.[20]

In May 2018, PCCA's then Chief Engineer provided an exit interview wherein he provided his reasons for leaving:

> When and why did you begin looking for a new job? . . . **On any given day there are least three active water leaks. Plumbing, chillers are breaking down often**. No longer has approval to fix anything that's an emergency without approval. . . . **there are units that have had no AC for three weeks**. . . ▮▮▮▮▮▮ **There are 35-40 apts with no air**. **No contractor will come on site**. ▮▮▮▮▮▮ For AC repairs, has to get a hold of Tom, Tom to Roger, Roger to Jonathan Sherman, Takes 4-5 days for response and approval. **Currently 10 apartments with water leaks**.[21]

(emphasis added). While this event of "sub-par cooling" (in CCA's own words) likely persisted

---

[16] Exhibit 35, Nightmares Email, p. 1.
[17] Exhibit 17, 2017 Block Family Email.
[18] Exhibit 17, 2017 Block Family Email, pp. 2-3.
[19] Exhibit 36, Hot Water Email.
[20] Exhibit 36, Hot Water Email.
[21] Exhibit 19, Exit Interview, p. 1.

through June of 2018,[22] breakdowns of the air conditioning units at PCCA have been endemic. Counsel for Ms. Rigsby previously identified roughly 25 instances, since 2017, when the air conditioning for at least one of the three buildings was out for longer than a day.[23]

Regarding the statement that contractors do not come onsite, PCCA has a long history of failing to pay its contractors, which explains the deplorable living conditions at the property and supports Plaintiff's claim that PCCA neglected the property. In 2020, PCCA looked into some repairs for its chillers, but acknowledged that it "can't use Vaughn anymore though, we owe them too much money. ☹ It sucks because they were really good to us."[24] In 2022, when the "AC [went] out again in half of the North Building" the Property Manager reached out to the P1 Group for repairs but "they have put [PCCA's] account on-hold for non-payment and will not respond to the call."[25] PCCA then "reached out to additional contractors, but [was] unsuccessful, due to previous payable issues."[26] In addition, since 2017, PCCA has been sued by nine contractors for failing to pay its bills.[27] The egregious failure to pay contractors has exposed the tenants at PCCA to various uninhabitable living conditions. For example, a contractor, PM, refused to come onsite and turn on the air conditioners in April 2018 until it was paid the ████ PCCA owed it.[28]

In 2021, Roger Remblake, Vice President of Facilities and Construction Management, confessed PCCA's "equipment overall is in poor shape from domestic hot water systems, to hydronic heating and cooling."[29] The equipment supporting PCCA's heating and cooling system is "either not working, turned off, bypassed or severely deteriorated."[30] As such, PCCA found it

---

[22] Exhibit 20, Sub-Par Cooling, p. 2.
[23] Exhibit 18, Foye Declaration, pp. 1-2.
[24] Exhibit 21, Vaughn Email.
[25] Exhibit 41, P1 Group Email, p 1.
[26] Exhibit 41, P1 Group Email, p. 1.
[27] Exhibit 22, Collection of Contractor Suits.
[28] Exhibit 38, PM Contract Email, pp. 2-3.
[29] Exhibit 30, 2021 Remblake Email, p. 2.
[30] Exhibit 30, 2021 Remblake Email, p. 2.

imperative to bring this equipment "back to our operating standards" despite the fact that the boiler system failed to provide adequate heat and hot water.[31]

Last, between January 2016 and August 2022, the word "mold" appears more than 300 times in PCCA's work orders.[32] That is an average of 3.75 mold-related work orders per month. The complaints piled so high that mold even became PCCA's "favorite four letter word!"[33]

In all, this "straightforward case" has a lot more substance than a single air conditioning outage. PCCA has engaged in a pattern and practice of failing to appropriately fund its property, resulting in the habitability conditions outlined above. Ms. Rigsby's claim for breach of the implied warranty of habitability is not limited to just the air conditioning issue. Rather, she has been subjected to the same pattern and practice of disinvestment in the property as other tenants.

Clearly there is a genuine issue of material fact as to whether PCCA breached the implied warranty of habitability with respect to the Plaza.

> B.     *A Violation of the Implied Warranty of Habitability is a Jury Question.*

As PCCA observed, "Habitability is measured by **community standards**, *generally reflected* in local housing and property maintenance codes." *Chiodini*, 207 S.W.3d at 176 (emphases added); *Detling*, 671 S.W.2d at 270 ("Habitability is to be measured by community standards, ***reflected in most cases*** in local housing and property maintenance codes.") (emphasis added).

Who better to judge the "community standards" of habitability in Kansas City, Missouri, than a Kansas City, Missouri jury. Indeed, under Missouri law, *this very question* (*i.e.*, whether certain conditions violate the requirement of habitability) is reserved for the **jury**; in cases "seeking recovery under theory of implied warranty of merchantability and fitness, question of whether

---

[31] Exhibit 30, 2021 Remblake Email, p. 2.
[32] Exhibit 18, Foye Declaration, p. 3.
[33] Exhibit 23, Mold email, p. 1.

product is of reasonable quality or of reasonable fitness is essentially fact issue for jury." *Smith v. Old Warson Dev. Co.*, 479 S.W.2d 795, HN 8, 800 (Mo. banc 1972). Summary judgment is clearly not appropriate on this issue.

      C.     *A Lack of Air Conditioning Violates the Implied Warranty of Habitability.*

PCCA wrongly argues that a lack of air conditioning in Kansas City, Missouri, does not constitute a violation under Missouri's implied warranty of habitability.

Here, PCCA's operating manual defines "Maintenance **Emergencies**" as, among other things, "No heat or air conditioning when outside temperature is extreme (55 degrees below and 85 degrees above)."[34] And PCCA holds itself to the standards in its operating manual.[35] According to the National Weather Service's historical weather data, forty-eight (48) days between June and July 2021 (when PCCA lacked air-conditioning) were 85-degress Fahrenheit or above.[36] Thus, PCCA failed to live up to its self-imposed standard of habitability on forty-eight (48) of the sixty-one (61) days in June and July 2021, which by its own terms constituted an "emergency."

PCCA ignores its self-defined failure by demanding that its wrongdoing must be assessed in terms of housing codes and whether Apartments.com considers air conditioning a necessity. First, Missouri law does not require a breach of the housing code. The true test for breach of the implied warranty of habitability is whether there are "dangerous or unsanitary conditions on the premises materially affecting the life, health and safety of the tenant." *Detling*, 671 S.W.2d at 270. Further, Missouri case law suggests that this element is not measured by a website, but by "community standards" which are "*generally* reflected" in housing codes. *Chiodini*, 207 S.W.3d at 176; *Detling*, 671 S.W.2d at 270 (emphasis added).

Second, PCCA points to a Healthy Homes Inspection that found the lack of air conditioning

---

[34] Exhibit 28, Operating Manual, p. 360 [emphasis added].
[35] Exhibit 1, Corp. Rep. Depo., 112:15 – 113:12.
[36] Exhibit 31, National Weather Data, https://www.weather.gov/wrh/Climate?wfo=eax, last visited July 20, 2023.

in mid-June to be "non-health hazardous." But that term is not defined by that report, and it is unclear what is intended by that language. What is clear from the report is the inspector's finding that PCCA's facilities were "not in compliance" with the KCMO Health Department standards *and* that PCCA was **ordered** to fix its "violations" within 10-days (which PCCA did not do). (Doc. 40-2, pp. 283-84). Though not required to prove Ms. Rigsby's claim, the KCMO report demonstrates her apartment was non-compliant with Kansas City municipal requirements.

Third, whether apartment complexes *advertise* their air conditioning on apartments.com or Zillow.com is irrelevant. PCCA wrongly analogizes an advertisement for air conditioning with the presence of air conditioning. Kansas City is simply not a climate where air conditioning is a luxury. For example, there are dozens of cooling centers in the Kansas City metropolitan area.[37] Logically, if air conditioning was a luxury, there would not be dozens of free cooling centers.

PCCA falsely claims that its air conditioning units were up and running swiftly. (Doc. 40, pp. 25-27). The air conditioning units were broken in October 2020, never turned on in May 2021, and the problem persisted through July 2021.[38] Contrary to PCCA's insistence that the issues were remedied by June 2021, PCCA issued rental credits for July 2021.[39] Reviews left by residents also support the fact that PCCA did not fix the air conditioning units until July 2021.[40] Ms. Rigsby testified consistently with the reviews of other tenants:

> A: They sent out several emails regarding the chillers working again, and that goes back to when I would talk to, I believe her name was, Mariah. Whenever they would send emails out, they would say you do have air. We never had air when they said we should be having air.[41]

The Court should deny PCCA's motion for summary judgment because there is a genuine

---

[37] https://data.mo.gov/Health/Missouri-Cooling-Centers-Map/2wki-9iz8, last visited July 24, 2023.
[38] Exhibit 24, Duncan October 2020 Email.
[39] Exhibit 32, June-July Credit, p. 1; Baker Email
[40] Exhibit 34, Anonymous Review.
[41] PCCA Exhibit B, Rigsby Depo, 104:19-24.

issue of material fact as to whether the implied warranty of habitability was breached with respect to a lack of air conditioning because: (1) PCCA did not live up to its self-imposed air conditioning requirements; (2) the City of Kansas City found that PCCA did not live up to its standards; and (3) there is a credibility issue regarding the dates PCCA claims the air conditioning wasn't working and when Ms. Rigsby and other tenants claim it wasn't working.

### IV. Ms. Rigsby's Attempts to Mitigate Her Damages Does Not Provide for Summary Judgment in PCCA's Favor.

PCCA argues throughout its motion for summary judgment that Ms. Rigsby really did not have it that bad. After all, she took advantage of PCCA's $200 air conditioning unit credit; she refused to be moved apartments when offered; and she didn't complain through PCCA's portal.

Contrary to PCCA's argument, Ms. Rigsby testified that she purchased a $500 window air conditioning unit, paying $300 out of pocket.[42] Moreover, the window air conditioning unit "still wasn't enough."[43] Ms. Rigsby had to move her air conditioning unit from her bedroom to her kitchen and back every weekday.[44] On the weekends, Ms. Rigsby would return home to Rolla, Missouri, to avoid the heat.[45] These facts only support a claim for breach of the implied warranty of habitability because Ms. Rigsby had to take it upon herself to attempt to make her living conditions habitable.

As discussed above, while Ms. Rigsby was offered to relocate to a new apartment with working air conditioning, she chose not to accept that offer because she was already planning to vacate the premises for habitable housing.[46] Ms. Rigsby's lease ended on September 15, 2021, but she left PCCA on July 31 or August 1, 2021.[47]

---

[42] PCCA Exhibit B, Rigsby Depo., 100:1-24.
[43] PCCA Exhibit B, Rigsby Depo., 100:16
[44] PCCA Exhibit B, Rigsby Depo, 102:24 – 103:4
[45] PCCA Exhibit B, Rigsby Depo, 61:19 – 63:4
[46] PCCA Exhibit B, Rigsby Depo, 103:9-18
[47] Exhibit 2, Rigsby Lease, p. 1; PCCA Exhibit B, Rigsby Depo., 61:6-18

Next, PCCA claims that summary judgment is appropriate because Ms. Rigsby never complained to it via its online portal. First, Missouri law does not require that; Missouri law only requires "reasonable notice" to the landlord. *Detling*, 671 S.W.2d at 270. Second, PCCA's position is contrary to Ms. Rigsby's sworn testimony:

> I know with confidence that I submitted work orders on behalf of the air conditioning, and this doesn't show that I ever did. And, also, after repeated work orders being requested and no response being given on the AC, I resorted to emails, phone calls that were never answered, going to the office which was rarely staffed. I tried many, many means outside of the maintenance requests, but I also know I did submit maintenance requests and I'm not seeing them [in the documents presented by PCCA's attorney].[48]

Not only did Ms. Rigsby provide reasonable notice, but other tenants at PCCA provided notice of the same issues by communicating with local news media who contacted PCCA and wrote articles regarding the lack of air conditioning.[49]

Last, PCCA compares Ms. Rigsby's claims against the plaintiffs in *Seymour v. Switzer Tenant LLC*, 667 S.W.3d 619 (Mo. App. W.D. 2023). In *Seymour*, the plaintiffs filed suit for breach of the implied warranty of habitability under the Missouri Merchandising Practices Act. *Id.* at 623. The court rendered a directed verdict in favor of the defendants because the temperature in the plaintiffs' apartment measured 67 degrees when the heater was set to 70 and 69 degrees when the heater was set to 73 degrees. *Id. Seymour* stands in stark contrast to the conditions at PCCA because the heater actually worked (just not as well as the tenants hoped) while PCCA's air conditioning units were entirely inoperable.

PCCA's jabs at Ms. Rigsby's attempts to mitigate her damages does not warrant summary

---

[48] PCCA Exhibit B, Rigsby Depo., 40:14-24.
[49] https://fox4kc.com/news/problem-solvers/residents-at-kansas-city-apartment-complex-go-months-without-air-conditioning/, last visited July 24, 2023; https://www.kshb.com/news/local-news/luxury-plaza-apartment-complex-without-a-c-for-months-tenants-say, last visited July 24, 2023; https://fox4kc.com/news/residents-at-kansas-city-apartment-complex-say-in-spite-of-assurances-ac-problems-still-not-fixed/, last visited July 24, 2023.

judgment in its favor.

### V.   Ms. Rigsby Has a Valid MMPA Claim Based on the Implied Warranty of Habitability.

Ms. Rigsby's cause of action under the Missouri Merchandising Practices Act for breach of the implied warranty of habitability is premised upon the implied representation that a purveyor of apartments has habitable apartments for rent. PCCA argues that Ms. Rigsby's MMPA claim fails because her implied warranty of habitability claim fails. As set forth above, that is incorrect.

To prevail on an MMPA claim, plaintiff must prove that she (1) purchased merchandise, (2) for personal, family, or household purposes, and (3) suffered an ascertainable loss as a result of an act declared unlawful under the MMPA. *Edmonds v. Hough*, 344 S.W.3d 219, 223 (Mo. App. 2013). "Merchandise" includes "real estate" according to the MMPA. R.S.Mo. § 407.010(4). A rental home is residential property and is for "personal, family, or household purposes." *Morgan v. Vogler Law Firm, P.C.*, 2017 WL 4387351, at *6 (E.D. Mo. Oct. 3, 2017). The Supreme Court of Missouri recognizes that what constitutes an "unfair practice" is "**unrestricted, all-encompassing and exceedingly broad**." *Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. banc 2001) (emphasis added).

It is "well-settled [law] in Missouri 'that a landlord impliedly warrants the habitability of leased residential property.'" *Chiodini*, 207 S.W.3d at 176. As part of this implied warranty, a "landlord agrees to provide facilities and services that are 'vital to the life, health, and safety of the tenant and to the use of the premises for residential purposes.'" *Fuller*, 402 S.W.3d at 111 (quoting *Moser*, 214 S.W.3d at 394).

Very simply, here, the fact that PCCA held itself out as a purveyor of (habitable) apartments is sufficient to create a fact question for the jury that based on the evidence presented: did PCCA hold itself out as the purveyor of habitable apartments and subsequently fail to provide

40

a habitable apartment? The evidence will show that PCCA *knew* its air conditioning systems were failing and would not be in working condition the first summer that Ms. Rigsby would reside there. Attached are eight sample email complaints demonstrating that PCCA had knowledge of air conditioning failures throughout the summer of 2020, when Ms. Rigsby was looking for an apartment at PCCA.[50] Despite that knowledge, PCCA did not inform Ms. Rigsby before she signed the lease that PCCA's air-conditioning was failing and might not work at all. PCCA's knowledge, coupled with its non-disclosure, is an unscrupulous business practice under the MMPA.

**VI.    Ms. Rigsby Has a Valid MMPA Claim Regarding Her Utility Bills.**

Ms. Rigsby has a valid MMPA claim against PCCA for failing to properly determine and charge Ms. Rigsby her appropriate share of utilities. Ms. Rigsby consumed utilities for household purposes and was erroneously charged by PCCA, acting through its agent, Paylease.

PCCA first attempts to distance itself from the utility billing practices at PCCA. PCCA argues that Paylease, "determined the amount of each individual utility fee owed[.]" (Doc. 40, p. 29). As such, and without case law in support, PCCA believes that it can escape any liability. Yet, Ms. Rigsby is in contractual privity with PCCA, *not* Paylease.[51] Ms. Rigsby's cause of action must, then, be against PCCA. *Huffman v. Credit Union of Texas*, 2013 WL 1121268, at *4 (W.D. Mo. Mar. 18, 2013).

PCCA next argues that there is no evidence that Ms. Rigsby was improperly charged for her share of utilities. However, PCCA has issued credits in the past for improperly charging tenants on their share of gas utilities.[52] PCCA's records also indicate an overbilling on gas charges. For example, PCCA was charged a total of $7,858.02 between Constellation and Spire for the service

---

[50] Exhibit 3, 2020 AC Complaints.
[51] Exhibit 2, Rigsby Lease, pp. 13-14.
[52] Exhibit 15, Gas Credit Email, pp. 1-2.

month of April 2021.[53] Yet, for that service month, PCCA identified a "total provider expense" for gas in the amount of ████.[54] In other words, PCCA was charged $7,858.02 for gas, but billed based upon a fictitious ████ in gas charges. In addition, KC Water charges PCCA for water and wastewater in a single bill but PCCA charges for these items separately.[55] The combined KC Water bill for the November 2020 service month was $5,454.42.[56] Yet, PCCA's utility billing spreadsheet shows charges for water and sewer which total ████.[57] The roughly ████ markup on the actual amount charged is then used in the calculation of the pro rata share each tenant is expected to pay. This results in a net gain to PCCA and an overpayment by Ms. Rigsby.

PCCA's last argument is that summary judgment should be granted because Ms. Rigsby has not provided PCCA with a specific dollar amount of damages. PCCA overlooks the fact that expert designations are not due yet, and the time for Ms. Rigsby to "prove" her case has not arrived.

At this stage of the litigation, Ms. Rigsby respectfully submits that summary judgment should not be granted on her MMPA claim where: (1) PCCA has issued credits related to utility overbilling and (2) Plaintiff has introduced examples of overbilling.

### VII.    PCCA's Inability to Provide Working Air Conditioning Was Willful Under R.S.Mo. § 441.233.

R.S.Mo. § 441.233 provides that any "landlord or its agent who willfully diminishes services to a tenant by interrupting or causing the interruption of essential services, *including but not limited to* electric, gas, water, or sewer service, to the tenant or to the premises" is guilty of forcible entry and detainer. (emphasis added).

While PCCA balks at the characterization of its conduct as "willful," PCCA's conduct was,

---

[53] PCCA Exhibit GG, pp. 263-264, 215-216
[54] Exhibit 13.
[55] PCCA Exhibit II, p. 3.
[56] PCCA Exhibit GG, pp. 87-88.
[57] Exhibit 13. Please see Column H titled "Zego Service Period" for the month of November 2020 and Column E titled "Total Provider Expense."

in fact, willful. "Willful is defined as '[p]roceeding from a conscious motion of the will; voluntary;

knowingly, deliberate; intending the result which actually comes to pass; designed; intentional;

purposeful; not accidental or involuntary.'" *Murphy v. Aaron's Automotive Products*, 232 S.W.3d

616, 621 (Mo. App. S.D. 2007) (quotation omitted). Here, PCCA had a "plan" to replace the

chillers in 2021, because it knew its chillers were past their usable life.[58] With this full knowledge

of impending failure the willful requirement of R.S.Mo. § 441.233 is satisfied.

PCCA next argues that air conditioning is not covered under the text of R.S.Mo. § 441.233.

Yet, R.S.Mo. § 441.233 applies to "essential services, *including but not limited to* electric . . . ."

(emphasis added). As argued above, air conditioning—during the summer in Kansas City,

Missouri—is an essential service. At a minimum, it is a fact question whether air conditioning is

to be considered an "essential service" pursuant to R.S.Mo. § 441.233 and, therefore, this question

can only be answered by the trier of fact.

### VIII.  Ms. Rigsby's Breach of Contract Claim Is Supported by the Evidence.

There are two sections of Ms. Rigsby's lease agreement that were breached: (1) the express

provision that PCCA will "act with customary diligence to" "maintain fixtures, furniture, hot

water, heating and A/C equipment"[59], and (2) the implied warranty of habitability which is read

into every single residential lease in the State of Missouri. *King*, 495 S.W.2d at 75.

First, the Court need only review the long history of failures noted above to arrive at the

inescapable conclusion that there is a genuine issue of material fact whether PCCA lived up to its

self-imposed obligation to maintain the "A/C equipment" "with customary diligence."[60]

Second, PCCA's reliance on the rent will not "abate" clause in its form lease agreement is

---

[58] Exhibit 27, 2021 Replacement Plan.
[59] Exhibit 2, Rigsby Lease, p. 5.
[60] Exhibit 2, Rigsby Lease, p. 5; Exhibit 18, Foye Declaration, Exhibit 3, 2020 AC Complaints; Exhibit 27, 2021 Replacement Plan.

43

misplaced. Rent "abatement" simply means that a tenant would be permitted to withhold rent payments until the time in which a landlord completes repairs. Therefore, this clause does not prohibit a breach of contract claim nor breach of contract remedies.

Third, PCCA argues that Ms. Rigsby failed to comply with her lease (barring her claim) because she did not complain through PCCA's tenant portal. As discussed above, Ms. Rigsby testified that she did complain through the portal *and* made phone calls *and* emailed *and* showed up to the office in person to complain.[61]

Fourth, notwithstanding the breach of the express terms of the agreement, PCCA breached the implied warranty of habitability by, *inter alia*, not providing adequate air conditioning during Summer 2021. Accordingly, Ms. Rigsby's breach of contract claim survives summary judgment.

In sum, PCCA seeks summary judgment on each of Ms. Rigsby's causes of action. Yet, **drawing all inferences in favor of Ms. Rigsby**, there is a genuine issue of material fact regarding each of the grounds on which PCCA has moved.

## <u>CONCLUSION</u>

WHEREFORE, Ms. Rigsby respectfully requests an order from this Court denying PCCA's motion for summary judgment and allowing Ms. Rigsby to move forward with continued class discovery and her motion for class certification.

---

[61] PCCA Exhibit B, Rigsby Depo, 40:14-24.

Respectfully submitted,

 /s/ Taylor P. Foye
Joseph A. Kronawitter        MO Bar No. 49280
Taylor P. Foye               MO Bar No. 71527
HORN AYLWARD & BANDY, LC
2600 Grand Boulevard, Suite 1100
Kansas City, MO 64108
Telephone 816-421-0700
Facsimile 816-421-0899
jkronawitter@hab-law.com
tfoye@hab-law.com

**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send a notice of electronic filing to all person registered for ECF as of that date.

 /s/ Taylor P. Foye
Attorney