# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### (WESTERN DIVISION)

| | | |
|---|---|---|
| RYANN RIGSBY, | ) | |
| | ) | |
| Individually and on behalf of those | ) | |
| similarly situated. | ) | Case No. 4:23-CV-00061-BCW |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| PLAZA CLUB CITY APARTMENTS, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT PLAZA CLUB CITY APARTMENTS, LLC'S REPLY SUGGESTIONS IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Ronald D. Balfour (admitted *pro hac vice*)
*RBalfour@amundsendavislaw.com*
Michael M. Chang (admitted *pro hac vice*)
*MChang@amundsendavislaw.com*
150 North Michigan Avenue, Suite 3300
Chicago, Illinois 60601
**AMUNDSEN DAVIS, LLC**

Joseph J. Roper      #36995
Abbigale A. Gentle      #47879
4435 Main St., Suite 920
Kansas City, Missouri 64111
Telephone: (816) 782-8881
Facsimile: (636) 798-0693
Email: jroper@wwbhlaw.com
     agentle@wwbhlaw.com
**WATTERS WOLF BUB HANSMANN LLC**

*Attorneys for Defendant*
*Plaza Club City Apartments, LLC*

# TABLE OF CONTENTS

RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS ...................................1

REPLY SUGGESTIONS IN FURTHER SUPPORT OF SUMMARY JUDGMENT ............17

ADDITIONAL NOTE ON THE LEGAL STANDARD ..................................................17

ARGUMENT ................................................................................................17

I.    PLAINTIFF HAS NEITHER A CLAIM FOR INJUNCTIVE RELIEF
NOR STANDING TO PURSUE ANY SUCH CLAIM ....................................17

    a.    Plaintiff's case is not "capable of repetition," nor does it "evade review" ..............18

    b.    Plaintiff does not assert any "inherently transitory" claims ....................................18

    c.    Plaintiff's claim for an injunction fails on the merits ................................................19

II.    SUMMARY JUDGMENT IS PROPER ON
PLAINTIFF'S HABITABILITY CLAIM .......................................................19

    a.    Plaintiff agreed to disclaim the warranty of habitability ...........................................19

    b.    The Warranty of Habitability does not apply to Plaintiff's claims .........................20

        1.    Scope of Plaintiff's Claims...............................................................................21

        2.    Under Missouri Law, the Warranty of Habitability does not apply
to lack of air conditioning – the only relevant complaint here ...................21

    c.    Plaintiff has not shown a material
question of fact with respect to habitability ...............................................................24

III.    SUMMARY JUDGMENT IS PROPER ON PLAINTIFF'S MMPA CLAIMS ............25

    a.    Plaintiff has offered no evidence differentiating her "habitability" MMPA
count from a garden-variety claim for breach of contract (Count III)....................25

    b.    Plaintiff has offered no evidence that she was overcharged for utilities,
and judgment is proper on her second MMPA claim (Count IV)..........................26

IV.    PLAINTIFF'S "ESSENTIAL SERVICE" CLAIM
FAILS AS A MATTER OF LAW .................................................................28

V.    SUMMARY JUDGMENT IS PROPER ON
PLAINTIFF'S CONTRACT CLAIM............................................................29

CONCLUSION..............................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................................................................17

*Berzito v. Gambino,*
308 A.2d 17 (N.J. 1973) ..........................................................................................................24

*Birchler v. Gehl Co.,*
88 F.3d 518 (7th Cir.1996) .......................................................................................................22

*Chiodini v. Fox,*
207 S.W.3d 174 (Mo. Ct. App. 2006) .............................................................................*passim*

*County of Riverside v. McLaughlin,*
500 U.S. 44 (1991) ...................................................................................................................18

*Craftsman Limousine, Inc. v. Ford Motor Co.,*
491 F.3d 380 (8th Cir. 2007) ...................................................................................................23

*Crowder v. Vandendeale,*
564 S.W.2d 879 (Mo. banc 1978) ............................................................................................20

*Cruz v. Hauck,*
627 F.2d 710 (5th Cir. 1980) ...................................................................................................18

*Dash v. Mayweather,*
731 F.3d 303 (4th Cir. 2013) ...................................................................................................17

*Detling v. Edelbrock,*
671 S.W.2d 265 (Mo. banc 1984) ............................................................................................22

*Gerstein v. Pugh,*
420 U.S. 103 (1975) .................................................................................................................18

*Gibbons v. J. Nuckolls, Inc.,*
216 S.W.3d 667 (Mo. 2007) .....................................................................................................26

*Grant v. Trustees of Indiana University,*
870 F.3d 562 (7th Cir. 2017) ...................................................................................................28

*Hess v. Chase Manhattan Bank, N.A.,*
220 S.W.3d 758 (Mo. banc 2007) ............................................................................................26

*In re Graven,*
936 F.2d 378 (8th Cir. 1991) ................................................................................................. 28

*Glover v. Bostrom,*
31 F.4th 601 (8th Cir. 2022) ................................................................................................ 25

*Kiechle v Drago,*
694 S.W.2d 292 (Mo. Ct. App. 1985) ................................................................................ 25

*King v. Moorehard,*
495 S.W.2d 65 (Mo. Ct. App. 1973) .................................................................................. 22

*Kingdomware Technologies, Inc. v. U.S.,*
579 U.S. 162 (2016) ............................................................................................................ 18

*Mackey v. Belden, Inc.,*
No. 4:21-CV-00149-JAR, 2021 WL 3363174 (E.D. Mo. Aug. 3, 2021) ........................... 19

*Milonas v. Williams,*
691 F.2d 931 (10th Cir. 1982) ............................................................................................ 18

*Mons v. McAleenan,*
No. CV 19-1593 (JEB), 2019 WL 4225322 (D.D.C. Sept. 5, 2019) ................................. 19

*Nixon v. Enter. Car Sales Co.,*
No. 4:09CV1896 HEA, 2011 WL 4857941 (E.D. Mo. Oct. 13, 2011) ............................... 28

*Olson v. Brown,*
594 F.3d 577 (7th Cir. 2010) ........................................................................................ 18, 19

*Schuchmann v. Air Services Heating & Air Conditioning, Inc.,*
199 S.W.3d 228 (Mo. Ct. App. 2006) ................................................................................ 25

*Seymour v. Switzer Tenant LLC,*
667 S.W.3d 619 (Mo. Ct. App. 2023) ................................................................................ 25

*Spencer v. Kemna,*
523 U.S. 1 (1998) ................................................................................................................ 18

*Swisher v. Brady,*
438 U.S. 204 (1978) ............................................................................................................ 18

*Thorpe v. D.C.,*
916 F. Supp. 2d 65 (D.D.C. 2013) ..................................................................................... 19

*Torgerson v. City of Rochester,*
643 F.3d 1031 (8th Cir. 2011) ............................................................................................ 29

*U.S. Parole Comm'n v. Geraghty,*
445 U.S. 388 (1980) ........................................................................................................18

*Witzman v.* Gross,
148 F.3d 988 (8th Cir. 1998) ......................................................................................21, 24

**Statutes**

Mo. Stat. § 441.233 ........................................................................................................28

**Rules**

Fed. R. Civ. P. 56 ..........................................................................................................28

## RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

<u>Historical Issues at PCCA</u>

1.     In March **2015**, a property condition report was created which indicated that, of the six chillers, one was not operable and four were reaching the end of their service life. (Exhibit 16, GRS Group Property Condition Report, pp. 1, 17).

<u>Response:</u>     Uncontroverted.

2.     In February 2017, as City Club Apartments took over managing the Plaza Club City Apartments, LLC ("PCCA") property (the three apartment buildings located at the intersection of 46th Street and Jefferson Street in Kansas City, Missouri "the Plaza"), it received an email from Block MultiFamily Group identifying issues with the buildings' electrical, plumbing, boiler, and air conditioning systems accompanied with a list of 23 remediation recommendations. (Exhibit 17, 2017 Block Family Email).

<u>Response:</u>     Uncontroverted. To clarify, the primary address of "Plaza Club City Apartments" is 4621 Jefferson Street. The three apartment buildings referenced as the Plaza Club property are commonly referred to as the "North" Building (4607 and 4609 Jefferson St,), the "South" Building (4617, 4619, and 4621 Jefferson St.), and the "Manor" Building (609 W. 46th St.). Paragraphs 1-2 of Defendant's SUF are mistaken to the extent they are inconsistent with this information.

3.     The February 2017 Block MultiFamily Group email specifically identified the fact that the boiler systems in each of the three buildings did not provide "adequate heat." (Exhibit 17, 2017 Block Family Email, pp. 2-3).

<u>Response:</u>     Controverted. The evidence cited indicates that each building was without adequate heat at the time of inspection. It does not provide evidence that the boiler systems generally did not or could not provide adequate heat.

4. The February 2017 Block MultiFamily Group email also recognized a more serious problem with each boiler: "the system does not have a backflow preventer . . . and now that we are chemically treating the boiler water any backflow into the fresh water could cause serious injury or death." (Exhibit 17, 2017 Block Family Email, p. 2).

<u>Response:</u> Controverted as to the characterization of the issues described in the email. Uncontroverted that the quoted language exists in the email.

5. Since 2017, there have been more than 25 instances when the air conditioning for at least one of the three apartment buildings has been out for longer than a day. (Exhibit 18, Foye Declaration, pp. 1-2; Exhibit 3, 2020 AC Complaints).

<u>Response:</u> **Controverted. The documents cited do not show the length of time of the outages and therefore do not support the statement that they were for "longer than a day." The documents also do not generally show that the outages at issue affected the "building" as opposed to an individual apartment.**

6. In May 2018, PCCA's then Chief Engineer provided an exit interview wherein he provided his reasons for leaving:

> When and why did you begin looking for a new job? . . . **On any given day there are least three active water leaks. Plumbing, chillers are breaking down often.** No longer has approval to fix anything that's an emergency without approval. . . . **there are units that have had no AC for three weeks. . .** ███████████████████. **There are 35-40 apts with no air. No contractor will come on site.** ██████████████. For AC repairs, has to get a hold of Tom, Tom to Roger, Roger to Jonathan Sherman, Takes 4-5 days for response and approval. **Currently 10 apartments with water leaks.**

(Exhibit 19, Exit Interview, p. 1) (emphasis added).

<u>Response:</u> **PCCA objects to this fact pursuant to Fed. R. Civ. P. 56(c) as the statements by the Chief Engineer are inadmissible hearsay to the extent they are asserted for the truth of the statements. Uncontroverted that such statements were made.**

7.      On June 15, 2018, Melissa Merkys, Property Manager at PCCA, recognized that she could not "keep the residents happy with sub-par cooling." (Exhibit 20, Sub-Par Cooling Email, p. 2).

Response:      Controverted. The full sentence from which Plaintiff quotes says: "It's a lot but I am not sure how much longer we can keep the residents happy with sub-par cooling." It does not say that Ms. Merkys "could not" keep them happy.

8.      In 2020, PCCA looked into some repairs for its heating and cooling chillers, but acknowledged that it "can't use Vaughn anymore though, we owe them too much money. ☹ It sucks because they were really good to us." (Exhibit 21, Vaughn Email).

Response:      Controverted that the statements in the email may be attributed to PCCA as a whole, and that PCCA owed Vaughn "too much money." Uncontroverted that PCCA obtained some bids related to its chillers in 2020.

9.      Since 2017, PCCA has been sued by the following nine contractors for failing to pay its bills: RJM Roofing, LLC; ServPro of West PASCO; Build Wiser Construction, LLC; Atronic Alarms, Inc.; DH Pace Company; Absolute Comfort Technologies, Inc.; Surface Restoration; U.S. Engineering Service, LLC; and American Boiler Services, Inc. (Exhibit 22, Collection of Contractor Suits).

Response:      PCCA responds that the exhibits cited speak for themselves. This statement is controverted to the extent it is inconsistent with the exhibits cited.

10.      Between January 2016 and August 2022, the word "mold" appears more than 300 times in PCCA's work orders. (Exhibit 18, Foye Declaration, p. 3).

Response:      Controverted. A "control F" search for "mold" in the PDF file containing PCCA's work order log leads to more than 300 hits (specifically, to approximately 303 hits). However, review of those hits demonstrates that at least 54 of them are as part of the word "molding." The word

3

"mold" itself, as opposed to the word "molding" or other words with the letters "mold" in them, does not appear more than 300 times. The full log of work orders is more than 12,000 pages, but an excerpt containing the pages with at least one hit on "mold" is attached hereto as Exhibit A.

Also of note, Plaintiff describes these in her brief as "complaints," (Dkt. # 48, p.1), but they are actually work order logs showing that PCCA fixed various mold issues over the years, primarily in tenant-controlled areas like dishwashers and showers where mold is neither unusual (due to moisture) nor caused by PCCA (*see* Dkt. # 40-2, pp. 212-213, explaining tenant responsibility for mold in certain areas).

11.    PCCA's favorite four-letter word is mold. (Exhibit 23, Mold Email, p. 1).

<u>Response:</u>    Controverted. The record cited supports that a single CCA employee once said "We have another resident throwing around our favorite four letter word! MOLD!", ostensibly in jest, since the email also says "I hope this email doesn't sound too sarcastic." The record does not support any conclusion that PCCA's favorite four-letter word is *actually* mold. As an entity with no employees and no operations, PCCA has no favorite word.

12.    The Plaza experienced air conditioning failures in the summer of 2020. (Exhibit 3, 2020 AC Complaints).

<u>Response:</u>    Controverted. The evidence cited shows that seven apartments had issues, not the property as a whole.

13.    PCCA had knowledge of air conditioning failures through the summer of 2020. (Exhibit 3, 2020 AC Complaints).

<u>Response:</u>    Controverted. The evidence cited shows that seven apartments had issues, not the property as a whole, and not "through the summer of 2020."

14.    In October 2020, the air conditioning was out for multiple days in the North building. (Exhibit 24, Duncan 2020 Email).

4

**Response:** Controverted. The evidence cited does not indicate what building the air conditioning "was out" in, how long it was out, or whether the entire building was affected.

15. In November 2020, the water heaters in both the North and South buildings were not working for multiple days. (Exhibit 25, Duncan November Email).

**Response:** Controverted. The document cited indicates that the water heaters were not working in the North and South Buildings at the time of the email but says nothing about how long that had been the case and therefore does not support the assertion that it was "multiple days."

16. In December 2020, the North building was without hot water for multiple days. (Exhibit 26, Duncan Water Email).

**Response:** Controverted. The document cited relates to heat, not hot water. Further, the email indicates that the boilers were not working to full capacity in the North Building at the time of the email but says nothing about how long that had been the case and does not say that they were not working at all. It there therefore does not support the assertion that there was an issue for "multiple days."

17. In 2020, PCCA knew it would have to replace its chillers in 2021. (Exhibit 27, 2021 Replacement Plan).

**Response:** Controverted. The document cited indicates that PCCA had a plan to replace chillers in the South Building in 2021, but does not contain any evidence that PCCA had reason to believe the chillers would fail before then and *need* to be replaced, as opposed to the plan representing normal capital investment, and does not contain any evidence that there was a plan to replace chillers in the North or Manor buildings.

18. In February 2020, PCCA received a bid to replace one of its air conditioning chillers. (Exhibit 6, 2020 Manor Building Lippert Bid; Exhibit 7, 2020 Manor Building Lippert Bit No. 2).

**Response:** Uncontroverted that PCCA received the bid cited from Lippert.

PCCA's Lease Agreements and (Self-Imposed) Obligations Thereunder

19.     PCCA is obligated to provide habitable apartments to its tenants. (Exhibit 1, Corp. Rep. Depo., 112:14-20).

**Response:**     Objection. This is a legal assertion, not a statement of fact.

20.     PCCA created self-imposed habitability standards which are set forth in its operating manual. (Exhibit 1, Corp. Rep. Depo., 113:5-12).

**Response:**     Controverted. The Operations Manual is published by and for City Club Apartments, not PCCA, and contains City Club Apartments' nationwide practices and procedures for business purposes. (*See* Dkt. # 48-28, pp. 2-3) The Operating Manual is not written or published by or specifically for PCCA and therefore cannot "self-imposed" standards for PCCA. Further, the document contained City Club's internal maintenance and service standards, not a "habitability standard" with any legal significance.

21.     PCCA defines a "maintenance emergency" as, among other things, a lack of "heat or air conditioning when outside temperature is extreme (55 degrees below and 85 degrees above)." (Exhibit 28, Operating Manual, p. 360).

**Response:**     Controverted. The Operations Manual cited is written by and for City Club Apartments, not PCCA. In addition, the excerpt of the Operating Manual provided by Plaintiff is taken out of context and does not include the full section regarding "maintenance emergencies." The Operations Manual states that it is for internal purposes only, is not intended to create a legal standard, and "nothing in this program confers any rights or entitlement of any associate or resident." A more complete excerpt of the Operations Manual is attached as Exhibit B.

22.     Ms. Rigsby's lease contains the following provision regarding the condition of the premises:

**25. CONDITION OF THE PREMISES AND ALTERATIONS.**
**YOU ACCEPT THE APARTMENT, FIXTURES, AND FURNITURE AS**
**IS, EXCEPT FOR CONDITIONS MATERIALLY AFFECTING THE**
**HEALTH OR SAFETY OF ORDINARY PERSONS. TO THE EXTENT**
**PERMITTED BY LAW, WE DISCLAIM ANY AND ALL IMPLIED**
**WARRANTIES, INCLUDING, BUT NOT LIMITED TO (IF**
**APPLICABLE) THE IMPLIED WARRANTY THAT THE PREMISES IS**
**SUITABLE FOR RESIDENT'S HABITABILITY OR (IF APPLICABLE)**
**ANY IMPLIED WARRANTY OF MERCHANTABILITY**

(Exhibit 2, Rigsby Lease, p. 5).

<u>Response:</u>      Uncontroverted.

23.      Ms. Rigsby accepted the premises "as is, except for conditions materially affecting the health or safety of ordinary persons. (Exhibit 2, Rigsby Lease, p. 5).

<u>Response:</u>      Uncontroverted.

24.      PCCA's form lease agreement contains an implied provision: the implied warranty of habitability. *Chiodini v. Fox*, 207 S.W.3d 174, 176 (Mo. App. E.D. 2006); *King v. Moorehead*, 495 S.W.2d 65, 75 (Mo. App. 1973).

<u>Response:</u>      Controverted. PCCA's form lease agreement expressly states that it "DISCLAIM[S] ANY AND ALL IMPLIED WARRANTIES, INCLUDING...THE IMPLIED WARRANTY THAT THE PREMISES IS SUITABLE FOR RESIDENT'S HABITABILITY." (Rigsby Ex. 2, p. 5).

25.      PCCA obligated itself to "act with customary diligence to" "maintain fixtures, hot water, heating and A/C equipment." (Exhibit 2, Rigsby Lease, p. 6).

<u>Response:</u>      Controverted to the extent there is an innuendo or suggestion that PCCA "obligated itself" other than through agreeing to the lease, which provides that it will "act with customary diligence." Otherwise, uncontroverted that the language is accurately quoted.

26.      The "premises" Ms. Rigsby rented from PCCA include, during the respective tenancies, apartment number 801M at 609 W 46th Street, Kansas City, Missouri, 64112 and

apartment number 408N at 4609 Jefferson Street, Kansas City, Missouri 64112. (Exhibit 2, Rigsby Lease, p. 2; Exhibit 39, First Rigsby Lease, p. 7).

**Response:** Uncontroverted. To clarify, Plaintiff is correct that the buildings at 609 W 46th Street and 4609 Jefferson Street are part of the Plaza Club property, notwithstanding any actual or apparent inconsistency with Paragraphs 1-2 of Defendant's SUF.

27. Ms. Rigsby chose not to accept PCCA's offer to relocate to the City Club Apartments Crossroads Kansas City location because she was already planning to vacate the Plaza location. (PCCA Exhibit B, Rigsby Depo., 103:9-18).

**Response:** Controverted. Ms. Rigsby testified that she chose not to accept PCCA's offer to relocate because it "seemed extremely inconvenient." (Rigsby Depo., 103:9-15).

28. Ms. Rigsby moved out of PCCA on July 31 or August 1, 2021. (PCCA Exhibit B, Rigsby Depo., 61:6-18).

**Response:** Uncontroverted.

Utilities at PCCA

29. Paylease, LLC d/b/a Zego ("Paylease") is PCCA's limited agent with respect to utility bills and their processing at the Plaza. (Exhibit 14, Zego Contract, pp. 1-2).

**Response:** Objection that this is a legal assertion, not fact. Controverted that any improper actions by Paylease were within the scope of its authority to act as an agent for PCCA.

30. PCCA has issued credits in the past for improperly charging tenants on their share of gas utilities. (Exhibit 15, Gas Credit Email).

**Response:** Controverted. The record cited appears to show that *Paylease* issued credits in connection with a mistake related to gas billing in 2022.

31. PCCA was charged a total of $7,858.02 between Constellation and Spire for the service month of April 2021. (PCCA Exhibit GG, pp. 263-264, 215-216).

8

**Response:**    Controverted. The Spire bill cited (pp. 215-216) was issued for service provided April 2 to May 1, not April 1 through April 30.

32.    For the April 2021 service month, PCCA identified a total provider expense for gas in the amount of ▮▮▮▮▮. (Exhibit 13).

**Response:**    Uncontroverted.

33.    KC Water charges PCCA for water and wastewater in a single bill but PCCA charges for these items separately. (PCCA Exhibit II, p. 3).

**Response:**    Controverted. KC Water issues combined bills for water and wastewater, but nevertheless issues two separate bills for Plaza Club each month, one two Plaza Club City Apartments and a second to "F&F Dunleith" with a separate account number that serves different service addresses. To demonstrate, the Plaza Club City Apartments KC Water bill for the service period of October 31, 2020 through December 1, 2020, is attached as Exhibit C. This document was produced to Plaintiff by KC Water in response to a subpoena issued by Plaintiff, who is therefore fully aware it exists. The bill cited by Plaintiff was issued to "F&F Dunleith," not Plaza Club City Apartments. Moreover, each bill had separate lines for water and wastewater charges.

34.    The combined KC Water water and wastewater bill for the November 2020 service month was $5,454.42. (PCCA Exhibit GG, pp. 87-88).

**Response:**    Controverted. The record cited is a bill for just the "F&F Dunleith" account, not the Plaza Club City Apartments Account The Plaza Club City Apartments bill for the corresponding time period, which was produced by KC Water in response to Plaintiff's subpoena, is attached as Exhibit C . In addition, the billing period was for 10/31/2020 through 12/1/2020, not just November.

35.    PCCA's utility billing spreadsheet shows separate charges for water (▮▮▮▮▮) and sewer (▮▮▮▮▮) which total ▮▮▮▮▮. (Exhibit 13).

**Response:** Controverted in that Exhibit 13 is not "PCCA's utility billing spreadsheet," it is the "provider expense report," and also in that it does not show specific charges. A spreadsheet showing the amount actually billed to tenants in total is referred to as the "Utility Recovery Performance" report. A copy of that report, redacted to show only the data points relevant to the purported discrepancies identified by Plaintiff, is attached hereto as Exhibit D. The spreadsheet, produced unredacted as PCCA 014078, shows PCCA recovered $8,610.57 from tenants for sewer charges and $4,627.10 for the November 2020 service month. Further controverted in that this statement does not specify the billing period it references.

The Summer of 2021

36.    On May 26, 2021, James Ellsberry, Property Manager at Plaza Club City Apartments, complained of the "frustrating" issues at the Plaza, and it was difficult to renew leases at the Plaza when residents were experiencing 90-degree temperatures in their apartments. (Exhibit 29, Frustrations Email).

**Response:** Controverted that "it was difficult to renew leases at the Plaza when residents were experiencing 90-degree temperatures in their apartments." Uncontroverted that Mr. Ellsbury made the statements in the email. In fact, as of January 25, 2022, 45 people had lived at Plaza Club for more longer than a year – including 24 who lived there for longer than two years and 12 who lived there longer than *five* years. *See* Demographics Report attached as Exhibit E. This means at least 45 tenants had renewed their leases.

37.    In 2021, Roger Remblake, Vice President of Facilities and Construction Management, confessed PCCA's "equipment overall is in poor shape from domestic hot water systems, to hydronic heating and cooling." (Exhibit 30, 2021 Remblake Email, p. 2).

**Response:** Controverted that Mr. Remblake's statement constituted a "confession." Moreover, the email cited reflects Mr. Remblake's opinion, not objective fact, and contains no foundation or basis.

38. PCCA was not maintaining its domestic hot water systems, hydronic heat, and chillers as it should. (Exhibit 30, 2021 Remblake Email, p. 2).

**Response:** Controverted. The email cited reflects Mr. Remblake's opinion, not objective fact, and contains no foundation or basis.

39. In 2021, the equipment supporting PCCA's heating and cooling system was "either not working, turned off, bypassed or severely deteriorated." (Exhibit 30, 2021 Remblake Email, p. 2).

**Response:** Controverted. The email cited reflects Mr. Remblake's opinion, not objective fact, and contains no foundation or basis.

40. In 2021, Roger Remblake, found it imperative to bring this equipment "back to our operating standards" despite the fact that the boiler system failed to provide adequate heat and could have caused serious injury or death since, at least, February 2017. (Exhibit 30, 2021 Remblake Email, p. 2).

**Response:** Controverted. The email cited reflects Mr. Remblake's opinion, not objective fact, and contains no foundation or basis. Further, the evidence cited does not support the statement that "the boiler system failed to provide adequate heat and could have caused serious injury or death since, at least, February 2017."

41. According to the National Weather Service's historical weather data, there were twenty-one (21) days in June 2021 and twenty-seven (27) days in July 2021 which were 85-degress Fahrenheit or above. (Exhibit 31, National Weather Data, https://www.weather.gov/wrh/Climate?wfo=eax, last visited July 20, 2023).

**Response:** Controverted. The data cited reflects the number of days on which the *high* temperature in Kansas City, Missouri was 85 degrees Fahrenheit or above. It does not indicate that the temperature was 85 degrees Fahrenheit or above for that number of (full) days.

42. PCCA failed to live up to its self-imposed standard of habitability on forty-eight (48) of the sixty-one (61) days in June and July 2021. (Exhibit 31, National Weather Data; Exhibit 28, Operating Manual, p. 360).

**Response:** Controverted. No such "self-imposed standard of habitability" exists or is stated in the Operations Manual. Further, nothing about the Operations Manual is "self-imposed" by PCCA, as that manual is published by and for City Club Apartments, LLC. Further, Plaintiff has not provided any evidence that PCCA (or City Club Apartments) failed to follow its procedures for dealing with Maintenance Emergencies.

43. Extreme and dangerous heat is such an issue in the Midwest during the summer that Kanas City has dozens of cooling centers. https://data.mo.gov/Health/Missouri-Cooling-Centers-Map/2wki-9iz8, last visited July 24, 2023.

**Response:** Controverted as to Plaintiff's characterization of heat. Uncontroverted as to the number of cooling centers in Kansas City. For purposes of clarification, on August 8, 2023, the website cited lists 29 cooling centers in Kansas City, which appear to be year-round facilities with a variety of offerings (such as YMCAs and community centers) rather than facilities specifically set up for purposes of cooling

44. On June 16, 2021, the KCMO Health Department found that PCCA's lack of air conditioning was "not in compliance" with its standards. (PCCA Exhibit B, p. 283).

**Response:** Controverted. The record cited indicates generally that "appliances" were not in compliance with standards for being "Properly Installed, Clean, [and in] Working Condition], and the next page indicates that the basis for that is that vents were "observed to be blowing out at 80

degrees when the thermostat was set to 50 degrees" in Plaintiff's apartment, but that the issue was "non-health hazardous." The record cited does not state that Plaintiff had a right to air conditioning that was violated.

45.     On June 16, 2021, the KCMO Health Department ordered PCCA to remedy the air conditioning issue within 10 days. (PCCA Exhibit B, p. 284).

<u>Response:</u>     Controverted. The KCMO Health Department does not issue "orders." The record cited indicates that the "appliance" issue with Ms. Rigsby's apartment was non-health hazardous and needed to be corrected within 10 days.

46.     On June 16, 2021, the KCMO Health Department found that Ms. Rigsby's apartment walls were registering moisture between 18 – 44 percent, and ordered the violation be remedied within 10 days. (PCCA Exhibit B, p. 284).

<u>Response:</u>     Controverted. The KCMO Health Department does not issue "orders." The record cited indicates that Ms. Rigsby's bathroom lacked an operable ventilation system or window, and that this non-health hazardous issue and needed to be corrected within 10 days. Uncontroverted that the KCMO Health Department found that the walls in the bathroom of Ms. Rigsby's apartment were registering moisture between 18-44 percent on June 16, 2021.

47.     PCCA sent several emails stating that the air conditioning chillers were working again, but that was false. (PCCA Exhibit B, Rigsby Depo., 104:19-24).

<u>Response:</u>     Controverted that the statements in the emails were false, as Plaintiff testified "Yes, it looks like I did get AC" as of June 24th, 2021, at 7:09 p.m, and further testified "yes" that it refreshed her recollection that she had air conditioning at that time. (PCCA Exhibit B, Rigsby Depo, 105:11-106:5). Uncontroverted that the emails described were sent.

48.     Ms. Rigsby purchased a $500 portable air conditioner and was not reimbursed the full amount by PCCA. (PCCA Exhibit B, Rigsby Depo., 100:1-24).

**Response:** Controverted. Ms. Rigsby did not request reimbursement for the full $500 cost of the portable air conditioner she chose to purchase. Uncontroverted that Ms. Rigsby purchased a portable air conditioner, that PCCA reimbursed her $200, and that PCCA provided her an additional $300 in rent credits that brought the total reimbursement to $500 (Rigsby Depo., 101:5-9; 102:3-13).

49.     Ms. Rigsby's portable air conditioner could not cool her entire apartment. (PCCA Exhibit B, Rigsby Depo., 100:16).

**Response:**     Controverted. Ms. Rigsby testified that she moved her air conditioner from place to place to lower the temperature , and it did cool the area where she had it, just not to a "comfortable" level (Rigsby Depo., 102:24-103:8).

50.     Ms. Rigsby complained to PCCA about the air conditioning via the online portal, through emails, through phone calls, and in person. (PCCA Exhibit B, Rigsby Depo., 40:14-24).

**Response:**     Controverted. Records reflect that Ms. Rigsby did not complain about air conditioning issues via the online portal until after the chiller problem was resolved and only spot issues remained. (*See* SUF ¶ 43).

51.     PCCA was provided with notice by Ms. Rigsby regarding the lack of air conditioning. (PCCA Exhibit B, Rigsby Depo., 40:14-24).

**Response:**     Controverted. There is no evidence in the record, other than Ms. Rigsby's self-serving testimony, that she provided proper and timely notice of her air conditioning concerns in accordance with the terms of her lease.

52.     Ms. Rigsby returned home to Rolla, Missouri on the weekends in the Summer of 2021 to avoid the excessive and dangerous heat at PCCA. (PCCA Exhibit B, Rigsby Depo., 61:19 – 63:4).

**Response:** Controverted to the extent characterizations are made to the heat as "excessive and dangerous. Uncontroverted that Plaintiff testified she returned home to Rolla, Missouri during the weekends in the Summer of 2021 when the air-conditioning stopped working.

53. PCCA issued partial rental credits to its tenants for June and July 2021. (Exhibit 32, June-July Credit, p. 1; Exhibit 33, Email PCCA 021538).

**Response:** Uncontroverted.

54. The air conditioning chillers at the Plaza were not fixed in June 2021 and air conditioning issues persisted thereafter. (Exhibit 34, Anonymous Review; Exhibit 18, Foye Declaration).

**Response:** Controverted. The evidence shows the chillers were fixed by June 24, 2021 (Dkt. # 40-23; PCCA Exhibit B, Rigsby Depo., 105:11-106:5). Uncontroverted that some spot air conditioning issues occurred after that time.

55. On October 21, 2021, Becky Chalou, Assistant Vice President at City Club Apartments, expressed her frustration with the conditions on the Plaza when she wrote: "Otherwise we simply won't have trash collected among the other nightmares that are Plaza." (Exhibit 35, Nightmares Email, p. 1).

**Response:** Controverted. Ms. Chalou's comment was more specifically directed at the outstanding balance of a Waste Management invoice. PCCA does not dispute that the language is accurately quoted in the email cited.

Continued Habitability Issues at PCCA

56. Air conditioning failures at the Plaza continued in the summer of 2022. (Exhibit 18, Foye Declaration).

**Response:** Controverted. The evidence shows some spot issues with air conditioning at PCCA in summer of 2022, not any general "air conditioning failures."

57.     PCCA's boilers in the South building failed in 2022 leading to a lack of hot water. (Exhibit 36, Hot Water Email).

**Response:**     Controverted in that the evidence cited does not indicate the reason for a lack of hot water and does not say anything about boilers.

58.     PCCA issued a rental credit to tenants in the South building relating to the lack of hot water. (Exhibit 36, Hot Water Email).

**Response:**     Controverted to the extent it is suggested that the entirety of the South Building was without water.

59.     Certain potential purchasers have looked at purchasing PCCA's three buildings, but ███████████████████████████████████████████████████████████ ███████████████████████████████████ (Exhibit 37, Investors Email, pp. 4-5).

**Response:**     Controverted. The record cited by Plaintiff shows that certain potential purchasers of PCCA have made certain statements and asked for certain concessions in connection with their negotiating position. These statements are inadmissible hearsay, and Plaintiff offers no reason to conclude that statements made in the course of negotiations express sincere beliefs.

60.     At least one potential purchaser has identified ███████████████████████ ████████████████████████████████████████████████." (Exhibit 37, Investors Email, pp. 4-5).

**Response:**     Controverted. The record cited by Plaintiff shows that certain potential purchasers of PCCA have made certain statements and asked for certain concessions in connection with their negotiating position. These statements are inadmissible hearsay, and Plaintiff offers no reason to conclude that statements made in the course of such negotiations express sincere beliefs.

## REPLY SUGGESTIONS IN FURTHER SUPPORT OF SUMMARY JUDGMENT

Plaintiff attempts to distract from the absence of any genuine issue of material fact by citing documents showing *other* Plaza Club tenants had issues over the course of six-plus years, mostly when Plaintiff did not live at Plaza Club. Those documents would not establish claims on behalf of those individuals, but the more important point is that those individuals and their potential claims *are not before the Court.* PCCA has moved the court for summary judgment against Ryann Rigsby in her individual capacity, not against any actual or putative class. There is no genuine issue of *material* fact with respect to *Ms. Rigsby's* claims, and summary judgment against her is proper.

## ADDITIONAL NOTE ON THE LEGAL STANDARD

"Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986) (internal citations omitted).

## ARGUMENT

### I.    PLAINTIFF HAS NEITHER A CLAIM FOR INJUNCTIVE RELIEF NOR STANDING TO PURSUE ANY SUCH CLAIM

Plaintiff concedes her claims for injunctive relief are moot, but says she may proceed anyway because there "are two situations in which a class may be certified despite the mooting of the named plaintiff's claim prior to a district court's class certification decision[.]" (Dkt. # 48, p. 30). But the question before the court is whether Ms. Rigsby may proceed with her individual claim, not whether a class may be certified. Thus, the case law Plaintiff cites does not apply. That said, Plaintiff does not qualify for either of the exceptions she describes in any event.

a.      Plaintiff's case is not "capable of repetition," nor does it "evade review."

The first exception, for cases "capable of repetition, yet evading review" applies "'only in exceptional situations,' where (1) 'the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration,' *and* (2) 'there [is] a reasonable expectation *that the same complaining party* [will] be subject to the same action again.'" *Kingdomware Technologies, Inc. v. U.S.*, 579 U.S. 162, 170 (2016), quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (emphasis added).  Here, Ms. Rigsby has not offered any evidence she intends to move back into Plaza Club.[1]

Moreover, PCCA's conduct does not "evade review." Plaintiff speculates that no PCCA tenant will renew their lease because of the alleged conditions, (Dkt. # 48, p. 31), but the *evidence* shows people do, in fact, renew leases at Plaza Club. As of January 25, 2022, 45 people had lived at Plaza Club for longer than a year, including 24 for longer than two years and 12 for longer than *five* years. (Response to Plaintiff's Statement of Material Facts ("Resp. PSF"), ¶ 36). Any one of them could seek injunctive relief if they were so inclined.

b.      Plaintiff does not assert any "inherently transitory" claims.

Plaintiff also would not qualify for the "inherently transitory" exception, even if class certification were before the court. This exception applies where "(1) it is uncertain that a claim will remain live for any individual who could be named as a plaintiff long enough for a court to certify the class; and (2) there will be a constant class of persons suffering the deprivation complained of in the complaint." *Olson v. Brown*, 594 F.3d 577, 582 (7th Cir. 2010). Taking the second element first, this case differs from the *Olson* and *Smith* cases cited by Plaintiff in that both of those are prisoner cases, as are nearly all cases where this exception has been applied.[2] In those cases, there

---

[1] *Compare Cruz v. Hauck*, 627 F.2d 710, 717 (5th Cir. 1980) (two named plaintiffs were in and out of their situation (jail) more than once), *with Milonas v. Williams*, 691 F.2d 931, 937 (10th Cir. 1982) (court emphasized the named Plaintiffs could be (involuntarily) returned to their situation).

[2] *See, e.g., Gerstein v. Pugh*, 420 U.S. 103, 110-11 n.11 (1975); *Swisher v. Brady*, 438 U.S. 204 (1978);  *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). Other "transitory" cases have involved border detainees, *Mons v.*

will be a "constant class of persons suffering the deprivation" because incarcerated individuals are *forced* to live in prisons. Needless to say, Plaza Club is not a prison. If future tenants want to avoid the "conditions" there, they can simply choose not to live there.

The first element of the "inherently transitory" exception does not apply, either. "[T]he crux of the 'inherently transitory' exception is the **uncertainty** about the length of time a claim will remain alive." *Olson*, 594 F.3d at 582 (emphasis added). The exception is needed because "the length of incarceration in a county generally cannot be determined at the outset and is subject to a number of unpredictable factors." *Id.* But the exception does not apply where "the named plaintiffs knew, from the outset, exactly how long their claims would remain alive[.]" *Id.* (citations omitted). Here, Plaintiff knew when her lease would end when she brought this lawsuit.

Finally, once again, the evidence shows plenty of people choose to renew their leases with PCCA and have standing to sue for injunctive relief if so inclined. Plaintiff is not one of them.

> c.      Plaintiff's claim for an injunction fails on the merits.

Even if Plaintiff had standing, she has no claim for an injunction. "A party seeking injunctive relief must demonstrate that there is no adequate remedy at law and irreparable harm will result if the injunction is not awarded." *Mackey v. Belden, Inc.*, No. 4:21-CV-00149-JAR, 2021 WL 3363174, at *12 (E.D. Mo. Aug. 3, 2021). Plaintiff has shown neither. To the contrary, she admits she will not suffer any irreparable harm, and her requested injunction for rent abatement is no different from the monetary relief she could receive at law. She has no valid injunctive claim.

## II.      SUMMARY JUDGMENT IS PROPER ON PLAINTIFF'S HABITABILITY CLAIM

> a.      Plaintiff agreed to disclaim the warranty of habitability.

---

*McAleenan*, No. CV 19-1593 (JEB), 2019 WL 4225322 (D.D.C. Sept. 5, 2019), involuntarily institutionalized individuals, *Thorpe v. D.C.*, 916 F. Supp. 2d 65 (D.D.C. 2013), and other indefinite, involuntary detention situations.

The undisputed evidence shows that Plaintiff expressly agreed to language disclaiming the warranty of habitability that Missouri law would otherwise imply in her lease. Specifically, Plaintiff testified that the disclaimer language was clear in the document, that she read the disclaimer language, that she knew what the disclaimer language meant, and – most importantly – that she *specifically agreed* to the disclaimer when she signed each of her leases. (SUF ¶ 11).

Although "boilerplate" disclaimers are ineffective under Missouri law if they do not reflect an actual agreement by the parties, Missouri does not "reject outright the possibility of a valid disclaimer or modification under any set of facts." *Crowder v. Vandendeale*, 564 S.W.2d 879, 881 (Mo. banc. 1978). Thus, disclaimers are not void as a matter of law; what matters is whether an agreement was "in fact" reached that the warranty was disclaimed. *Id.* Here, Plaintiff's testimony that she did "in fact" read, understand, and agree to the disclaimer is unambiguous. (SUF ¶ 11).[3]

Plaintiff cannot avoid summary judgment by conflating her habitability claim with other, unrelated issues, but she certainly tries. First, Plaintiff argues the "premises" is only the apartment interior, but her lease disclaims "any and all implied warranties" without limitation to the premises. (SUF ¶ 10). Second, Plaintiff contends the disclaimer language is contradicted by preceding language concerning her acceptance of the premises, but that is separate from the warranty of habitability covering conditions that develop *subsequent to* a tenant taking possession. *See Chiodini v. Fox*, 207 S.W.3d 174, 176 (Mo. Ct. App. 2006). There is likewise no inconsistency between the disclaimer of *implied* warranties and PCCA's *express* agreement to act with customary diligence. As to the *implied* warranty, Plaintiff's voluntary agreement to the language is dispositive.

### b.  The Warranty of Habitability does not apply to Plaintiff's claims.

Separately, the warranty of habitability does not apply to Plaintiff's claims in any event.

---

[3] Notably, Ms. Rigsby is is a law school graduate who has taken the bar exam, not an average consumer. (Dkt. # 48, p.1). There is no reason to doubt her testimony that she understood and agreed to what she was signing.

1. **Scope of Plaintiff's Claims.**

At the outset, it is important to clarify that the only relevant claims relate to the air conditioning chiller failure in 2021. Plaintiff tries to muddy the water by arguing that the warranty of habitability "is not limited to singular issues." (Dkt. # 48, p. 36). But no class has been certified in this matter, and Plaintiff *herself* testified that she did not encounter any other issues at Plaza Club that affected her health, her safety, or her ability to inhabit her apartment (SUF ¶ 60). Plaintiff does not dispute this in her brief, instead arguing Plaza Club suffered from a pattern of "disinvestment." (*Dkt.* # 48, p. 35). [1] There is no individual cause of action for pattern of "disinvestment." The salient question is whether Ms. Rigsby's apartment was habitable.

Rather than point to evidence probative of her individual claim, Plaintiff cites documents suggesting some tenants lacked heat in 2015, some had water leaks in 2018, and others lacked hot water in 2022. (*Id.*) None of those issues affected *Ryann Rigsby*, who did not even live at Plaza Club in any of those years. They have no relevance to her individual claim.

2. **Under Missouri Law, the Warranty of Habitability does not apply to lack of air conditioning – the only relevant complaint here.**

Once the scope of Plaintiff's claim is clear, it is equally clear she has no claim at all. That is because air conditioning is not covered by the warranty of habitability under Missouri law. As an initial matter, Plaintiff has not cited any case in which a Missouri court found a breach of the warranty of habitability based on lack of air conditioning. This Court should not recognize Plaintiff's novel state law claim or declare a right to central air conditioning that does not exist under Missouri law. *See Witzman v.* Gross, 148 F.3d 988, 991 (8th Cir. 1998) ("A federal court should proceed with great caution when the effect of its ruling would be to broaden the law beyond

---

[1] In her SUF response, Plaintiff notes some mold and a broken garage gate, but the mold was not in her apartment and did not affect her health, and she did not park her car in the garage. (Dkt. # 40-2, 24:16-20; 82:4-5; 82:24-83:6). In any event, she does not raise these issues in her brief as a basis for finding uninhabitability – with good reason.

the point where any other court has yet ventured.") (citation omitted); *Birchler v. Gehl Co.*, 88 F.3d 518, 521 (7th Cir.1996) ("When confronted with a state law question that could go either way, the federal courts usually choose the narrower interpretation that restricts liability").

Putting that aside, Plaintiff offers no basis for expanding the scope of the warranty of habitability to cover air conditioning. "Habitability is measured by community standards, generally reflected in local housing and property maintenance codes." *Chiodini,* 207 S.W.3d at 176, citing *Detling v. Edelbrock,* 671 S.W.2d 265, 270 (Mo. banc 1984). Plaintiff concedes that, despite the existence of multiple applicable codes, *none* of them – neither the Kansas City Missouri Health Department Healthy Homes Rental Inspection Program Rules & Regulations nor the Kansas City Code of Ordinances Subdivision regarding Basic Sanitary and Comfort Facilities, nor any other code or regulation — contain air conditioning requirements. The only "violation" found by the Healthy Homes Inspection Program — apparently to a generic provision for broken appliances — was non-health hazardous and therefore not a breach. (SUF ¶ 28) *See Chiodini* 207 S.W.3d at 177 ("minor housing code violations not affecting the habitability of the property are not considered breaches"). This is dispositive, as the warranty of habitability creates "an obligation which the landlord fulfills by *substantial* compliance with the relevant provisions of an applicable housing code." *King v. Moorehard*, 495 S.W.2d 65, 75 (Mo. Ct. App. 1973) (emphasis added).

Plaintiff's arguments for allowing her habitability claim to proceed anyway have no merit. First, Plaintiff asserts that the question of what "community standards" apply is a jury question, citing cases regarding the warranties of merchantability and fitness. But, for the warranty of *habitability*, the Missouri Supreme Court outlined factors for "courts," not juries, to consider "[i]n determining whether the condition constitutes a material breach[.]" *Detling*, 671 S.W.2d at 270. The *court* sets the legal standard, and then a jury determines whether it was breached. The jury does not, itself, get to determine the applicable legal standard.

22

Regardless of whether the question is ultimately for the court or a jury, a plaintiff must produce sufficient evidence to show a genuine question of material fact in order to survive summary judgment. *Craftsman Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 386 (8th Cir. 2007). Even if there is no strict requirement that something be reflected in the housing code in order to be considered a "community standard" — which is questionable in light of *King* — that is at least "generally" the case. *Chiodini* 207 S.W.3d at 176. Plaintiff has offered no basis for deviating from that general rule. In particular, there is *no* evidence, nor citation to case law or housing codes, or *anything* else, that "community standards" require central air conditioning in every apartment.

Rather than cite any relevant evidence, Plaintiff notes that City Club's Operations Manual identifies lack of air conditioning as a "Maintenance Emergency." But the salient question is community standards for habitability, not City Club's national maintenance and customer service expectations for its employees. Habitability is determined by community standards reflected in housing codes, not a landlord's or management company's operational and customer service standards. Moreover, this particular Operations Manual cannot be relevant to "community standards" because it is issued by City Club, not PCCA; is issued for properties nationwide, not just Kansas City; and is specifically designated an internal document for internal use only. (Resp. PSF, ¶ 20). Moreover, Plaintiff omits the next page of the Operating Manual, which explains what the standard *is* in the event of a "Maintenance Emergency." In such an event, staff must be "alerted to the situation," and should "assess the situation and stop[] the issue from spreading to the best of their abilities." (Resp. PSF, ¶ 21). Plaintiff offers no evidence PCCA failed to meet this standard.

Plaintiff's observation that Kansas City has public cooling centers likewise provides no basis for concluding that the community expects air conditioning in all individual housing units. To the contrary, it indicates an expectation that some people may *not* have homes with air conditioning and therefore need someplace else to go. Indeed, news articles indicate that such centers are

specifically intended for people whose homes lack air conditioning and thus "may be hotter" than the cooling centers.[5] That would not be the framing if all homes had central air conditioning.

While Plaintiff writes off the Zillow and Apartment.com evidence as "advertising," those documents and the local housing codes are the only evidence in the record actually probative as to whether the community in Kansas City, Missouri expects central air conditioning as a matter of course, as they would with running water and indoor plumbing, or if they consider it a common amenity like a dishwasher. Both pieces of evidence show the latter. (Dkt. # 40, pp. 24-25). Plaintiff would have the Court believe over 41% of apartments in Kansas City are "uninhabitable" (or at least advertise themselves as such). (*See id.*). Setting a standard that 41% of apartments in Kansas City violate would not be consistent with the Eighth Circuit's directive to "proceed with caution" when broadening state law. *See Witzman*, 148 F.3d at 991.

c.     **Plaintiff has not shown a material question of fact with respect to habitability.**

Summary judgment is also proper because Plaintiff's apartment was not uninhabitable. Two pieces of evidence are dispositive here. First, Rigsby was offered another unit and *turned it down* because moving would have been "inconvenient." (*Id.* at ¶ 34). Inconvenience is not sufficient to demonstrate uninhabitability. *See Chiodini* 207 S.W.3d at 177 ("minor housing code violations not affecting the habitability of the property are not considered breaches"). *See also Berzito v. Gambino*, 308 A.2d 17, 22 (N.J. 1973) ("Not every defect or inconvenience will be deemed to constitute a breach of the covenant of habitability.").

Second, Rigsby *concedes she had working air conditioning* — it was simply a window unit that PCCA gave her money to buy rather than central air. Rigsby testified that the window unit did not work as well as she preferred, but that makes this case precisely on point with *Seymour v.*

---

[5] *See*, *e.g.*, https://fox4kc.com/weather/beat-the-heat-kansas-city-area-cooling-center-locations/#:~:text=Cooling%20Centers,that%20are%20open%20to%20help (last visited August 21, 2023)

*Switzer Tenant LLC*, 667 S.W.3d 619 (Mo. Ct. App. 2023). Similarly, the fact that Rigsby "chose" to purchase a more expensive air conditioner (using $300 in rent credits that PCCA *gave* her) is not evidence that the A/C credit from PCCA insufficient. (Dkt. # 40-2, 102:14-23). There is no violation of the warranty of habitability if the premises are restored to habitability, as PCCA did here. *Chiodini*, 207 S.W.3d at 176.

## III.    SUMMARY JUDGMENT IS PROPER ON PLAINTIFF'S MMPA CLAIMS.

### a.    Plaintiff has offered no evidence differentiating her "habitability" MMPA count from a garden-variety claim for breach of contract (Count III).

Plaintiff's first MMPA claim, in Count III, is based on an underlying breach of the warranty of habitability and fails for the same reasons her habitability claim fails. The MMPA version of this claim fails for the additional reason that Plaintiff offers no evidence to elevate her claim from a breach of warranty claim to an MMPA claim. Missouri courts have repeatedly held that a breach of contract, without more, is not sufficient to establish an MMPA claim. *Schuchmann v. Air Services Heating & Air Conditioning, Inc.*, 199 S.W.3d 228, 234 (Mo. Ct. App. 2006); *Kiechle v Drago*, 694 S.W.2d 292, 294 (Mo. Ct. App. 1985). Without any aggravating factor, the MMPA claim fails.

The only aggravating factor alleged is that PCCA purportedly "knew" it was renting Ms. Rigsby an apartment without working air conditioning when she signed her lease. But the evidence shows nothing of the sort. Initially, the complaints cited are inadmissible hearsay. *See Glover v. Bostrom*, 31 F.4th 601, 605 (8th Cir. 2022) (finding unsworn out-of-court complaints inadmissible for summary judgment purposes). Substantively, Plaintiff appears to show a handful of complaints about specific air conditioning outages in May and June of 2020 — *none* of which were in units leased to Plaintiff, and none of which suggest the issues were not resolved. The only indication that any issues even related to building-wide problems is a single complaint regarding the South Building, where Plaintiff never lived (Dkt. #48-3, p. 19). There is no evidentiary basis for Plaintiff's

25

speculation that PCCA "knew" or had reason to know her air conditioning in the Manor building would fail. Thus, there is nothing to elevate Plaintiff's claim above a breach of contract claim, and her MMPA claim fails. *See Hess v. Chase Manhattan Bank, N.A.*, 220 S.W.3d 758, 774 (Mo. banc 2007) (unlawful "omission" under MMPA is limited to "any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her.").

> **b. Plaintiff has offered no evidence that she was overcharged for utilities, and judgment is proper on her second MMPA claim (Count IV).**

At the outset, Plaintiff's MMPA claim for allegedly improper utility bills fails because the the bills were submitted to her *by* Paylease and she paid all amounts *to* Paylease. (SUF ¶ 54). PCCA was not involved with the process and cannot have committed a deceptive act in connection with the process. Plaintiff argues that she was "in contractual privity with PCCA" but privity is irrelevant, as this is not a breach of contract claim. *See Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007) (MMPA claim "does not [necessarily] contemplate a direct contractual relationship"). Rather, this claim is based on the premise that Plaintiff was billed more for utilities than she should have been. Since PCCA did not bill her *at all*, PCCA cannot have *over*-billed her.

In any event, Plaintiff's half-hearted attempt to provide evidence she was overcharged for utilities by *anybody* fails. The overarching theme is that Plaintiff has not shown even one instance where she was charged one amount but should have been charged a different amount instead.

Plaintiff first notes that "PCCA has issued credits in the past for improperly charging tenants on their share of gas utilities," but the evidence shows a single overcharge, by Paylease, for January 2022 — after Plaintiff left — and further shows it was rectified. (*See* Dkt. # 48-15).

Plaintiff's second purported piece of evidence is that the "provider expense" spreadsheet shows a slightly different amount for gas in April 2021 than the "April 2021" gas bills. But there is no actual discrepancy: the spreadsheet entry is for the service period from April 1-April 30, 2021,

but the Spire bill indicates it is for service provided from April 2, 2021 to May 1, 2021, so these numbers would not be expected to precisely match (Dkt. #40-33, p. 215). Further, the "provider expense" spreadsheet does not show how much the tenants were *charged* for utilities – it shows PCCA's *expenses*. Information about tenant charges is found in the Utility Recovery Performance report (Resp. PSF, ¶ 35) and the prebill documents (Dkt #40-34). The Utility Recovery Performance Report shows, for the service month of April 2021, PCCA recovered $7,551.94 for gas. (Resp. PSF, ¶ 35, Ex. D.). That amount is *less* than the $7,858.02 in gas charges Plaintiff identifies (PSF ¶ 31). Moreover, even if Paylease had overcharged the tenants as a collective for gas in April 2021, there is no evidence any of that excess was allocated to and paid *by Plaintiff*. Specifically, Plaintiff was charged $53.10 for gas supplied in April of 2021. (Dkt. # 40-34, p. 48). Plaintiff has not shown that she should have been charged some other amount instead.

Finally, Plaintiff points to the November 2020 entries on the provider expense spreadsheet for water and wastewater, and compares them to a KC Water bill for November 2020. Plaintiff notes the numbers do not add up to the same thing, and contends that means she was overcharged for water that month. But the KC Water bill cited is only for one of the two KC Water accounts associated with the property: the F&F Dunleith account. (Resp. to PSF, ¶¶ 33-34). In contrast, the spreadsheet encompasses that account *plus* the account in the name of Plaza Club City Apartments, which covers service for remainder of the property. (*Id.*) Of course the numbers are not the same. More importantly, in addition to pointing to the wrong spreadsheet again, Plaintiff again fails to provide any evidence connecting the alleged overcharge to her personally. In particular, for November 2020, the evidence shows Plaintiff was billed $29.05 for water and $54.06 for sewer services. (Dkt. # 40-34, p. 34). Plaintiff has not shown that those amounts should have been something else instead. Ultimately, there is no evidence Plaintiff was overcharged for water, sewer, or gas – in November 2020, April 2021, or any other month.

27

That last piece is important: since Plaintiff has no ascertainable loss, she has no MMPA claim. *Nixon v. Enter. Car Sales Co.*, No. 4:09CV1896 HEA, 2011 WL 4857941, at *7 (E.D. Mo. Oct. 13, 2011) (summary judgment granted where plaintiff claimed "some amount of damage was done" but failed to show actual damages). Plaintiff argues "the time for Ms. Rigsby to 'prove' her case has not arrived," but summary judgment *is* the "'put up or shut up' moment in a lawsuit.'" *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017) (citations omitted). Plaintiff must show "specific, admissible evidence" sufficient "to permit a trier of fact to make a finding in [her] favor[.]" *Id.* If Plaintiff needed more discovery, Fed. R. Civ. P. 56(d) provided a mechanism for her to obtain it. *See Ray v. Am. Airlines, Inc.*, 609 F.3d 917, 923 (8th Cir. 2010).

## IV.  PLAINTIFF'S "ESSENTIAL SERVICE" CLAIM FAILS AS A MATTER OF LAW.

Plaintiff asks this court to find that air conditioning constitutes an "essential service" under Missouri law, and specifically Mo. Stat. § 441.233(2). But Plaintiff has not cited a single case in which air conditioning was considered an "essential service" and this court should not recognize her novel state law theory. *See supra*, p. 7. More importantly, the claim makes no sense: air conditioning cannot be an essential *service* because it is not a *service* at all. While the statutory list of "electric, gas, water, or sewer service" is not exclusive, Plaintiff offers no basis for bringing air conditioning within the scope of the statute.  Plaintiff says this is a fact question, but statutory interpretation is a question of law for the Court. *In re Graven*, 936 F.2d 378, 384–85 (8th Cir. 1991). That said, the facts are illustrative: Plaintiff replaced her A/C with a window unit. If electric or gas service were cut off, she would have been at the mercy of the landlord. That is a key difference between an "essential service" and an appliance.

Even if the statute applied, Plaintiff cannot establish the willfulness element because PCCA did not willfully break its own chillers. Plaintiff contends PCCA "knew its chillers were past their usable life," but this argument has no evidentiary support. Plaintiff merely cites evidence that

PCCA planned to replace (some) chillers in 2021, then leaps to the conclusion that it "knew" they (all) would fail before then. Plaintiff's speculation about PCCA's motivation for investing capital in the property is not evidence. Moreover, even knowledge would not make the actions "willful."

## V. SUMMARY JUDGMENT IS PROPER ON PLAINTIFF'S CONTRACT CLAIM

Plaintiff's claim for breach of express contract fails. At a threshold level, there is no specific evidence Plaintiff provided notification through the portal, which was a condition precedent under the contract and thus necessary for her claim. Plaintiff puts forth no documentary evidence as to any purported notice she gave regarding the chiller failure before they were fixed on June 24, 2021. (PSF ¶ 63). Plaintiff testified generally that she used the portal, but she cannot avoid summary judgment through self-serving testimony without *specific* facts sufficient to establish her claim. *See e.g., Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) ("The nonmovant ... must come forward with 'specific facts showing that there is a genuine issue for trial.'").

Moreover, PCCA did not breach the terms of the contract. The contract does not promise Plaintiff will *have* air conditioning or that any A/C provided will be operational 100% of the time, so the mere fact that it was down for some period is not a breach. Conceding that, Plaintiff pivots to contend PCCA breached its agreement to maintain A/C "with customary diligence." But Plaintiff offers no evidence or case law to show what the standard for customary diligence *is* in this context, let alone whether PCCA violated it during her lease term. The only evidence of PCCA's actions during Plaintiff's lease term shows it replaced the chillers promptly once it determined they were irreparable. (SUF ¶¶ 20-40). PCCA further provided a window air-conditioner for Plaintiff to use until a replacement chiller was obtained. Plaintiff offers no evidence PCCA could have acted faster under the circumstances, let alone that "customary diligence" required it to do so.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of PCCA.

Respectfully submitted,

**AMUNDSEN DAVIS, LLC**

<u>/s/ Ronald D. Balfour</u>
Ronald D. Balfour
IL Bar No. 6307658 (admitted *pro hac vice*)
Michael M. Chang
IL Bar No. 6323721 (admitted *pro hac vice*)
150 North Michigan Avenue, Suite 3300
Chicago, Illinois  60601
Telephone: (312) 894-3200
Facsimile:  (312) 894-3210
Email:  RBalfour@amundsendavislaw.com
        MChang@amundsendavislaw.com

**WATTERS WOLF BUB HANSMANN
LLC**

Joseph J. Roper              #36995
Abbigale A. Gentle           #47879
4435 Main St., Suite 920
Kansas City, Missouri 64111
Telephone: (816) 782-8881
Facsimile:  (636) 798-0693
Email: jroper@wwbhlaw.com
        agentle@wwbhlaw.com

**ATTORNEYS FOR DEFENDANT
PLAZA CLUB CITY APARTMENTS,
LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing document was electronically filed with the United States District Court, Western District of Missouri, via the Court's CM/ECF Filing system, which will send notification of such filing to counsel of record, on August 21, 2023.

/s/Ronald D. Balfour