IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RYANN RIGSBY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:23-CV-00061-BCW |
| PLAZA CLUB CITY APARTMENTS LLC, | ) ) ) |
| Defendant. | ) ) |

## ORDER

Before the Court is Defendant Plaza Club City Apartments LLC's motion for summary judgment (Doc. #39). The Court, being duly advised of the premises, grants said motion.

## BACKGROUND

Plaintiff Ryann Rigsby ("Plaintiff") signed a residential lease with Defendant Plaza Club City Apartments LLC ("PCCA") starting September 11, 2020, and ending September 15, 2021. (Doc. #1). Beginning in the late spring of 2021, Plaintiff's air conditioning ("AC") was not functioning properly such that, during the summer of 2021, Plaintiff was periodically without AC. Plaintiff alleges PCCA had previous knowledge of its AC issues but consistently fails to maintain its properties, leaving tenants with unsafe and inadequate AC. Additionally, during her tenancy, Plaintiff alleges she overpaid for utility services and unnecessary fees due to PCCA's improper determination of applicable utility and fee amounts.

On July 2, 2021, Plaintiff filed a class action petition in the Circuit Court of Jackson County, Missouri against PCCA alleging Count I, request for injunction; Count II, violations of the Missouri Merchandising Practices Act ("MMPA")—implied warranty of habitability; Count III, breach of the implied warranty of habitability; Count IV, violations of the MMPA—utility charges and fees; Count V, violations of Mo. Rev. Stat. § 441.233(2); and Count VI, breach of

1

contract. (Doc. #1). On January 30, 2023, PCCA filed a notice of removal to this Court. (Doc. #1).

On June 16, 2023, the parties filed a joint motion requesting the Court suspend Plaintiff's deadline for filing a class certification motion until the Court ruled on PCCA's forthcoming summary judgment motion. (Doc. #33). The Court granted the motion (Doc. #34) and PCCA subsequently filed the instant summary judgment motion on June 30, 2023 (Doc. #39). On August 2, 2023, Plaintiff filed her opposition (Doc. #48) and on August 21, 2023, PCCA filed its reply in support of the instant motion (Doc. #52).

## UNCONTROVERTED MATERIAL FACTS

PCCA owns apartment buildings located at 609 W. 46th Street (the "Manor building"), 4607 and 4609 Jefferson Street (the "North building"), and 4617, 4619, and 4621 Jefferson Street (the "South building"), in Kansas City, Missouri. (Doc. #40-1); (Doc. #48-1 at 17:22-18:20); (Doc. #52). Together, these buildings form an apartment complex called Plaza Club City Apartments ("Plaza Club"). Id. Plaintiff found Plaza Club by searching the internet for places to live in Kansas City. (Doc. #40-2 at 19:3-8). Due to Plaza Club's proximity to her law school campus, Plaintiff signed a lease on July 28, 2020 to share an apartment unit with a roommate for a lease term beginning August 8, 2020. Id. at 21:21-22:17.

Following issues with her roommate, Plaintiff signed a second lease with Plaza Club in a different unit for a lease term of September 11, 2020, to September 15, 2021. Id. at 23:2-7 & 28:7-12. Both of Plaintiff's leases contained the following provision:

> **25. CONDITIONS OF THE PREMISES AND ALTERATIONS.**
> YOU ACCEPT THE APARTMENT, FIXTURES, AND FURNITURE AS IS, EXCEPT FOR CONDITIONS MATERIALLY AFFECTING THE HEALTH OR SAFETY OF ORDINARY PERSONS. TO THE EXTENT PERMITTED BY LAW, [PCCA] DISCLAIM[S] ANY AND ALL IMPLIED WARRANTIES,

2

> **INCLUDING, BUT NOT LIMITED TO (IF APPLICABLE) THE IMPLIED WARRANTY THAT THE PREMISES IS SUITABLE FOR RESIDENT'S HABITABILITY OR (IF APPLICABLE) ANY IMPLIED WARRANTY OF MERCHANTABILITY.**

(Doc. #48-2 at 5).

Plaintiff read this lease language and signed her lease. (Doc. #40-2 at 33:14-34:5; 34:13-23). Both of Plaintiff's leases also provided that notices or requests for maintenance needed to be submitted through "either the online tenant/maintenance portal or signed in writing and delivered to [PCCA's] designated representative (except in cases of . . . emergency). " (Doc. #48-2 at 5).

### A. AC issues at Plaza Club

Plaza Club has a total of six "chillers" that provide AC to the property—two for each building. (Doc. #40-3). The chillers are shut off around every October for the fall and winter season and turned back on around April. (Doc. #40-4).

In March of 2015, a property condition report was created for PCCA indicating that, of the six chillers, one was not operable and four of them were reaching the end of their service life. (Doc. #48-16). And, since as early as 2017, Plaza Club has experienced periodic AC outages impacting apartment units in at least one of its three buildings due to the chillers' failure to function properly. (Doc. #48-18). For example, in June and/or July of 2020, Plaza Club received complaints from certain tenants noting that the AC was not functional, so Plaza Club worked with third-party contractor Lippert Mechanical to rectify the issues and perform maintenance on the affected chillers. (Doc. #40-5). However, Plaintiff was not living at PCCA during these incidents and testified that she did not have AC issues in August and/or September of 2020 when she first moved in. (Doc. #40-2 at 26:7-13).

On April 22, 2021, about a week before the chillers were scheduled to be turned back on during Plaintiff's tenancy, third-party contractor P1 Group, Inc. ("P1") performed maintenance

work on all six chillers (condenser coil cleaning) and was working on providing a list of proposed repairs. (Doc. 40-6). In or about late April 2021, as per schedule, PCCA began the process of turning the chillers on. (Doc. #40-7). However, in or about late April 2021, residents reported being without AC. (Doc. #40-8). Accordingly, PCCA had conversations with P1 regarding the AC issue and had on-site meetings on April 29, 2021. Id.

On April 30, 2021, PCCA assessed that two of the oldest chillers had "failed tube bundles and [were] leaking water profusely when attempting to fill." (Doc. #40-9). On May 3, 2021, P1 indicated these two chillers would need to be replaced instead of repaired and reported that the replacements were being priced. (Doc. 40-10). On May 4, 2021, PCCA ordered one if its employees to "[h]ave [purchase orders] issue[d] asap for the repairs required below. Once I get the chiller replacement cost, I will forward." (Doc. #40-11).

While P1 was in the process of ordering parts, PCCA sent an email to its residents stating "[p]urchase orders for all needed repairs have been made today. [We are] awaiting the official start time for the repairs, [we] expect repairs to start sometime this week before the weather spikes again. [We] will send and update with the specific days and times once [we] receive that today and/or tomorrow from our third-party vendor." (Doc. #40-12 at 2).

P1 worked with Carrier—a heating, ventilation, and air conditioning company—to secure replacement chillers that were in stock. (Doc. #40-13). On May 11, 2021, P1 submitted to PCCA revised pricing for the in-stock Carrier chillers. (Doc. #40-14). On May 18, 2021, PCCA sent an email to a resident stating some apartment units affected by the faulty chillers had operational AC again and reported that the South and Manor buildings would be getting new chillers. (Doc. #40-15). However, the air conditioning in Plaintiff's apartment was not working when she tried

4

to turn it on in April or May of 2021 due to a failure of the chiller that served her specific apartment unit. (Doc. #40-2 at 116:17-21).

PCCA informed Plaintiff and other residents whose apartments were affected by the AC outage that they would receive a $150 rent credit, and an additional $200 credit to reimburse them for purchasing an in-unit air conditioner. (Doc. #40-19). Furthermore, an additional $150 rent credit was provided in July such that, in total, affected residents, including Plaintiff, received $300 in rent credits and a $200 reimbursement for in-unit air conditioners. (Doc. #40-2 at 106:6-103:12). PCCA also offered to relocate Plaintiff to an apartment unit unaffected by the AC outage, but Plaintiff declined. Id.

Nevertheless, Plaintiff did purchase an in-unit air conditioner. (Doc. #40-2 at 102:14-103:8). Plaintiff testified the in-unit air conditioner did not keep her apartment "comfortably cool," however. Id. To escape the heat in her apartment, Plaintiff would return home to Rolla, Missouri on the weekends. (Doc. #40-2 at 61:19-62:3).

On June 16, 2021, the Kansas City Missouri Health Department (the "Health Department") conducted an inspection investigation of Plaintiff's apartment unit in response to a complaint. (Doc. #40-2 at 283-85). The inspection revealed two violations—one regarding the dysfunctional AC and the other regarding the lack of an operable ventilation system in the bathroom. (Doc. #40-2 at 284). The Health Department deemed the violations "non-health hazardous" but noted they "must be corrected within 10 days." Id.

On June 11, 2021, P1 reported that certain parts for the repair of the chillers had arrived and that it planned to start repairs the morning of the following day. (Doc. #40-20). However, on June 14, 2021, P1 reported that some of the repairs could not be completed because "the pump housing is damaged." (Doc. #40-21).

5

On June 21, 2021, the installation of the new replacement chillers began. (Doc. #40-23). On June 23, 2021, PCCA sent an update to tenants in the Manor building regarding the repairs stating that PCCA had "approved our vendor to bring in extra manpower as well as work overtime for the fix. Tomorrow we will have an extra 5 mechanics working on the wiring for both buildings to ensure the chillers are operational as soon as possible. [PCCA] will also be issuing an additional credit of $150 for the month of July for the delays due to logistics and the pandemic." (Doc. #40-19 at 12).

When the installation of the replacement chillers began, PCCA indicated to residents that it expected the AC to be fully functional by June 24, 2021. (Doc. #40-23). Subsequently, on June 24, 2021, Plaintiff texted her mom that she had AC. (Doc. #40-2 at 105:21-106:4). However, on July 29, 2021, Plaintiff submitted an AC maintenance request indicating her AC was not working at that time.

### B. Utility charges and fees

Plaintiff's lease explained that her water, sewage, gas, trash, stormwater, and cooling charge bills would be billed by the service provider and allocated to the resident by third-party billing company, Paylease. (Doc. #40-2). The lease further explains that the allocation "is an estimate of usage by the resident," and to the extent an allocation is used "[PCCA] or our billing company will calculate your allocated share of the utilities and services provided and all costs in accordance with state and local statutes." Id. The allocation process includes an accounting for the deduction of certain percentages attributable to common areas which are not allocated to residents, using amounts determined in accordance with industry standards. (Doc. #40-27). Specifically, for electric and cooling, up to 75% of the total utility charge incurred by PCCA for the property is allocated among the residents while the remainder is paid by PCCA; up to 95%

6

for gas and trash; and up to 90% for water and sewage. Id. However, PCCA, itself, does not determine the amount of each individual utility fee owed—Paylease does. (Doc. #40-17-28).

Plaintiff testified that she thought her utility bills were high based on conversations with her mom. (Doc. #40-2 at 48:1-10). Plaintiff also testified that she was unaware what the normal cost of utilities were in the Kansas City area and attributed the bills to the higher cost of living in the Kansas City area. (Doc. #40-2 at 48:6-49:11). Even so, Plaintiff paid each of her utility bills in full. (Doc. #40-2 at 52:18-53:5).

On either July 31 or August 1, 2021, before the actual end date of Plaintiff's lease, she moved out of PCCA. (Doc. 40-2 at 61:6-18).

## LEGAL STANDARD

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment bears the burden to establish that there is no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, the court evaluates the evidence in the light most favorable to the nonmoving party and the nonmoving party is entitled to "the benefit of all reasonable inferences." Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991); White v. McKinley, 519 F.3d 806, 813 (8th Cir. 2008).

7

# ANALYSIS

PCCA argues there are no genuine issues of material fact, and it is entitled to summary judgment on all Counts alleged in the complaint. (Doc. #39). PCCA's specific arguments in support of summary judgment are as follows: (1) Count I, request for injunction fails because: (a) Plaintiff has no standing to assert a claim for injunctive relief and (b) the claim fails on its merits because Plaintiff will not suffer irreparable harm if the injunction is denied; (2) Count III, breach of the implied warranty of habitability fails because Plaintiff's lease conspicuously disclaimed the implied warranty of habitability; (3) Count II, violations of the MMPA—implied warranty of habitability fails because Count III fails; (4) Count IV, violations of the MMPA—utility charges and fees fails because Plaintiff cannot sustain an MMPA claim based on her belief that her utility charges were high; (5) Count V, violation of Mo. Rev. Stat. § 441.233(2) fails because Plaintiff cannot show any willful conduct on the part of PCCA; and (6) Count VI, breach of contract fails because PCCA did not breach the lease agreement.

**A. PCCA is entitled to summary judgment on Count I, request for injunction.**

In Count I, Plaintiff alleges that PCCA "habitually fails to perform needed maintenance and timely complete repairs which jeopardizes the safety and security of its tenants." (Doc. #1). Accordingly, Plaintiff requests a temporary injunction that "enjoin[s] Defendant from collecting rent until this Court finds that Defendant has adequately fixed the complaints made by the Plaintiff – tenants." Id. However, PCCA argues Plaintiff lacks standing to seek injunctive relief because she no longer lives at PCCA. (Doc. #39). Furthermore—and independent of Plaintiff's lack of standing—PCCA argues Plaintiff's request for temporary injunction fails on its merits because she cannot demonstrate irreparable harm even if she still lived at PCCA.

In opposition, Plaintiff argues she is entitled to seek injunctive relief prior to class certification, even if her individual claim is moot, because of two exceptions to the standing rule: (1) the "capable of repetition, yet evading review" exception, and (2) the "inherently transitory" exception. Plaintiff does not address PCCA's argument regarding irreparable harm. (Doc. #48).

"Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). However, [f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003). Furthermore "[w]hen there is an adequate remedy at law, a preliminary injunction is not appropriate." Id. (citing Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 738 (8th Cir. 1989)).

The Court finds PCCA is entitled to summary judgment on Count I. Even if Plaintiff had standing to seek injunctive relief, she cannot succeed on the merits of her claim because she cannot demonstrate irreparable harm.

"To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Roudachevski v. All-Am. Care Centers, Inc., 648 F.3d 701, 706 (8th Cir. 2011) (citations omitted). Here, Plaintiff does not address PCCA's arguments regarding irreparable harm. The Court is thus left to presume the purported harm is limited to the habitability claims Plaintiff alleges during her tenancy with PCCA. However, Plaintiff's tenancy ended in 2021 and the summary judgment evidence does not indicate that the issues raised by Plaintiff are ongoing

9

or currently have any effect on Plaintiff or current tenants. Therefore, because Plaintiff cannot demonstrate irreparable harm, PCCA's motion for summary judgment is granted as to Count I. Lewis, 346 F.3d at 844.

### B. PCCA is entitled to summary judgment on Count III, breach of the implied warranty of habitability.

PCCA argues it is entitled to summary judgment on Count III because Plaintiff knowingly signed her lease with the understanding that PCCA expressly disclaimed any implied warranty of habitability. (Doc. #39). PCCA further argues if the implied warranty of habitability had not been disclaimed, it would not apply because the warranty does not cover AC. In opposition, Plaintiff argues the disclaimer is ambiguous and is unenforceable to the benefit of PCCA. (Doc. #48). Further, Plaintiff argues its implied warranty of habitability claim is not limited to the singular issue of AC but based upon PCCA's pattern of disinvestment in its properties.

Under Missouri law, a tenant must prove the following four elements in order to proceed on a claim for breach of the implied warranty of habitability: "(1) entry into a lease for residential property; (2) the subsequent development of dangerous or unsanitary conditions on the premises materially affecting the life, health and safety of the tenant; (3) reasonable notice of the defects to the landlord; and (4) subsequent failure to restore the premises to habitability." Chiodini v. Fox, 207 S.W.3d 174, 176 (Mo. Ct. App. 2006) (citing Detling v. Edelbrock, 671 S.W.2d 265, 270 (Mo. 1984)). Furthermore, "[a] breach of implied warranty must be more than a de minimis violation or minor housing code violation." Seymour v. Switzer Tenant LLC, 667 S.W.3d 619, 626 (Mo. Ct. App. 2023) (citations omitted).

Even assuming the implied warranty of habitability was not disclaimed, and that AC is covered under the warranty, the Court finds PCCA is entitled to summary judgment on Count III.

Here, Plaintiff's claim for breach of the implied warranty of habitability fails on element two of the analysis. Chiodini, 207 S.W.3d at 176. Specifically, Plaintiff argues Count III is based on PCCA's pattern of disinvestment in its apartment complexes; however, Plaintiff's arguments regarding PCCA's disinvestment predates her tenancy and otherwise fail to demonstrate that "the condition of the premises was of such a nature as to render the [property] unsafe or unsanitary." Seymour, 667 S.W.3d at 626.

Nor do the uncontroverted facts show that Plaintiff's life, health, and safety was materially impacted by the AC outages. Id. Here, Plaintiff's apartment was inspected by the Health Department and the violations observed, including the dysfunctional AC, were specifically deemed "non-health hazardous." (Doc. #40-2 at 284). Furthermore, Plaintiff's in-unit air conditioner, while perhaps not ideal, could at least cool the area where it was placed, and Plaintiff was able to move it around her apartment as needed. (Doc. #40-2 at 102:24-103:8).

Finally, the initial AC outage was rectified by PCCA such that even if Plaintiff prevailed on the first three elements of the breach of implied warranty of habitability analysis, her claim would fail as to the fourth element. Chiodini, 207 S.W.3d at 176; (Doc. #40-2 at 105:21-106:4). Therefore, apart from Plaintiff's own testimony, the contention that her apartment was unlivable is otherwise unsupported. And Plaintiff's conclusory testimony is not enough to defeat summary judgment. Ballard v. Heineman, 548 F.3d 1132, 1136 (8th Cir. 2008) (citing Allen v. Entergy Corp., 181 F.3d 902, 906 (8th Cir. 1999)) ("explaining that conclusory [testimony] devoid of specific factual allegations rebutting the moving party's evidence cannot defeat a summary judgment motion"). Accordingly, PCCA is entitled to summary judgment on Count III.

### C. PCCA is entitled to summary judgment on Count II, violations of the MMPA—implied warranty of habitability and Count IV, violations of the MMPA—utilities and fees.

Both Count II and IV allege violations of the MMPA. (Doc. #1). As to Count II, based on the implied warranty of habitability, PCCA argues it is entitled to summary judgment because Plaintiff has no underlying claim for breach of the implied warranty of habitability. (Doc. #40). Also, PCCA argues that even if Plaintiff's breach of the implied warranty of habitability claim survives the instant motion for summary judgment, it is still entitled to summary judgment on Count II because: (1) Plaintiff testified she was never misled by anyone at PCCA about the condition of her apartment, (2) there is no evidence of any unfair practice on behalf of PCCA with respect to utility charges, and (3) PCCA is in fact close to Plaintiff's law school which was her basis for choosing to live there.

With respect to Count IV, based on Plaintiff's utility bills and fees, PCCA argues it is entitled to summary judgment for the following reasons: (1) it is undisputed that Paylease and Evergy—not PCCA—issued utility bills to Plaintiff, (2) there was no deception or unfair practice associated with Plaintiff's utilities, and (3) Plaintiff suffered no ascertainable loss caused by Paylease's utility billing practices.

Plaintiff, however, argues PCCA is not entitled to summary judgment on Count II or Count IV. (Doc. #48). As to Count II, Plaintiff argues the fact that PCCA held itself out as a purveyor of habitable apartments is sufficient to create a fact question for the jury. As to Count IV, Plaintiff argues that summary judgment is not appropriate because: (1) in the past, PCCA has issued credits related to utility overbilling and (2) Plaintiff has introduced examples of overbilling. Additionally, Plaintiff argues that PCCA is liable for Count II, though Paylease issued her utility bills, because Plaintiff is in contractual privity with PCCA and not Paylease.

12

To prevail on an MMPA claim, a plaintiff must show she "purchased merchandise . . . from [PCCA]; (2) for personal, family or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful under the [MMPA]." Vitello v. Natrol, LLC, 50 F.4th 689, 693 (8th Cir. 2022) (citing Murphy v. Stonewall Kitchen, LLC, 503 S.W.3d 308, 311 (Mo. Ct. App. 2016)). "[U]nlawful acts [under the MMPA] include "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Owen v. Gen. Motors Corp., 533 F.3d 913, 922 (8th Cir. 2008) (citing Mo. Rev. Stat. § 407.020(1)). Furthermore "the plain language of the MMPA demands a causal connection between the ascertainable loss and the unfair or deceptive merchandising practice [at issue]." Id.

The Court finds PCCA is entitled to summary judgment on Count II. Plaintiff's Count II is expressly premised on Count III, breach of the implied warranty of habitability. See (Doc. #1-1 at ¶57 & ¶58). But as discussed above, Plaintiff cannot sustain her claim for breach of the implied warranty of habitability. Therefore, Count II necessarily fails consistent with the analysis as to Count III.

PCCA is also entitled to summary judgment on Count IV. Even assuming Count IV is properly brought against PCCA and not Paylease and/or Evergy, Plaintiff has not identified any unlawful act with respect to her utility bills. Vitello, 50 F.4th at 693. Here, Plaintiff testified that she believed her utility bills were high based on conversations she had with her mom. (Doc. #40-2 at 48:1-10). Yet Plaintiff's belief is not necessarily indicative of an unlawful act within the meaning of the MMPA. Nor does Plaintiff otherwise argue that there was any "deception, fraud, false pretense, false promise, misrepresentation . . . ." associated with her utility bills. Owen, 533

13

F.3d at 922. Instead, Plaintiff argues Count IV survives summary judgment because (1) in the past, PCCA has issued credits related to utility overbilling and (2) Plaintiff has introduced examples of overbilling. But this evidence does not relate to *Plaintiff's* utility bills, nor is it necessarily indicative of an unlawful act under the MMPA. In fact, Plaintiff's evidence appears to support the opposite conclusion—that where PCCA identified instances of overbilling, it took steps to compensate the affected tenants.

Additionally, even if Plaintiff had identified an unlawful act with respect to her utility charges, she has not shown that she suffered an ascertainable loss. In the complaint, Count IV states that Plaintiff and class members "suffered ascertainable losses in an amount to be determined at trial[]" (Doc. #1-1 at ¶ 95), but other than this conclusory statement, Plaintiff has not provided any summary judgment evidence to substantiate that said losses exist. Indeed, when PCCA sought specifics regarding losses related to utility overbilling in May of 2022, Plaintiff stated she was "still gathering her utility charge information" and would "supplement her response [to PCCA's interrogatory] when all necessary information has been gathered." (Doc. #40-29 at 10).

Plaintiff's utility bills are included as part of the summary judgment evidence. (Doc. #40-2). Yet, to date, Plaintiff has not provided any supplemental information regarding her losses such that, even construing all reasonable inferences in Plaintiff's favor, it appears that such losses either do not exist or are not ascertainable. Accordingly, the instant summary judgment motion is granted as to Count IV. Vitello, 50 F.4th at 694-95 (summary judgment proper on MMPA claim where moving party cannot show "ascertainable loss resulting from [an] unlawful act[]").

### D. PCCA is entitled to summary judgment on Count V, violation of Mo. Rev. Stat. § 441.233(2).

PCCA argues it is entitled to summary judgment on Count V for the following reasons: (1) there is no evidence it acted willfully by intentionally cutting off Plaintiff's AC, and (2) as a matter of law AC is not an "essential service" within the meaning of Mo. Rev. Stat. § 441.233(2). In opposition, Plaintiff argues PCCA acted willfully since it had a plan to replace its chillers in 2021, notwithstanding the AC outage, because it knew its chillers were already past their useful life. Plaintiff further represents that AC is an essential service because it is powered by electricity which is a covered service under the statute.

Section 441.233(2) applies to landlords that "willfully diminish[]" essential services, including electric by "interrupting or causing the interruption" of the same. Mo. Rev. Stat. § 441.233(2). Assuming AC is an essential service within the meaning of § 441.233(2), Plaintiff cannot show that PCCA acted willfully in this regard. See Mathews v. B & K Foods, Inc., 332 S.W.3d 273, 277 (Mo. Ct. App. 2011) (quoting BLACK'S LAW DICTIONARY 1599 (6th ed. 1990) ("Willful is defined as proceeding from a conscious motion of the will; voluntary; knowingly[;] deliberate; intending the result which actually comes to pass; designed; intentional; purposeful; not accidental or involuntary.'")). PCCA did indicate to a resident by email that it planned to replace its chillers in 2021, but this fact, standing alone, is not evidence demonstrating PCCA deliberately intended to interfere with the AC. (Doc. #48-27). Therefore, because Plaintiff cannot show that PCCA deliberately intended to interrupt the AC, the instant summary judgment motion is granted as to Count V.

### E. PCCA is entitled to summary judgment on Count VI, breach of contract.

PCCA argues it is entitled to summary judgment on Count VI because: (1) there is no specific term in Plaintiff's lease that she would be provided AC 100% of the time, (2) Plaintiff

15

did not provide any notice of her AC issues through the tenant portal which is a condition precedent for any claim for repair, and (3) PCCA repaired the AC in Plaintiff's apartment with customary diligence. (Doc. #40). In opposition, Plaintiff argues PCCA did not act with customary diligence in maintaining her AC and that PCCA otherwise breached the lease agreement because of its breach of the implied warranty of habitability. (Doc. #48).

First, to the extent Plaintiff alleges breach of contract based on breach of the implied warranty of habitability, the argument is denied consistent with the preceding discussion regarding Count III. Furthermore, PCCA is entitled to summary judgment on Count VI regarding its obligation to act with "customary diligence" in maintaining Plaintiff's AC equipment.

Plaintiff's lease agreement includes an express term that PCCA will act with "customary diligence" to "maintain . . . A/C equipment." (Doc. 40-2). However, neither the Eighth Circuit nor the Missouri courts have articulated a specific standard with respect to "customary diligence." Even so, the Court finds as instructive the definition of the following terms:

> **custom**, *n.* (13*c*) 1. A practice that by its common adoption and long, unvarying habit has come to have the force of law. See usage (1). – **customary**, adj.
> **diligence.** (14c) . . . 2. The attention and care required from a person in a given situation . . . .
> **due diligence.** (18c) 1. The diligence reasonably expected from, and ordinarily exercised by a person who seeks to satisfy a legal requirement or to discharge an obligation. – Also termed *reasonable diligence*; *common diligence*.

BLACK'S LAW DICTIONARY 484, 573 (11th ed. 2019).

It follows, then, that whether PCCA acted with customary diligence in maintaining Plaintiff's AC is a question of reasonableness—specifically, whether PCCA exercised "[t]he diligence reasonably expected from, and ordinarily exercised by" a landlord obligated to maintain AC equipment in like circumstances. Id.

16

"Generally, a question of reasonableness is a question of fact for the jury rather than a question of law for the court." Watters v. Travel Guard Int'l, 136 S.W.3d 100, 109 (Mo. Ct. App. 2004). However, "the question of reasonableness can be determined as a matter of law based upon undisputed facts." Id. (citing Wunsch v. Sun Life Assurance Co. of Can., 92 S.W.3d 146, 153 (Mo. Ct. App. 2002)). Specifically, "when fair-minded people, exercising reasonable judgment, could [not] reach different conclusions on the issue in controversy[,]" summary judgment is properly granted as to that issue. Id.; Drury Co. v. Mo. United Sch. Ins. Couns., 455 S.W.3d 30, 39 (Mo. Ct. App. 2014) (holding questions of fact do not exist where "reasonable minds could not differ[.]").

Here, whether PCCA acted with customary diligence to maintain Plaintiff's AC equipment can be determined as a matter of law based on the undisputed facts. Watters, 136 S.W.3d at 109. Specifically, the uncontroverted facts demonstrate that once PCCA learned of the AC outages affecting Plaintiff beginning in April 2021, it: (1) worked with third-party contractor P1 to determine what repairs and/or replacements needed to be performed, (2) placed orders for replacement chillers after determining that some were irreparable, (3) communicated with affected residents to keep them apprised of the status of the repairs throughout the period in question, (4) approved overtime hours and extra manpower to get the replacement chillers operational as soon as possible, (5) provided a total of $300 in rent credits and a $200 reimbursement for window unit air conditioners, and (6) offered to relocate Plaintiff to a different unit that was not experiencing AC issues during the repairs. Further, PCCA informed residents that it expected to restore AC on June 24, 2021, and on that day, Plaintiff texted her mom that she did in fact have AC. In sum, the undisputed facts demonstrate that, under the circumstances, PCCA was diligent in its effort to rectify the AC outages and made efforts to

17

Case 4:23-cv-00061-BCW   Document 53   Filed 10/04/23   Page 17 of 18

accommodate residents for the inconvenience. See LimoLiner, Inc. v. Dattco, Inc., 809 F.3d 33, 40 (1st Cir. 2015) (no breach of contract and 3-month repair period was reasonable where "a number of critical parts" were missing, "significant repair work" was necessary, and "the extent of [the repairs] was originally unforeseen by the parties.").

Even though Plaintiff subsequently experienced another AC outage on July 29, 2021[1] after the chillers had been replaced, this fact, standing alone, is not enough to demonstrate PCCA's failure to maintain Plaintiff's AC with customary diligence. Hines v. Mercedes-Benz USA, LLC, 358 F. Supp. 2d 1222, 1231 (N.D. Ga. 2005) (no genuine issue of material fact and 2-month repair time reasonable even though a subsequent repair was needed thereafter). Nor is Plaintiff's argument regarding PCCA's "long history" of failures persuasive, whereas here (1) the other AC outages at issue occurred outside of Plaintiff's tenancy and did not affect her and (2) the simple fact that the AC was down at times does not mean that PCCA breached its duty to maintain AC equipment with customary diligence. Therefore, Plaintiff's argument in this respect is denied and PCCA is entitled to summary judgment on Count VI. Accordingly, it is hereby

ORDERED PCCA's motion for summary judgment (Doc. #39) is GRANTED.

IT IS SO ORDERED.

Date: October 4, 2023 /s Brian C. Wimes
JUDGE BRIAN C. WIMES
UNITED STATES DISTRICT COURT

---

[1] Plaintiff also vacated her apartment unit 2-3 days after submitting this maintenance request. (Doc. 40-2 at 61:6-18). Whether the July 29, 2021 AC issue was resolved is not a part of the summary judgment evidence.